# 24-1948

## In the United States Court of Appeals
### FOR THE SECOND CIRCUIT

BURGIOUS FRAZIER, JR., WAYNE KRUG, BEN PEREZ, VANESSA SZAJNBERG, NICHOLAS TAPALANSKY, SHELLY YIP, YOSUB KIM,

*Petitioners-Appellees*,

v.

X CORP., formerly known as Twitter, Inc.,
X HOLDINGS CORP, formerly known as X Holdings I, Inc.,

*Respondents-Appellants*.

On Appeal from the United States District Court for the
Southern District of New York, No. 24-cv-2135, Hon. Jed S. Rakoff

## BRIEF OF APPELLANTS

MELISSA D. HILL
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
(212) 309-6000

MICHAEL E. KENNEALLY
JAMES D. NELSON
BRENDAN J. ANDERSON
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000

*Counsel for Respondents-Appellants*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, counsel for Appellants certify that X Corp. is wholly owned by X Holdings Corp., a privately held corporation. No publicly held corporation owns 10% or more of X Corp.'s stock. No publicly held corporation owns 10% or more of the stock of X Holdings Corp.

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement...............................................................i

Table of Authorities.........................................................................iv

Introduction................................................................................ 1

Statement of Jurisdiction.................................................................. 7

Statement of the Issues.................................................................... 7

Statement of the Case ..................................................................... 8

I. Petitioners signed the DRA and did not make use of their right to opt out of the agreement. ................................................... 8

II. Petitioners filed this proceeding to compel X Corp. to pay their arbitration fees. ...................................................................12

Summary of Argument......................................................................18

Standard of Review .......................................................................21

Argument..................................................................................21

I. The district court's authority to compel arbitration does not extend to resolving an arbitration fee dispute that the DRA assigns to the arbitrator.........................................................21

II. The district court's preliminary allocation of all ongoing fees to X Corp. conflicts with the DRA. ........................................30

    A. Petitioners were not required to be bound by the DRA as a condition of their employment......................................31

    B. The DRA's specific method for allocating fees supersedes the Minimum Standards and Rule 31(c). ..........39

ii

# TABLE OF CONTENTS
(continued)

**Page**

Conclusion ........................................................................ 44

Certificate of Compliance .......................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) .................................................................. 21, 41, 42

*Bahoor v. Varonis Sys., Inc.*,
152 F. Supp. 3d 1091 (N.D. Ill. 2015) ................................................ 42

*Borodaenko v. Twitter, Inc.*,
No. 22-cv-7226, Dkt. 14 (N.D. Cal. Dec. 21, 2022) ............................ 33

*Brady v. Williams Cap. Grp., L.P.*,
928 N.E.2d 383 (N.Y. 2010) ......................................................... 41, 42

*Brown v. Peregrine Enters., Inc.*,
No. 22-2959, 2023 WL 8800728 (2d Cir. Dec. 20, 2023) ........ 26, 27, 29

*Cir. City Stores, Inc. v. Ahmed*,
283 F.3d 1198 (9th Cir. 2002) ............................................................ 36

*Cohen v. UBS Fin. Servs., Inc.*,
799 F.3d 174 (2d Cir. 2015) ............................................................... 21

*Dealer Comput. Servs., Inc. v. Old Colony Motors, Inc.*,
588 F.3d 884 (5th Cir. 2009) .............................................................. 29

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ........................................................................... 21

*Essex v. Children's Place, Inc.*,
No. 15-cv-5621, 2017 WL 6000347 (D.N.J. Dec. 4, 2017) .................. 37

*Frazier v. X Corp*,
No. 24-cv-2135, 2024 WL 3370887 (S.D.N.Y. July 11, 2024)............. 15

*Goobich v. Excelligence Learning Corp.*,
No. 19-cv-6771, 2020 WL 5593011 (N.D. Cal. Sept. 18, 2020)..... 25, 40

iv

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Granite Rock Co. v. Int'l Bhd. of Teamsters,*
561 U.S. 287 (2010) ................................................................. 22

*Henry Schein, Inc. v. Archer & White Sales, Inc.,*
586 U.S. 63 (2019) ................................................................... 22

*Hoeg v. Samsung Elecs. of Am., Inc.,*
717 F. Supp. 3d 782 (N.D. Ill. 2024) ............................... 16, 28

*Hoeg v. Samsung Elecs. Am., Inc.,*
No. 24-1274, 2024 WL 3593896 (7th Cir. July 31, 2024) ................... 16

*Holcomb v. TWR Express, Inc.,*
11 A.D.3d 513 (2d Dep't 2004) ......................................... 38

*Int'l Bhd. of Elec. Workers, Loc. Union 43 v. NLRB,*
9 F.4th 63 (2d Cir. 2021) ...................................... 25, 39, 42

*Lamps Plus, Inc. v. Varela,*
587 U.S. 176 (2019) ............................................................ 22

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.,*
595 F.3d 458 (2d Cir. 2010) ............................................. 43

*Lifescan, Inc. v. Premier Diabetic Servs., Inc.,*
363 F.3d 1010 (9th Cir. 2004) ........................................... 29

*Marino v. CVS Health,*
698 F. Supp. 3d 689 (S.D.N.Y. 2023) ............................... 36

*Melton v. Pavilion Behav. Health Sys.,*
843 F. App'x 9 (7th Cir. 2021) ......................................... 36

*Mohamed v. Uber Techs., Inc.,*
848 F.3d 1201 (9th Cir. 2016) ........................................... 36

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Rodriguez v. Four Seasons Hotels, Ltd.*,
  No. 09-cv-2864, 2009 WL 2001328 (S.D.N.Y. July 10, 2009)............ 36

*Simeon v. Domino's Pizza LLC*,
  No. 17-cv-5550, 2019 WL 7882143 (E.D.N.Y. Feb. 6, 2019) ........ 35, 36

*United States v. Gonzales*,
  520 U.S. 1 (1997)...................................................................... 23

*Vaden v. Discover Bank*,
  556 U.S. 49 (2009) ...................................................................... 7

*Wallrich v. Samsung Elecs. Am., Inc.*,
  106 F.4th 609 (7th Cir. 2024) ................................................ 28, 29, 30

*Weiss v. Macy's Retail Holdings, Inc.*,
  741 F. App'x 24 (2d Cir. 2018) ............................................... 38

*Young v. Refined Techs., Inc.*,
  No. 22-cv-1032, 2022 WL 3012536 (C.D. Cal. June 17, 2022) ........... 37

**STATUTES**

28 U.S.C.
  § 1291 ...................................................................................... 7
  § 1331 ...................................................................................... 7

Federal Arbitration Act
  9 U.S.C. § 4.................................................................... *passim*
  9 U.S.C. § 16.............................................................................. 7

**RULES & REGULATIONS**

FED. R. APP. P. 4......................................................................... 7

**OTHER AUTHORITIES**

*Apportionment*, BLACK'S LAW DICTIONARY (12th ed. 2024).................... 41

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*JAMS Employment Arbitration Rules & Procedures* (June 1, 2021),
https://www.jamsadr.com/files/Uploads/Documents/JAMS-Rules/
JAMS_employment_arbitration_rules-2021.pdf .................................. 3
    Rule 2 ....................................................................... 12, 24
    Rule 11 ...................................................................... 24, 25
    Rule 31 ..................................................................... *passim*

*JAMS Policy on Employment Arbitration Minimum Standards of
Procedural Fairness* (July 15, 2009), https://www.jamsadr.com/
files/Uploads/Documents/JAMS-Rules/JAMS_Employment_Min_
Stds-2009.pdf ......................................................................... 11

OXFORD ENGLISH DICTIONARY (2d ed. 1989) ........................................... 40

WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1955) .................... 41

## INTRODUCTION

Petitioners are seven former Twitter employees who agreed through a Dispute Resolution Agreement ("DRA") to arbitrate disputes related to their employment. Although Petitioners had to sign the DRA to accept employment, they were not required to remain bound by the DRA. As the DRA explained in bold print, arbitration was not a mandatory condition of Petitioners' employment with Twitter. A prominent box at the top of the document advised, "**You can choose to opt out of this Agreement—you have 30 days to opt out.**" AA224.[1] The DRA then detailed that Petitioners were free to opt out by submitting a form within thirty days of receiving the DRA, in which case they would "**not be subject to [the] Agreement.**" AA226 (DRA § 8). Petitioners did not opt out, but numerous other Twitter employees did.

The DRA provides for arbitration before the Judicial Arbitration and Mediation Services ("JAMS") organization under the JAMS Employment Arbitration Rules and Procedures ("JAMS Employment Rules").

---

[1] Each Petitioner's signed DRA is available in the appendix, AA224-26, AA262-64, AA300-02, AA339-41, AA377-79, AA416-18, AA455-57, but they have no relevant differences. For simplicity, this brief cites the DRA of the lead Petitioner, Burgious Frazier, Jr.

1

The DRA has several specific provisions about how arbitration will be conducted. Most relevant here, Section 6 describes the process for determining responsibility for arbitration fees and costs. AA225 (DRA § 6). If, under applicable law, the company is required to pay all the fees, it must do so. *Id.* If, however, applicable law does not require the company to pay all the arbitration fees, fees are to be "apportioned between the parties in accordance with applicable law." *Id.* And "any disputes in [this] regard" are to be resolved "by the Arbitrator." *Id.*

Petitioners were affected by reductions in force at Twitter. They now pursue various claims against X Corp. and X Holdings, Inc. (collectively, "X Corp"). Because Petitioners did not opt out of the DRA, they, and thousands of other former employees, filed arbitration demands. X Corp. is ready and willing to proceed with those arbitrations, in line with the DRA's terms. And in arbitrations where applicable law requires it, X Corp. is paying the arbitration fees.

Yet for many former employees, including Petitioners, applicable law does not require X Corp. to pay all fees. The company therefore insisted that JAMS require the parties to share the fees under Section 6, subject to claimants' ability to raise any fee dispute with their respective

arbitrators. But JAMS, at the claimants' urging, has refused. It has taken the position that its "Minimum Standards" for employment arbitrations—which are nowhere mentioned in the parties' DRA—require X Corp. to pay all ongoing fees, regardless of what applicable law or the DRA's terms dictate.

Indeed, JAMS has taken this position even though the Minimum Standards apply only to mandatory arbitration agreements, which the DRA expressly states it is not, and even though the default fees arrangement under the JAMS Employment Rules for non-mandatory agreements is that, "unless the Parties have agreed to a different allocation, each Party shall pay its pro rata share of JAMS fees." JAMS Employment Rule 31(a).[2] Moreover, JAMS has insisted that it, and not any arbitrator, has the final say as to whether X Corp. should pay all arbitration fees, again contrary to the plain terms of the DRA. Because X Corp. faces thousands of employee claims in a mass arbitration driven by well-funded plaintiffs' law firms, JAMS's position threatens to force X Corp. to pay

---

[2] *JAMS Employment Arbitration Rules & Procedures* (June 1, 2021), https://www.jamsadr.com/files/Uploads/Documents/JAMS-Rules/JAMS_employment_arbitration_rules-2021.pdf.

JAMS tens of millions of dollars in additional arbitration fees, contrary to the plain terms of the DRA, as well as JAMS's own Employment Rules.

Unwilling to accede to this rewriting of the agreements that X Corp. struck with its employees, X Corp. has informed JAMS that it will not pay claimants' share of the ongoing fees where state law does not require it to do so. X Corp. remains perfectly willing, however, to arbitrate on the terms specified in the DRA.

Petitioners responded with a petition to compel arbitration under Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4. The petition is a misnomer, as both sides here are willing to arbitrate. In fact, X Corp. filed its own motion to compel arbitration against a different claimant represented by Petitioners' counsel, which remains pending in the District of Delaware. *See* AA494-518. The fundamental issue in dispute is on what terms the arbitration should proceed. Petitioners here sought an order requiring X Corp. to pay all ongoing arbitration fees. Their lead argument below was that X Corp. was estopped from contesting its obligation to pay all ongoing fees because an arbitrator in one arbitration, aware of JAMS's position, found that the JAMS Minimum Standards applied. That decision arose because the claimant's counsel

chose one case in which to front a portion of the arbitration fees to enable a specific arbitrator to resolve that claimant's fees dispute—a method that Petitioners (and the vast majority of other claimants) have been unwilling to pursue.

The district court rejected Petitioners' estoppel argument but granted their Petition on other grounds, fashioning a form of "interim" relief that Petitioners did not request. The court recognized that under the DRA's unambiguous terms, the ultimate determination over fees must be made by the individual arbitrators. Yet the court ordered X Corp. to pay all ongoing arbitration fees in these disputes in the interim, until the arbitrators in Petitioners' individual arbitrations order otherwise. In so ruling, the district court held that it had the authority to resolve the parties' fees dispute on an interim basis and that the Minimum Standards apply in these arbitrations.

Both conclusions are wrong, and this Court should reverse. The district court's order contradicts Section 4 of the FAA, which allows a court to compel arbitration only "in the manner provided for in [the parties'] agreement" and only "in accordance with the terms of the agreement." 9 U.S.C. § 4. The district court did not compel arbitration "in the manner

provided for" in the DRA or "in accordance with [its] terms." To start, the DRA requires "any" fee disputes to be resolved by the arbitrator—not a court or the arbitral forum as an organization. AA225 (DRA § 4). In addition, even on their own terms, the Minimum Standards apply only if the arbitration agreement was a "condition of employment," which by its plain language the DRA was not. What's more, any categorical requirement that the company pay the ongoing fees would contradict the specific fee-sharing provision in Section 6, which requires the arbitrator to apportion the fees between the parties in accordance with applicable law if a dispute arises.

Underlying the district court's decision is a concern that, without requiring X Corp. to pay the ongoing fees, these arbitrations will remain stalled. While that concern is understandable, the solution is not to re-write X Corp.'s contract because the claimants and JAMS have to date refused to abide by it. Courts have recognized that a party cannot be required to pay arbitration fees in a manner contrary to its agreement.

In any event, the district court's concern is misplaced. Even if JAMS decided to dismiss the arbitrations rather than apply the DRA, the claimants could still pursue relief for their underlying claims in court, so they

6

would not be left in limbo. What the FAA does not permit, let alone require, is forfeiture of a party's contractual rights through an order to pay arbitration fees in a manner contrary to a lawful arbitration agreement. The district court's contrary order should be reversed, and the Petition should be denied.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 9 U.S.C. § 4 and 28 U.S.C. § 1331 because the parties' underlying disputes include claims under federal law. AA111 (¶ 9); *Vaden v. Discover Bank*, 556 U.S. 49, 62 (2009). This Court has appellate jurisdiction under 9 U.S.C. § 16(a)(3) and 28 U.S.C. § 1291 because the district court's order is a final decision filed on July 11, 2024 and entered on the docket on July 12, 2024. SPA1-24; AA6-7. X Corp. timely filed its notice of appeal on July 18, 2024. AA573; FED. R. APP. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1.     Whether the district court had authority to require X Corp. to pay all ongoing fees in Petitioners' arbitrations, pending any ultimate determination by the arbitrator, even though the DRA requires "any" disputes concerning the allocation of fees to be decided by the arbitrator.

2. Whether the district court erred in requiring X Corp. to preliminarily pay all fees under the JAMS Minimum Standards, even though the Minimum Standards apply only to agreements required as "a condition of employment" and even though the allocation of fees in the Minimum Standards conflicts with Section 6 of the DRA.

## STATEMENT OF THE CASE

### I. Petitioners signed the DRA and did not make use of their right to opt out of the agreement.

Petitioners Burgious Frazier, Yosub Kim, Wayne Krug, Ben Perez, Vanessa Szajnberg, Nicholas Tapalansky, and Shelly Yip each electronically signed a DRA with Twitter. *See* AA224-26, AA262-64, AA300-02, AA339-41, AA377-79, AA416-18, AA455-57. Although they had to initially sign the agreement to begin work at Twitter, the DRA's introductory paragraph—set off from the rest of the agreement in a prominent box—contains bolded language that highlighted their ability to opt out of the agreement altogether: "**You can choose to opt out of this Agreement—you have 30 days to opt out.**" AA224. In another bolded paragraph, the DRA states that "**[a]rbitration is not a mandatory condition of Employee's employment at the Company**." AA226 (DRA § 8). The right to opt out was further highlighted in a separate bolded line just

above the signature block: "**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement**." *Id.*

To opt out of the DRA, an employee simply needed to "submit a signed and dated statement on a 'Dispute Resolution Agreement Opt Out Form' ('Form') . . . within 30 days of the Employee's receipt of this Agreement." AA226 (DRA § 8). Doing so would have permitted the employee to "**not be subject to this Agreement**." *Id.* Conversely, if an employee did not submit the opt-out form within thirty days, "continuing the Employee's employment constitute[d] mutual acceptance of the terms of this Agreement by Employee and the Company." AA226. Petitioners did not opt out of the DRA through this mechanism and thus agreed to be bound by the DRA. *See* AA109 (¶ 2) (asserting that Petitioners have "an active DRA").

For employees who did not opt out, disputes subject to arbitration under the DRA include "any dispute arising out of or related to Employee's employment with Twitter, Inc. . . . or termination of employment," including "all . . . state statutory and common law claims." AA224

(DRA § 1). The DRA further authorizes the arbitrator to resolve all "disputes arising out of or relating to [the] interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement." *Id.*

The DRA is "governed by the [FAA] and evidences a transaction involving commerce." *Id.* As to the administration of the arbitration, the DRA generally provides that the "Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ('JAMS'), pursuant to the then-current JAMS Rules." AA225 (DRA § 5). There are, however, several provisions that prescribe procedures beyond the JAMS Employment Rules. These include how the parties select an arbitrator, AA225 (DRA § 3), and, especially relevant here, how arbitration fees are to be allocated between the parties, AA225 (DRA § 6). The DRA addresses arbitration fees in Section 6:

> [I]n all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and *any* disputes in that regard will be resolved by the Arbitrator.

AA225 (DRA § 6) (emphasis added).

JAMS maintains its own rules for the allocation of fees in employment arbitrations in the JAMS Employment Rules. The default rule states that "unless the Parties have agreed to a different allocation, each Party shall pay its pro rata share of JAMS fees." JAMS Employment Rule 31(a). But if "an Arbitration is based on a clause or agreement that is required as a condition of employment, the only fee that an Employee may be required to pay is the initial JAMS Case Management Fee." JAMS Employment Rule 31(c).

Separate from its Employment Rules, JAMS also maintains a set of policies known as the Minimum Standards. *JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness* (July 15, 2009), https://www.jamsadr.com/files/Uploads/Documents/JAMS-Rules/JAMS_Employment_Min_Stds-2009.pdf. Like JAMS Rule 31(c), the Minimum Standards apply when "an arbitration is based on a clause or agreement that is required as a condition of employment." *Minimum Standards* ¶ B. In such arbitrations, "[t]he only fee that an employee may be required to pay is JAMS' initial Case Management Fee. All other costs must be borne by the company." *Minimum Standards* No. 6. The JAMS Employment Rules are explicitly subject to the parties' agreement, whereas JAMS

claims it can apply the Minimum Standards notwithstanding contrary terms in the parties' agreement. JAMS Employment Rule 2(a).

## II. Petitioners filed this proceeding to compel X Corp. to pay their arbitration fees.

In October 2022, X Holdings I, Inc. and X Holdings II, Inc. completed their purchase of Twitter, Inc. Afterward, the company began restructuring its workforce and operations, resulting in multiple reductions in force that affected Petitioners. Each Petitioner was offered significant severance benefits in exchange for a general release of claims. Petitioners declined these severance offers. Instead, they—and more than 2,200 other former employees—filed demands for arbitration. *See* AA118-457; AA458 (¶ 2).

On June 2, 2023, X Corp. sent a letter to JAMS requesting, consistent with the DRA's terms, that arbitration costs be apportioned between the Parties for any arbitrations pending in jurisdictions where fee-sharing is lawful. AA459 (¶ 3); AA461. In the letter, X Corp. cited Section 6 of the DRA. AA462-63.

In response, on June 21, 2023, JAMS's General Counsel stated that the JAMS Minimum Standards would apply to each arbitration proceeding, "notwithstanding any contrary provision in the parties' arbitration

12

agreement." AA459 (¶ 4); AA465. The June 21 statement further noted that while "[t]he Minimum Standards do not prevent an employee from contributing to JAMS fees," JAMS would continue to issue invoices in accordance with the Minimum Standards absent employee agreement. AA465. Finally, JAMS asserted that, although the parties could direct any further dispute about the applicability of the Minimum Standards to the assigned arbitrator in each case, JAMS retained the right to "make a final determination" on the issue. *Id.*

On June 28, 2023, X Corp. responded and reiterated that applying the Minimum Standards and allowing JAMS as an organization to make the final determination would conflict with the terms of the parties' arbitration agreement. AA458 (¶ 5); AA468. X Corp. objected that JAMS's position on this issue prevented the company "from exercising its contractual rights and improperly negate[d] a material provision in the dispute resolution agreements." *Id.* Given JAMS's refusal to adhere to the terms of the DRA, X Corp. declined to proceed under the Minimum Standards for arbitration demands in jurisdictions where fee-sharing is lawful. *Id.*

On June 30, 2023, JAMS's General Counsel wrote the parties and observed that employees could elect to contribute to JAMS fees. AA459

13

(¶ 6); AA471. The letter stated that if a claimant was willing to waive the Minimum Standards and "share JAMS fees according to the underlying arbitration clause, they should advise JAMS and Respondent accordingly." AA466.

One claimant, Yunfeng Zhang, took up JAMS's suggestion, at least in part. He fronted part of his share of the fees (with X Corp. paying its corresponding share) and moved "for an interim award" declaring the DRA requires X Corp. to pay all JAMS's fees under the Minimum Standards. AA120. The company opposed. AA144. The *Zhang* arbitrator ruled that X Corp. would "be required to pay all the JAMS fees and arbitrator fees (other than the initial case management fee) incurred in connection with" the *Zhang* arbitration. AA186. The arbitrator also ignored Zhang's request for an "interim award" and "captioned [the] award a 'Partial Final Award.'" AA186 & n.3. The claimant has not sought to confirm that decision in any court.

On March 21, 2024, Petitioners filed this proceeding under FAA Section 4. AA1, AA3. They petitioned to "compel arbitration" by requiring X Corp. to pay all arbitration fees in their respective arbitrations. AA109. Petitioners' primary theory was that X Corp. should be estopped from

relying on its contractual right to fee splitting because of the *Zhang* arbitration. They contended, in other words, that the *Zhang* decision controlled not only that arbitration but every other arbitration filed against X Corp. under the DRA. *See* D. Ct. Dkt. 4. The company opposed, arguing that the arbitrator in each arbitration was the only one who could resolve any disputes concerning arbitration fees, that the *Zhang* decision could not be used to control every other fee dispute, and that X Corp. was entitled to have fees evenly split between the parties absent a decision by the arbitrator under applicable law that a different arrangement was necessary. *See* D. Ct. Dkt. 22.

On July 7, 2024, the district court issued its ruling. It rejected Petitioners' primary theory—estoppel—but held that X Corp. was required to "pay all ongoing arbitration fees for petitioners' claims *unless and until the individual arbitrator in each of petitioners' respective arbitrations rules to the contrary.*" SPA2; *see Frazier v. X Corp*, No. 24-cv-2135, 2024 WL 3370887 (S.D.N.Y. July 11, 2024). In so holding, the district court recognized that fee disputes needed to be resolved by the arbitrator and that any issue concerning the effect of the *Zhang* decision on future arbitrations was for the arbitrator to decide. SPA8-10 & n.3.

Still, the district court held that it had the authority to compel X Corp. to preliminarily pay all fees prior to a future decision by an arbitrator. SPA11. The court cited, among other cases, a since-reversed decision from a district court in the Seventh Circuit asserting authority under FAA Section 4 to compel a party to pay arbitration fees. *Id.* (citing *Hoeg v. Samsung Elecs. of Am., Inc.*, 717 F. Supp. 3d 782 (N.D. Ill. 2024), *rev'd sub nom. Hoeg v. Samsung Elecs. Am., Inc.*, No. 24-1274, 2024 WL 3593896 (7th Cir. July 31, 2024)). The district court reasoned that it must have authority to compel X Corp. to pay fees at least as an interim measure, because otherwise the company could "effectively resist arbitration altogether." *Id.*

Then, the district court determined that in that preliminary posture, X Corp. should be required to pay all the fees. SPA14-24. The court came to this conclusion by holding that the DRA was a condition of employment and that the JAMS Minimum Standards applied and did not conflict with Section 6 of the DRA. *Id.*

In response to the numerous DRA provisions allowing Petitioners to opt out of the agreement, the district court purported to draw a distinction between whether "arbitration" was a condition of employment

16

versus whether the DRA, as an "agreement[]," was a condition of employment. SPA19. The district court held that the JAMS Employment Rules applied to agreements that were conditions of employment, not only arbitrations required as a condition of employment. *Id.* Because the opt-out provision, in the district court's view, at most made the "arbitration" non-mandatory, but still required an initial signature accepting the "agreement," X Corp. was subject to the Minimum Standards. *Id.*

The district court recognized that distinguishing between required arbitrations and required arbitration agreements might seem counterintuitive. But the court cited a law review article and a tentative draft of a proposed Restatement of Consumer Contracts to suggest that individuals in Petitioners' position cannot be expected to read and understand the opt-out provision:

> [A]s a matter of policy it is entirely reasonable for JAMS to conclude that granting an employee the right to opt out of arbitration will have little practical effect in the overwhelming majority of cases, so that requiring the employee to enter into the agreement will as a practical matter be little different from forcing them to arbitrate.

SPA20-21. The district court did not mention the numerous ex-Twitter employees who did in fact opt out of the DRA and are pursuing relief in

17

court, nor cases within this Circuit and others recognizing that similarly structured opt-out provisions rendered arbitration agreements non-mandatory.

The district court also rejected X Corp.'s argument that DRA Section 6 is a specific contract provision that prevails over any conflicting language in the Minimum Standards because Section 6 requires that arbitration costs be "apportioned" between the parties, while the Minimum Standards require X Corp. to pay all ongoing fees. The district court held that the language says "nothing about how large [the parties'] respective portions should be." SPA22-23. The district court also concluded that this interpretation did not render DRA Section 6 superfluous. SPA23. X Corp. now appeals.

## SUMMARY OF ARGUMENT

The district court asked two questions: (1) whether it, as opposed to an arbitrator, had the authority to order X Corp. to pay all ongoing fees and (2) whether the Minimum Standards apply and require X Corp. to pay all ongoing fees pending any ultimate determination by an individual arbitrator. At some level, those were the right questions to ask. But the district court reached the wrong answers.

18

As an initial matter, the district court did not have the authority to make any order concerning fees. The DRA places the authority to resolve "any" disputes concerning fee allocation solely with the arbitrator, which the district court agreed was not equivalent to the arbitral organization. A court applying the FAA generally cannot contravene an express delegation and the district court's reasons for doing so fall flat.

The district court's first justification for overriding Section 6 was the DRA's general incorporation of the JAMS Employment Rules, which give JAMS preliminary authority to decide certain disputes. But a general incorporation of the JAMS Employment Rules cannot override the specific provision of the DRA. And even if JAMS did have the authority to make such a preliminary determination, that would not give the district court any such authority.

The district court also apparently believed that it needed to decide the fee dispute to keep these arbitrations from stalling. But this Court and other circuits have recognized that parties are justified in refusing to pay arbitration fees if doing so would be contrary to the terms of their agreement. That remains true even if it results in dismissal of the arbitration, in which case the claimant may pursue relief in court.

Second, the district court's determination that the Minimum Standards apply and require X Corp. to pay all ongoing fees is erroneous. The Minimum Standards apply only when an agreement is required as a "condition of employment." The DRA was not because Petitioners could opt out of it. Cases from New York district courts and from circuit courts elsewhere, which the district court failed to address, uniformly find that opt-out provisions render arbitration agreements nonmandatory and non-adhesive. Moreover, other former Twitter employees did opt out and pursued claims in court—another fact ignored by the district court. Instead, the court relied on academic literature in the markedly different consumer contracts realm to justify its position. This cannot override the facts and law here demonstrating that the DRA was not a condition of Petitioners' employment.

Finally, the Minimum Standards do not apply because the DRA lays out detailed requirements for fee-sharing that conflict with the Minimum Standards' blanket requirement that the company pay virtually all the fees. Under fundamental principles of contract interpretation, the general provision stating that the arbitrations must take place pursuant to the JAMS Employment Rules cannot override the DRA's specific fee

sharing requirements. Moreover, contrary to the district court's conclusion, applying the Minimum Standards would render Section 6 superfluous, also in contravention of interpretive principles. This provides an independent basis for reversing the district court's order.

## STANDARD OF REVIEW

This Court reviews a grant of a motion to compel arbitration de novo. *E.g.*, *Cohen v. UBS Fin. Servs., Inc.*, 799 F.3d 174, 177 (2d Cir. 2015).

## ARGUMENT

**I.    The district court's authority to compel arbitration does not extend to resolving an arbitration fee dispute that the DRA assigns to the arbitrator.**

Under Section 4 of the FAA, courts may direct arbitration only "in the manner provided for in [the parties'] agreement." 9 U.S.C. § 4. Thus, "courts must 'rigorously enforce' arbitration agreements *according to their terms.*" *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (emphasis added); *see also, e.g.*, *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985) ("[T]he purpose behind [the FAA] was to ensure judicial enforcement of privately made agreements to arbitrate."). This principle extends not just to the merits of the parties' underlying dispute,

but also threshold questions, like questions of arbitrability, that the parties have agreed to assign to an arbitrator. *See, e.g.*, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 71 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract.").

Arbitration agreements may be enforced only according to their terms because arbitration is strictly "a matter of consent." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010). In other words, "arbitrators wield only the authority they are given." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019). And parties "may generally shape [arbitration] agreements to their liking by specifying with whom they will arbitrate, the issues subject to arbitration, the rules by which they will arbitrate, and the arbitrators who will resolve their disputes." *Id.*

The district court ran afoul of these principles by purporting to resolve the parties' fees dispute on an interim basis. DRA Section 6 plainly states that "*any* disputes [regarding apportionment of fees] will be resolved *by the Arbitrator*." AA225 (DRA § 6) (emphasis added). The district court correctly recognized that the DRA's use of the term "Arbitrator" refers to "the individual arbitrator appointed in each case (as opposed to

JAMS as an organization).” SPA8 n.2. And the court also correctly recognized that the arbitrator is the one ultimately responsible for resolving fee disputes. SPA8-9. As the district court articulated the point, “ultimate resolution of any dispute over how fees should be allocated must be resolved by an individual arbitrator.” SPA10. Even so, the district court held that both it and JAMS had the authority to resolve fee disputes before the appointment of an arbitrator and through any contrary determination by that arbitrator. That conclusion contradicts the text of the DRA and courts’ limited role under Section 4 of the FAA.

To reach its conclusion, the district court distinguished between resolving an ultimate dispute over fees and an interim dispute over fees, and found the DRA “silent on the question of interim relief.” SPA12. But the DRA is not silent on who decides interim fees disputes. The DRA explicitly delegates “any” disputes regarding fee sharing to “the Arbitrator.” AA225 (DRA § 6). The straightforward meaning of this language is that the only individual that can resolve “any” kind of dispute regarding fees—whether ultimate or interim—is the individual arbitrator in each arbitration. *See, e.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (“Read naturally, the word ‘any’ has an expansive meaning, that is, ‘one

or some indiscriminately of whatever kind.'" (citation omitted)). The DRA's language makes no distinction between preliminary disputes and disputes that arise after an arbitrator is appointed, as the district court did.

The district court reasoned that the DRA's provision that arbitration shall be "pursuant to the then-current JAMS Rules" gives JAMS some preliminary authority to resolve fee disputes. SPA12 & n.4. The district court drew that inference because the DRA generally incorporates the JAMS Employment Rules, AA225 (DRA § 4), and those rules include a provision allowing JAMS to resolve certain disputes over the appointment of the arbitrator, JAMS Employment Rule 11(c). But the fee dispute here is not a dispute over the appointment of an arbitrator (many of which have already been appointed), and in any event the JAMS Employment Rules explicitly note that "[t]he Parties may agree on any procedures not specified herein or in lieu of these Rules." JAMS Employment Rule 2(a). The DRA modifies the default process for appointing an arbitrator. AA225 (DRA § 3). And, more importantly, the DRA has its own procedures for resolving any disputes over apportionment of fees. AA225 (DRA § 6). Thus, if there were any friction between JAMS Employment

24

Rule 11(c) and DRA Section 6 (which there is not), the DRA would control in any event.

For similar reasons, the district court's application of the specific-governs-the-general rule—"specific terms and exact terms are given greater weight than general language," *Int'l Bhd. of Elec. Workers, Loc. Union 43 v. NLRB*, 9 F.4th 63, 75 (2d Cir. 2021) (citation omitted)—is backwards. The DRA's provision for arbitration under the JAMS Employment Rules is clearly a more general provision than its provision assigning fee-sharing disputes to the arbitrator. The latter is a specific rule, rather than a general incorporation of many rules. The district court identified no case holding that a provision adopting an arbitration provider's rules is more specific than a provision dealing with fees. But X Corp. identified at least one district court case that held the opposite and found that a provision specifically dealing with fees should govern, as it should here. *See Goobich v. Excelligence Learning Corp.*, No. 19-cv-6771, 2020 WL 5593011, at *3 (N.D. Cal. Sept. 18, 2020) ("While the parties may have intended to utilize the AAA rules, it does not follow that they intended those rules govern over express provisions in the [agreement] to the contrary. Moreover, applying the fee schedule of the AAA

Employment Rules 'would impermissibly render the more specific provisions in [the arbitration agreement] superfluous.' . . . The Court therefore finds that the specific provision requiring the parties to split arbitration fees equally controls over the AAA Employment Rules incorporated by reference." (citation omitted)).

The district court's ruling that it had authority to resolve this fees dispute seems to have been motivated by a consequential concern—that any other approach would allow X Corp. "to effectively resist arbitration altogether." SPA11. But consistent with the FAA's requirement to apply arbitration agreements according to their terms, courts recognize that there is nothing improper about refusing to pay arbitration fees that the parties' arbitration agreement does not require that party to pay.

Consider this Court's recent decision in *Brown v. Peregrine Enterprises, Inc.*, No. 22-2959, 2023 WL 8800728 (2d Cir. Dec. 20, 2023). There, a district court lifted a stay of litigation in favor of arbitration after the arbitration provider insisted on applying its own fee schedule despite a contrary fees arrangement in the parties' arbitration agreement and closed the arbitration. *Id.* at *1. This Court reversed the lifting of the stay, observing that the employer "cannot be faulted for standing on its

contractual entitlements" and thus had not waived its right to arbitrate. *Id.* at *3.

In *Brown*, this Court was unmoved by the possibility that employees' reluctance to pay arbitration fees might keep their arbitrations in a standstill. The employees were capable of remedying that problem by paying their half of the fees, and the Court even left open the possibility of compelling the employees "under section 4 of the FAA . . . to pay their equal share of the arbitration fees under the [agreements] to initiate such arbitration before the AAA." *Id.* at *4. Similarly, here, Petitioners have the power to break the logjam and move forward with arbitration at any time. JAMS expressly gave Petitioners the choice to "share JAMS fees according to the underlying arbitration clause" if they wished for the arbitrations to proceed. AA472. The claimant in the *Zhang* arbitration did that, and Petitioners can too if they want the arbitrations to move forward.

What Petitioners cannot do under the FAA is obtain an order requiring X Corp. to arbitrate in a manner inconsistent with the DRA. And, tellingly, one of the decisions that the district court relied on to conclude that it could require X Corp. to pay fees was summarily reversed by the

Seventh Circuit just a few weeks after the district court's decision here. *See Hoeg,* 717 F. Supp. 3d at 782, *rev'd,* 2024 WL 3593896. That reversal was based on another recent Seventh Circuit decision, *Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609 (7th Cir. 2024), which is highly instructive.

In *Wallrich*, consumers filed a petition under 9 U.S.C. § 4 seeking a court order requiring the respondent to pay an arbitration provider's fees. There, unlike here, the alleged agreement between the parties ostensibly "delegated threshold arbitration fee disputes to the AAA." *Wallrich*, 106 F.4th at 620. When the respondent refused to pay the fees, the AAA offered the petitioners an opportunity to advance the fees. *Id.* When they did not do so, the AAA dismissed the arbitrations. *Id.* The Seventh Circuit held that in those circumstances, the district court lacked authority to require payment of fees using 9 U.S.C. § 4. *Id.* It reasoned that the parties had expressly delegated responsibility over fee disputes to the AAA, which had decided in its discretion to terminate the arbitrations, thus completing the arbitration per the agreements' terms. *Id.*

So, having decided not to advance arbitration fees, the *Wallrich* petitioners could pursue a lawsuit in court but could not compel the other

28

side to pay fees in a way that flouted the parties' agreement. *Id.* In doing so, the *Wallrich* court cited authority from other circuits refusing to order a party to pay fees as a means of compelling arbitration. *See Id.* (citing *Dealer Comput. Servs., Inc. v. Old Colony Motors, Inc.*, 588 F.3d 884 (5th Cir. 2009); *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010 (9th Cir. 2004)).

Here, the arbitrations are not complete; JAMS has not terminated Petitioners' cases and no arbitrator in those cases has exercised his or her express authority under DRA Section 6 to resolve any disputes regarding the apportionment of fees in Petitioners' arbitrations. Even so, the Seventh Circuit's reasoning in *Wallrich* is instructive because it shows that the district court does not have power to override the arbitrators' exclusive authority to resolve any fees dispute for the sake of moving arbitration forward. That is true, much as in *Brown*, even if the result of Petitioners' refusal to advance their share of the fees is a halt, or termination, of the arbitral process.

The proper course under Section 4 of the FAA is for arbitration to proceed in accordance with the parties' agreement, with an appointed arbitrator deciding all fee disputes. If JAMS closes the arbitrations as a

result, Petitioners may then pursue relief in court on the ground that the parties had "fully 'arbitrated' under their agreement." *Id.* at 621 (citation omitted). But courts cannot usurp the role that the parties delegated to the arbitrator just because doing so might allow the arbitration to proceed more efficiently.

In any event, the district court's concerns about the nonpayment of fees are overblown. X Corp. has paid its portion of the initial case initiation fees. Its position is not that it should pay no fees, just that the fees should be apportioned as described in the agreement. As the district court recognized, the parties could mutually split fees to procure a binding determination by an arbitrator, as happened in the *Zhang* arbitration. There is no reason to depart from the plain meaning of DRA Section 6 or FAA Section 4 and issue an order that allows preliminary fees disputes to be resolved by someone other than the parties' chosen decisionmaker, the arbitrator in each arbitration. This point on its own compels reversal of the district court's order.

## II. The district court's preliminary allocation of all ongoing fees to X Corp. conflicts with the DRA.

Even if the district court had authority to decide the fees dispute as a preliminary matter, it still would be error to require X Corp. to pay all

ongoing fees pending a determination by an arbitrator. That order must be reversed because it contradicts the terms of the DRA in two independent ways. First, while the district court applied the JAMS Minimum Standards to reach that result, the Minimum Standards by their terms apply only to arbitration agreements required as a "condition of employment." The DRA was not required as a condition of employment because Petitioners had the option not to be bound by it. Second, and in any event, DRA Section 6 describes a specific method for dividing fees, and that specific provision supersedes the DRA's more general incorporation of the JAMS Employment Rules.

### A. Petitioners were not required to be bound by the DRA as a condition of their employment.

To hold X Corp. preliminarily responsible for paying all ongoing arbitration fees, the district court concluded that JAMS Employment Rule 31(c) and the JAMS Minimum Standards override Section 6. But neither JAMS Employment Rule 31(c) nor the Minimum Standards apply here. The former applies only "[i]f an Arbitration is based on a clause or agreement that is required as a condition of employment." JAMS Employment

Rule 31(c). Likewise, the Minimum Standards apply only "[if] an arbitration is based on a clause or agreement that is required as a condition of employment." Minimum Standards ¶ B.

The DRA was not required as a condition of employment. Its text contains numerous explicit statements to that effect. The DRA acknowledges in bolded text, "**Arbitration is not a mandatory condition of Employee's employment at the Company**." AA226 (DRA § 8). Employees had thirty days after their receipt of the DRA "**to opt out and not be subject to this Agreement**." *Id.* Such employees would "not be subject to any adverse employment action as a consequence of that decision and [could] pursue available legal remedies without regard to [the DRA]." *Id.* Before signing the DRA, each Petitioner certified that he or she "**agree[d] to the terms of this Dispute Resolution Agreement, and confirm[ed] [he or she was] aware of my right to opt out per the terms of this Agreement**." *Id.*

Numerous Twitter employees made use of this opportunity to opt out of the DRA while continuing their employment, proving that the DRA was not a condition of employment. Some such employees who opted out

are now pursuing litigation in federal court. *See, e.g.*, *Borodaenko v. Twitter, Inc.*, No. 22-cv-7226, Dkt. 14 (N.D. Cal. Dec. 21, 2022) (Twitter not moving to compel as to plaintiff who "timely opted out"). Petitioners, unlike those other employees, chose not to opt out.

Despite the availability of the opt-out provision, the district court erroneously held that the DRA was a condition of Petitioners' employment. This holding stemmed from the district court's conclusion that the DRA only allowed employees to opt out of "arbitration," while the Minimum Standards are concerned with whether the "agreement" was required as a condition of employment. In the district court's view, because employees were required to sign the DRA, which the district court likened to a "contract[] of adhesion," SPA20, the DRA was a condition of employment, even if it permitted employees to opt out of arbitration.

That is wrong—even setting aside the artificiality of the distinction between arbitration required as a condition of employment and arbitration agreements required as a condition of employment. The opt-out provision did not merely allow an employee to avoid arbitration; it literally allowed employees to "**not be subject to this Agreement**." AA226 (DRA § 8). In other words, Petitioners were not required to be bound by

33

any part of the DRA if they chose not to be. So the district court's distinction between required arbitrations and required agreements misses the mark. The opt-out provision entails that the entire agreement was not a condition of employment.

Nor does it matter that Petitioners had to initially sign the DRA to begin their employment, as they could submit the opt-out form along with the DRA, or before or after. As the district court emphasized, the operative question under the language of the Minimum Standards and Employment Rule 31(c) is whether the agreement—here the DRA—was required. Whether a signature was required is irrelevant. Moreover, the timing for signing the DRA and opting out ensured that no Petitioner needed to be bound by the DRA even temporarily. Petitioners were able to submit an opt-out form within thirty days of receiving a copy of the DRA. AA226 (DRA § 8). There was no requirement to sign the DRA before submitting the opt-out form. And not only that, the DRA indicates that the DRA would take effect only if the employee continued employment after the thirty-day opt-out provision had ended. *Id.* ("Should an Employee not opt out of this Agreement within 30 days of the Employee's

receipt of this Agreement, continuing the Employee's employment consti-tutes mutual acceptance of the terms of this Agreement by Employee and the Company.").

In addition, the DRA's language suggests that once an employee provides an opt-out form, the DRA is not binding on that employee at all, not even for disputes that may have accrued before the company's receipt of the opt-out form: once an employee opts out, the employee "may pursue available legal remedies without regard to this Agreement." AA226 (DRA § 8). In other words, opting out any time within those thirty days would mean the DRA never applied.

The district court's classification of the DRA as a condition of em-ployment, a contract of adhesion, or otherwise mandatory contradicts nu-merous cases—all of which the district court ignored. For example, in *Simeon v. Domino's Pizza LLC*, No. 17-cv-5550, 2019 WL 7882143, at *5 (E.D.N.Y. Feb. 6, 2019), the court recognized that an opt-out mechanism "ma[de] clear that dispute resolution by arbitration [was] not a manda-tory condition of [the plaintiff's] employment," even though the plaintiff "was required to sign the Agreement 'in order to commence or continue' his employment." Because of the opt-out mechanism, the agreement was

not a "mandatory arbitration provision." *Id.* Citing *Simeon*, the court held in *Marino v. CVS Health*, 698 F. Supp. 3d 689, 695 (S.D.N.Y. 2023), that an opt-out provision "negate[d] any suggestion plaintiff was forced to enter into the Arbitration Agreement." Likewise, in *Rodriguez v. Four Seasons Hotels, Ltd.*, No. 09-cv-2864, 2009 WL 2001328, at *4 (S.D.N.Y. July 10, 2009), the court found that the plaintiff "was not required to submit to the offending mediation/arbitration provisions as a condition of employment, but was provided with the choice of opting-out."

Other circuits have likewise recognized that opt-out mechanisms have a real effect on whether the agreement is adhesive or mandatory. Indeed, the Ninth Circuit has explicitly rejected the suggestion that employment agreements with opt-out mechanisms are contracts of adhesion. *See, e.g.*, *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016) ("[A]n arbitration agreement is not adhesive if there is an opportunity to opt out of it."); *Cir. City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1199–200 (9th Cir. 2002) ("Ahmed was not presented with a contract of adhesion because he was given the opportunity to opt-out of the Circuit City arbitration program by mailing in a simple one-page form"); *see also Melton v. Pavilion Behav. Health Sys.*, 843 F. App'x 9, 10 (7th Cir. 2021)

(describing an agreement with opt-out rights as having a "non-mandatory nature").[3]

The district court simply ignored these cases. Petitioners have attempted to distinguish them on the ground that they analyzed the enforceability of arbitration agreements rather than the applicability of the JAMS Minimum Standards or Employment Rule 31(c). That is a distinction without a difference. The key point is that courts widely recognize opt-out provisions as preventing an agreement from counting as adhesive, mandatory, or a condition of employment. No precedent supports making a different categorization in a fees dispute than courts would make in an enforceability dispute. In any context, an opt-out mechanism

---

[3] Numerous district courts in other circuits have similarly held that an arbitration agreement with an opt-out mechanism is not mandatory or adhesive. *See, e.g.*, *Young v. Refined Techs., Inc.*, No. 22-cv-1032, 2022 WL 3012536, at *5 (C.D. Cal. June 17, 2022) (referring to "an opt-out provision" as "[o]ne of the typical indicia that a contract is not a condition of employment"); *Essex v. Children's Place, Inc.*, No. 15-cv-5621, 2017 WL 6000347, at *5 (D.N.J. Dec. 4, 2017) ("Plaintiffs were not required to participate in TCP's arbitration program as a condition of employment with TCP. . . . [T]he Arbitration Agreement expressly state[s] that signing the Arbitration Agreement is not a mandatory condition of employment. . . . To the contrary, the Arbitration Agreement has a clear 'opt out' provision.").

means the arbitration agreement was not required as a condition of employment.

Common sense leads to the same conclusion. If a school organizes field trips for its students, but at the start of each year notifies parents they have thirty days to return a form and opt out of the field trips, no one would say that the field trips are a condition of enrollment. Nor would anyone say that *agreeing* to field trips is a condition of enrollment—even if all parents had to sign an acknowledgment of the field trips policy and their right to opt out. So too here, it is wrong to classify the DRA as a condition of employment when every employee had the right to opt out.

Also unpersuasive was the district court's attempt to rely on academic writing to support its interpretation on the theory that consumers cannot reasonably understand opt-out mechanisms in the contracts they sign. It is a fundamental principle of contract law that "[a] party who executes a contract is presumed to know its contents and to assent to them." *Holcomb v. TWR Express, Inc.*, 11 A.D.3d 513, 514 (2d Dep't 2004) (citation omitted). This principle applies just as much to opt-out provisions in employees' arbitration agreements as it does to other situations. For example, in *Weiss v. Macy's Retail Holdings, Inc.*, 741 F. App'x 24, 27

(2d Cir. 2018), this Court disagreed with a district court's suggestion that an opt-out form allegedly mailed to the home of an employee with a learning disability was "incapable of being readily understood." The district court made the same error here when it presumed that employees in Petitioners' position would not read or understand the opt-out provision.

In any event, there is no reason to believe that the district court's theories about consumer behavior apply to this situation. Petitioners were employed in high-salary positions, requiring high levels of education. The DRA advised that Petitioners could seek legal advice before signing. In these circumstances, it is not fair to assume, as the district court did, that Petitioners did not "read, let alone understand" the DRA. SPA20. Because that unwarranted assumption undergirded the district court's conclusion that the DRA was a condition of Petitioners' employment, the district court's order should be reversed.

### B. The DRA's specific method for allocating fees supersedes the Minimum Standards and Rule 31(c).

The district court also erred in applying Employment Rule 31(c) and the Minimum Standards for another reason: requiring X Corp. to pay all ongoing fees is entirely at odds with the specific method for fee-sharing outlined in the DRA. *See Int'l Bhd. of Elec. Workers*, 9 F.4th at 75 ("It

is a well-recognized tenet of contract interpretation that 'specific terms and exact terms are given greater weight than general language.'" (citation omitted)); *Goobich*, 2020 WL 5593011, at *3 (holding that agreement's fee-sharing provision superseded agreement's incorporation of AAA rules).

Section 6 of the DRA obligates X Corp. to "pay the Arbitrator's and arbitration fees" only in those "cases where required by law." AA225 (DRA § 6). But "[i]f under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law" with disputes "resolved by the Arbitrator." *Id.* In contrast, the Minimum Standards and JAMS Employment Rule 31(c) require an employer to pay *all* fees (except a small case initiation fee) in every case in which they apply.

Where, as here, it is undisputed that applicable law (the FAA and New York law), does not require X Corp. to pay all the arbitration fees, applying the Minimum Standards and Employment Rule 31(c) categorically would negate the text of Section 6. The ordinary meaning of "apportion" is divide proportionally. *See* OXFORD ENGLISH DICTIONARY 579 (2d

ed. 1989) ("To assign in proper portions or shares; to divide and assign proportionally; to portion out, to share"); WEBSTER'S NEW INTERNATIONAL DICTIONARY 132 (2d ed. 1955) ("To divide and assign in just proportion; to divide and distribute proportionally; to make an apportionment of; portion out; to allot"); *Apportionment*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("Division into proportionate shares . . . ."). And that is also the default fee arrangement under the JAMS Employment Rules, which provide that when an agreement is not a condition of employment, "unless the Parties have agreed to a different allocation, each Party shall pay its pro rata share of JAMS fees." JAMS Employment Rule 31(a).

So, when the arbitration involves one claimant and one respondent, the starting place for apportioning fees between the parties would naturally be a fifty/fifty allocation. Of course, that allocation could potentially be altered under the DRA's terms if claimants demonstrate on an individual basis that "filing and administrative fees attached to arbitration . . . are so high as to make access to the forum impracticable." *Am. Express*, 570 U.S. at 236 (citation omitted); *see also Brady v. Williams Cap. Grp., L.P.*, 928 N.E.2d 383, 387 (N.Y. 2010). But applying the Minimum Standards and Employment Rule 31(c) without regard to the arbitrator's

41

application of the test under applicable law would nullify the apportionment provision in DRA Section 6. Such an interpretation is improper, as the parties' specific agreement must control. *See, e.g.*, *Brady*, 928 N.E.2d at 386 ("[W]e agree with the lower courts that the terms of the parties' Arbitration Agreement, rather than the AAA rules, controlled" responsibility for payment of fees.); *Bahoor v. Varonis Sys., Inc.*, 152 F. Supp. 3d 1091, 1100 (N.D. Ill. 2015) (holding that although "the parties agreed to operate under . . . JAMS rules[,] . . . any default fee provisions in the . . . JAMS rules are overridden by the express Agreement that the parties signed"); *cf. Int'l Bhd. of Elec. Workers*, 9 F.4th at 75.

The district court's contrary conclusion is unpersuasive. First, the district court noted that some definitions of "apportion" suggest that it is merely the means of allocating something and not a measure of allocation. The court also cited cases finding that liability could be "apportioned" 100% to one party. But while that could be true in individual cases if arbitration fees "are so high as to make access to the forum impracticable" for a particular employee, *Am. Express*, 570 U.S. at 236, the context in which "apportion" is used in the DRA belies the notion that X Corp. should be obligated to pay both sides' fees across the board. The

section refers to two distinct ways fees can be allocated: (1) if applicable law requires it, the company will pay all arbitration fees, and (2) if applicable law does not require it, the fees will be "apportioned between the parties" under the standards of applicable law. AA225 (DRA § 6). To give each phrase its own meaning, apportionment cannot mean, as a blanket rule, that X Corp. is required to pay all fees, or virtually all fees, regardless of applicable law or the individual circumstances of a particular employee. The contrast between these two possibilities suggests that fees will be allocated in fair proportion, consistent with the term's ordinary meaning.

Second, contrary to the district court's determination, applying the Minimum Standards or Employment Rule 31(c) would render Section 6 superfluous, in violation of bedrock contract interpretation principles. *See Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) ("The court should read the integrated contract . . . 'to safeguard against adopting an interpretation that would render any individual provision superfluous[.]'" (citation omitted)). Requiring X Corp. to pay virtually all arbitration fees across the board leaves no room for

43

"applicable law" or an arbitrator's "apportioning" those fees as contemplated in the DRA whenever there is "any" fee dispute. The district court disagreed on the ground that the Minimum Standards would not apply if a claimant retained counsel in connection with the DRA. SPA23. But limiting the arbitrator's role to such narrow circumstances still negates the plain terms of DRA Section 6. It clearly says that the arbitrator—not JAMS, and not the district court—should resolve "any" dispute over the proper apportionment of fees. Applying the Minimum Standards across the board, except for the limited set of cases where JAMS is willing to dispense with them, is incompatible with Section 6's arrangement.

Because Section 6 takes precedence over any conflicting aspect of the Minimum Standards or Employment Rule 31(c), X Corp. should not be required to pay virtually all ongoing fees in these arbitrations. For this reason, too, the district court's decision should be reversed.

## CONCLUSION

For all these reasons, the order of the district court should be reversed and the Petition to Compel Arbitration should be denied.

44

Dated:  October 31, 2024   Respectfully submitted,

           /s/ Michael E. Kenneally

MELISSA D. HILL      MICHAEL E. KENNEALLY
MORGAN, LEWIS & BOCKIUS LLP  JAMES D. NELSON
101 Park Avenue      BRENDAN J. ANDERSON
New York, NY  10178    MORGAN, LEWIS & BOCKIUS LLP
(212) 309-6000      1111 Pennsylvania Avenue, NW
           Washington, DC  20004
           (202) 739-3000

*Counsel for Respondents-Appellants*

45

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because it contains 9,001 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, Century Schoolbook 14-point font.

Dated: October 31, 2024      /s/ Michael E. Kenneally
                                   MICHAEL E. KENNEALLY
                                   *Counsel for Respondents-Appellants*