# DISPUTE RESOLUTION AGREEMENT

**This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**

**You can choose to opt out of this Agreement – you have 30 days to opt out.**

## 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2. Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.

### 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee. Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

### 4. Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

### 5. How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis**. Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

### 6. Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

## 7. The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8. An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9. Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10. Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Leslie Berland, Head of People
TWITTER, INC.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME PRINTED Kourtney Traina

EMPLOYEE SIGNATURE *Kourtney Traina*
Kourtney Traina (Nov 20, 2020 14:15 PST)

Date: Nov 20, 2020

# EXHIBIT 3

NOTICE TO ALL PARTIES June 21, 2023

**RE: Twitter Inc.'s Request For Fee Sharing**

Dear Parties:

JAMS has received and reviewed Twitter's June 2 request for equal apportionment of JAMS fees in arbitrations pending in certain jurisdictions, and the several responses thereto from counsel for Claimants.

JAMS notified the parties at the outset of these matters that the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("Minimum Standards" or "Standards") applies. The Minimum Standards reflect JAMS administrative policy to administer employment arbitrations under the protections provided in the Minimum Standards. Application of the Standards is separate and apart from the protections that may apply in any given jurisdiction, and JAMS applies the Standards nationwide. While the Minimum Standards might go further than the law requires in a particular jurisdiction, JAMS has chosen to conduct its business in a manner which provides these protections for employees where the arbitration agreement is not negotiated and is required as a condition of employment. As our notice at the outset of each case advised, JAMS applies the Minimum Standards notwithstanding any contrary provision in the parties' arbitration agreement (unlike the JAMS Rules, which are subject to party-agreed procedures consistent with JAMS Rule 2).

The Minimum Standards do not prevent an employee from contributing to JAMS fees (see the Comment under Standard No. 6). However, absent employee agreement JAMS will continue to issue invoices in these matters consistent with Standard No. 6.

Where JAMS has determined the Minimum Standards apply and an employer declines to proceed under the Minimum Standards, JAMS will decline to administer the arbitration.

As our notice in each case advised, any further issue about whether the Minimum Standards apply in a given case should be directed to the arbitrator in the case. After hearing from the parties, if the arbitrator believes JAMS should revisit the issue, the arbitrator may advise JAMS accordingly. JAMS will then review the issue, taking the arbitrator's position into consideration, and will make a final determination.

Sincerely,

*/s/ Sheri Eisner*

Sheri Eisner
Senior Vice President, General Counsel
Co-Chair, JAMS National Arbitration Committee

# EXHIBIT 4

Morgan Lewis

**Sari M. Alamuddin**
Partner
+1.312.324.1158
sari.alamuddin@morganlewis.com

June 28, 2023

**VIA EMAIL**

Sheri Eisner
Senior Vice Present, General Counsel
Co-Chair, JAMS National Arbitration Committee

Re: Twitter, Inc's Response to JAMS' June 21, 2023 Letter

Dear Ms. Eisner:

On behalf of X Corp. as success-in-interest to Twitter, Inc. (collectively, hereinafter "Twitter"), we write in response to your letter dated June 21, 2023.

As we explained in our June 2, 2023 letter to JAMS, both JAMS' Minimum Standard No. 6, and any decision by JAMS that it will make the final determination on this Standard's application to these cases, conflict with the express, unambiguous and controlling terms of the applicable dispute resolution agreements between the parties. We accordingly sought clarification from JAMS as to its understanding of the application of these principles in these matters. In JAMS' letter dated June 21, 2023, JAMS decided (1) that it would apply the Minimum Standards "notwithstanding any contrary provision in the parties' arbitration agreement"; (2) where it "has determined that Minimum Standards apply and an employer declines to proceed under the Minimum Standards, JAMS will decline to administer the arbitration"; and (3) if an individual arbitrator believes that JAMS should revisit the issue, JAMS may take that into consideration but ultimately JAMS "will make a final determination."

JAMS' decision prevents Twitter from exercising its contractual rights and improperly negates a material provision in the dispute resolution agreements should Twitter proceed in accordance with that decision. For this reason and based upon JAMS' recent June 21 determination, Twitter declines to proceed under the Minimum Standards for all demands in jurisdictions where fee-sharing is lawful. Attached to this letter is a list of demands against Twitter currently filed with and/or pending before JAMS in such jurisdictions. We understand that, in accordance with your June 21 letter, JAMS will no longer administer these arbitrations. As a result, JAMS should cease invoicing Twitter for any fees/costs associated with these arbitrations.

Please let us know if you have any questions. Counsel for claimants is copied on this letter.

Sincerely,

/s/

Sari M. Alamuddin

SMA
Attachment
c: Dixon Diab & Chambers LLP
Outten & Golden LLP
Lichten & Liss-Riordan P.C.
Kamerman, Uncyk, Soniker & Klein, P.C.

| Claimant Last Name | Claimant First Name | Location | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601002238 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601002240 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |

| Claimant Last Name | Claimant First Name | Location | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601002243 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 / 33379 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601002250 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601002251 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |

| Claimant Last Name | Claimant First Name | Location | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601002253 |
| [redacted] | [redacted] | [redacted] | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601002255 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601002259 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |

| Claimant Last Name | Claimant First Name | Location | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Kamerman, Uncyk, Soniker & Klein, P.C. | 1345002152 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601002262 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Kamerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Kamerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601002265 |
| [redacted] | [redacted] | [redacted] | Kamerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601002266 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |

| Claimant Last Name | Claimant First Name | Location | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601002270 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601002275 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601002276 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601002277 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | Lichten & Liss-Riordan, P.C. | |

| Claimant Last Name | Claimant First Name | Location | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601002279 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 2602003380 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601002283 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |

| | | | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601002287 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601002288 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601002290 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601002293 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |

| Claimant Last Name | Claimant First Name | Location | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]amerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | 1601002294 |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]amerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | [redacted]ichten & Liss-Riordan, P.C. | |

| Claimant Last Name | Claimant First Name | Location | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | 1601001991 |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | 1601002299 |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | 1601002302 |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | amerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | 1601002303 |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | 1601001991 |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |
| | | | ichten & Liss-Riordan, P.C. | |

| Claimant Last Name | Claimant First Name | Location | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | amerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | amerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | amerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | amerman, Uncyk, Soniker & Klein, P.C. | |

| Claimant Last Name | Claimant First Name | Location | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 / 33378 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601002315 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |

| Claimant Last Name | Claimant First Name | Location | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |

| [redacted] | [redacted] | [redacted] | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | amerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601002317 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601002318 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601002319 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601002320 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | 1601002321 |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | amerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |
| [redacted] | [redacted] | [redacted] | ichten & Liss-Riordan, P.C. | |

| Claimant Last Name | Claimant First Name | Location | Claimant Firm | Reference Number |
|---|---|---|---|---|
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Kamerman, Uncyk, Soniker & Klein, P.C. | 1601002006 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | 1601001991 |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |
| [redacted] | | | Lichten & Liss-Riordan, P.C. | |

# EXHIBIT 5

RE: Joint Letter Regarding Stay of Arbitration Proceedings Between X Corp./Twitter and KROG Claimants

Alamuddin, Sari M. <sari.alamuddin@morganlewis.com>
Wed 3/6/2024 12:02 PM
To:Akiva Cohen <acohen@kusklaw.com>;Sarah Nevins <snevins@jamsadr.com>;Stephenson, Kassia <kassia.stephenson@morganlewis.com>
Cc:Chowdhry, Kaiser H. <kaiser.chowdhry@morganlewis.com>;Mike Dunford <mdunford@kusklaw.com>;mgl@rezlaw.com <mgl@rezlaw.com>

That order only applies to the Zhang arbitration, and it is incorrect to say that Respondent has not yet complied with that order because a stay has been in place. Now that the stay has been lifted, Respondent does intend to comply with the Zhang order in the Zhang arbitration. There is, however, a dispute as to whether that arbitration order applies to other arbitrations which are individual arbitrations before different arbitrators. While Claimants may believe that the order applies beyond Zhang, Respondents do not, and indeed the parties are currently litigating that dispute in federal court, as counsel for Claimants is aware.

**Sari M. Alamuddin**
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive, Suite 2800 | Chicago, IL 60606-1511
Direct: +1.312.324.1158 | Main: +1.312.324.1000 | Fax: +1.312.324.1001
sari.alamuddin@morganlewis.com | www.morganlewis.com
Assistant: Rhoda Morris | +1.312.324.1157 | rhoda.morris@morganlewis.com

Morgan Lewis 150 YEARS
150 YEARS OF RAISING THE BAR
Learn More

---

**From:** Akiva Cohen <acohen@kusklaw.com>
**Sent:** Wednesday, March 6, 2024 10:52 AM
**To:** Alamuddin, Sari M. <sari.alamuddin@morganlewis.com>; Sarah Nevins <snevins@jamsadr.com>; Stephenson, Kassia <kassia.stephenson@morganlewis.com>
**Cc:** Chowdhry, Kaiser H. <kaiser.chowdhry@morganlewis.com>; Mike Dunford <mdunford@kusklaw.com>; mgl@rezlaw.com
**Subject:** Re: Joint Letter Regarding Stay of Arbitration Proceedings Between X Corp./Twitter and KROG Claimants

[EXTERNAL EMAIL]
That is not correct. Judge Maas issued an order in the Zhang Arbitration construing the DRA as requiring Respondents to comply with the Minimum Standards. I attach the order here.

To date, Respondents have not complied with that order (including in the *Zhang* arbitration!), and it appears that Claimants will need to move, arbitration by arbitration, for Sanctions orders under Rule 29 addressing their willful default. But it only "remains a live issue" to the extent that Respondents have determined they will simply refuse to comply with their obligations.

At a bare minimum, we expect JAMS to authorize billing for such sanctions motions to be made against amounts Respondents have already paid in the arbitrations where they have already paid such deposits, given the ruling that such amounts are properly Respondents' obligations under the DRA.

---

**From:** Alamuddin, Sari M. <sari.alamuddin@morganlewis.com>
**Sent:** Wednesday, March 6, 2024 9:29 AM
**To:** Sarah Nevins <snevins@jamsadr.com>; Akiva Cohen <acohen@kusklaw.com>; Stephenson, Kassia <kassia.stephenson@morganlewis.com>
**Cc:** Chowdhry, Kaiser H. <kaiser.chowdhry@morganlewis.com>; Mike Dunford <mdunford@kusklaw.com>; mgl@rezlaw.com <mgl@rezlaw.com>
**Subject:** RE: Joint Letter Regarding Stay of Arbitration Proceedings Between X Corp./Twitter and KROG Claimants

Correct; that remains a live issue.

**Sari M. Alamuddin**
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive, Suite 2800 | Chicago, IL 60606-1511
Direct: +1.312.324.1158 | Main: +1.312.324.1000 | Fax: +1.312.324.1001
sari.alamuddin@morganlewis.com | www.morganlewis.com
Assistant: Rhoda Morris | +1.312.324.1157 | rhoda.morris@morganlewis.com

Morgan Lewis 150 YEARS

150 YEARS OF RAISING THE BAR

Learn More

---

**From:** Sarah Nevins <snevins@jamsadr.com>
**Sent:** Wednesday, March 6, 2024 8:14 AM
**To:** Akiva Cohen <acohen@kusklaw.com>; Alamuddin, Sari M. <sari.alamuddin@morganlewis.com>; Stephenson, Kassia <kassia.stephenson@morganlewis.com>
**Cc:** Chowdhry, Kaiser H. <kaiser.chowdhry@morganlewis.com>; Mike Dunford <mdunford@kusklaw.com>; mgl@rezlaw.com
**Subject:** RE: Joint Letter Regarding Stay of Arbitration Proceedings Between X Corp./Twitter and KROG Claimants

[EXTERNAL EMAIL]
Thank you.

I assume that the fee split question has not been solved for cases outside of California, Oregon and Nevada. Please confirm if this is correct.

Sarah

**Sarah Nevins**
Arbitration Practice Manager –
East/Central

**JAMS - *Local Solutions. Global Reach.*™**
P: 313.209.8851
**www.jamsadr.com**

Manage your case anytime, anywhere.
**Register now for JAMS Access**.
Follow us on **LinkedIn** and **Twitter**.

---

**From:** Akiva Cohen <acohen@kusklaw.com>
**Sent:** Wednesday, March 6, 2024 8:58 AM
**To:** Sarah Nevins <snevins@jamsadr.com>; Alamuddin, Sari M. <sari.alamuddin@morganlewis.com>; Stephenson, Kassia <kassia.stephenson@morganlewis.com>
**Cc:** Chowdhry, Kaiser H. <kaiser.chowdhry@morganlewis.com>; Mike Dunford <mdunford@kusklaw.com>; mgl@rezlaw.com
**Subject:** Re: Joint Letter Regarding Stay of Arbitration Proceedings Between X Corp./Twitter and KROG Claimants

**Caution:** This email originated from outside JAMS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning, Ms. Nevins. Mediation concluded without an agreement and all cases should be reactivated.

Best,

Akiva

---

**From:** Sarah Nevins <snevins@jamsadr.com>
**Sent:** Wednesday, March 6, 2024 7:58 AM
**To:** Alamuddin, Sari M. <sari.alamuddin@morganlewis.com>; Stephenson, Kassia <kassia.stephenson@morganlewis.com>
**Cc:** Chowdhry, Kaiser H. <kaiser.chowdhry@morganlewis.com>; Mike Dunford <mdunford@kusklaw.com>; Akiva Cohen <acohen@kusklaw.com>; mgl@rezlaw.com <mgl@rezlaw.com>
**Subject:** RE: Joint Letter Regarding Stay of Arbitration Proceedings Between X Corp./Twitter and KROG Claimants

Good Morning Counsel.

I am writing to follow up regarding the status of the cases mediated on February 7. Please advise at your convenience.

Thank you,
Sarah

**Sarah Nevins**
Arbitration Practice Manager –
East/Central

**JAMS - *Local Solutions. Global Reach.*™**
P: 313.209.8851
**www.jamsadr.com**

Manage your case anytime, anywhere.
**Register now for JAMS Access**.
Follow us on **LinkedIn** and **Twitter**.

---

**From:** Alamuddin, Sari M. <sari.alamuddin@morganlewis.com>
**Sent:** Wednesday, February 21, 2024 8:25 AM
**To:** Sarah Nevins <snevins@jamsadr.com>; Stephenson, Kassia <kassia.stephenson@morganlewis.com>
**Cc:** Chowdhry, Kaiser H. <kaiser.chowdhry@morganlewis.com>; Mike Dunford <mdunford@kusklaw.com>; Akiva Cohen <acohen@kusklaw.com>; mgl@rezlaw.com
**Subject:** Re: Joint Letter Regarding Stay of Arbitration Proceedings Between X Corp./Twitter and KROG Claimants

**Caution:** This email originated from outside JAMS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

The parties are considering a mediator's proposal which remains open until February 23, 2024. Thank you.

**Sari M. Alamuddin**

**Morgan, Lewis & Bockius LLP**

77 West Wacker Drive, Fifth Floor | Chicago, IL 60601

Direct: +1.312.324.1158 | Main: +1.312.324.1000 | Fax: +1.312.324.1001

sari.alamuddin@morganlewis.com | www.morganlewis.com

Assistant: Rhoda Morris | +1.312.324.1157 | rhoda.morris@morganlewis.com

---

**From:** Sarah Nevins <snevins@jamsadr.com>
**Sent:** Wednesday, February 21, 2024 7:22:31 AM
**To:** Stephenson, Kassia <kassia.stephenson@morganlewis.com>
**Cc:** Alamuddin, Sari M. <sari.alamuddin@morganlewis.com>; Chowdhry, Kaiser H. <kaiser.chowdhry@morganlewis.com>; Mike Dunford <mdunford@kusklaw.com>; Akiva Cohen <acohen@kusklaw.com>; mgl@rezlaw.com <mgl@rezlaw.com>
**Subject:** RE: Joint Letter Regarding Stay of Arbitration Proceedings Between X Corp./Twitter and KROG Claimants

[EXTERNAL EMAIL]
Good Morning Counsel.

I am writing to follow up regarding the status of the cases mediated on February 7. Please advise at your convenience.

Thank you,
Sarah

**Sarah Nevins**
Arbitration Practice Manager – East/Central

**JAMS - *Local Solutions. Global Reach.*™**
P: 313.209.8851
**www.jamsadr.com**

Manage your case anytime, anywhere.
**Register now for JAMS Access**.
Follow us on **LinkedIn** and **Twitter**.

---

**From:** Stephenson, Kassia <kassia.stephenson@morganlewis.com>
**Sent:** Thursday, December 21, 2023 4:47 PM
**To:** Sarah Nevins <snevins@jamsadr.com>
**Cc:** Alamuddin, Sari M. <sari.alamuddin@morganlewis.com>; Chowdhry, Kaiser H. <kaiser.chowdhry@morganlewis.com>; Mike Dunford <mdunford@kusklaw.com>; Akiva Cohen <acohen@kusklaw.com>; mgl@rezlaw.com
**Subject:** Joint Letter Regarding Stay of Arbitration Proceedings Between X Corp./Twitter and KROG Claimants

**Caution:** This email originated from outside JAMS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Ms. Nevins,

Please see attached for the Parties' joint letter to JAMS regarding the Parties' agreement to a stay of all pending arbitrations. Please let us know if you have any questions or need anything further.

Thank you,

**Kassia Stephenson**
**Morgan, Lewis & Bockius LLP**
One Market, Spear Street Tower | San Francisco, CA 94105
Direct: +1.415.442.1349 | Main:+1.415.442.1000 | Fax: +1.415.442.1001
kassia.stephenson@morganlewis.com| www.morganlewis.com
Assistant: Lilliam Quave | +1.415.442.1587 | lilliam.quave@morganlewis.com
**OOO 12/27/23 – 1/7/24**

Morgan Lewis 150 YEARS

150 YEARS OF RAISING THE BAR

Learn More

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BURGIOUS FRAZIER, JR., YOSUB KIM, WAYNE KRUG, BEN PEREZ, VANESSA SZAJNBERG, NICHOLAS TAPALANSKY, and SHELLY YIP, | No. |
| Petitioners, | |
| -against- | **PETITION TO COMPEL** |
| X. CORP f/k/a TWITTER, INC. and X HOLDINGS CORP f/k/a X HOLDINGS I, INC., | |
| Respondents. | |

1. This Petition to compel arbitration under 9 U.S.C. § 4 arises out of Respondents' bad-faith attempt to delay the arbitrations in which they required Petitioners to pursue their claims relating to Respondents' refusal to pay Petitioners the severance Respondents promised them and Petitioners earned.

2. The source of that delay is simple: Twitter, Inc. ("Twitter") required each of the Petitioners to sign an arbitration agreement (Twitter's form "Dispute Resolution Agreement," or "DRA") in order to accept employment with Twitter. In December, 2022, after other former Twitter employees brought a putative class action in the Northern District of California to address their claims to severance, Twitter successfully moved to compel to arbitration the claims of any employee – such as Petitioners – with an active DRA. But once they shunted the employees' claims to arbitration, Respondents stalled hundreds of them by simply refusing to pay the fees required to allow the arbitrations to proceed.

3. There is no basis for Respondents' refusal to pay the required fees. Petitioners' DRAs are crystal clear: their arbitrations are to be conducted at JAMS and according to JAMS's Employment Arbitration Rules & Procedures (the "JAMS Rules"), which mandate that employers

such as Twitter pay all of the arbitral fees for such arbitrations other than a small initial filing fee . The DRAs also have an express provision addressing fees, which provides that fees will be apportioned between Petitioners and Respondents in accordance with New York law; as discussed in the accompanying Memorandum of Law, New York law does not mandate any particular apportionment of fees, and confirms JAMS's authority to mandate that employers pay the vast majority of the fees.

4. Nor do Respondents have any good-faith basis to argue otherwise. Faced with Respondents' plan of delay, and its position that the DRA required its employees to pay 50% of the arbitral fees, Petitioners' colleague Zhang Yunfeng sought and obtained a construction of the DRA from the arbitrator appointed to hear his case, retired Judge Frank Maas.

5. After extensive briefing (*see* Exhibits 1-3 hereto) and oral argument, on November 30, 2023, Judge Maas rejected Respondents' arguments and held, in a Partial Final Award (Exhibit 4 hereto), that Twitter's DRA required Respondents to abide by the JAMS Rules and pay the fees. Despite that, Respondents have not paid the fees for any of the claimants whose cases they have stalled, insisting that each claimant must first extend the arbitral fees Respondents refused to pay, in order to get a *separate* ruling from an arbitrator that the DRA requires Respondents to pay the fees.

6. As discussed in Petitioners' accompanying Memorandum of Law, however, the Court need not make itself an accessory to Respondents' attempt to grind its employees down through delaying tactics. Section 4 of the Federal Arbitration Act gives the Court the power to compel Respondents to arbitrate "in accordance with the terms [of the DRA]." Because Judge Maas has already determined that the terms of the DRA require Respondents to pay fees as required by JAMS's Rules, after a full and fair opportunity for Respondents to litigate the issue, Respondents are estopped from arguing to the contrary in opposition to this Petition. Thus, the Court should direct

Respondents to arbitrate in accordance with the terms of the DRAs, including by paying the arbitral fees required by JAMS's Rules.

**THE PARTIES**

Petitioners are citizens of the State of New York who were formerly employed by Twitter in New York, and who commenced arbitration with Respondents in New York. Copies of Petitioners' Demands for Arbitration are annexed hereto as Exhibits 5-11.

7. Respondent X Corp., f/k/a Twitter,[1] is a Nevada Corporation with a principal place of business in San Francisco, California, and a Respondent in Petitioners' arbitrations.

8. Respondent X Holdings Corp., f/k/a X Holdings I, Inc. is a Nevada Corporation with a principal place of business in San Francisco, California, and a Respondent in Petitioners' arbitrations.

**JURISDICTION AND VENUE**

9. Jurisdiction is proper under 28 U.S.C. § 1331 and *Vaden v. Discover Bank*, 556 U.S. 49, 62 (2009), in that Petitioners' underlying arbitration demands include claims under Federal law. Jurisdiction is also proper under 28 U.S.C. § 1332(a)(1) and (c)(2), in that the action is between citizens of different states and the amount in controversy is greater than $75,000.

10. Venue is proper in that 9 U.S.C. § 4 requires a Petition to compel arbitration be filed in a district in which jurisdiction would lie in the absence of the arbitration agreement, and in which the arbitration is to be held.

**THE DRA AND TWITTER'S ONBOARDING PROCESS**

11. For years, Twitter has required its employees to execute a form DRA as a condition of employment.

[1] Despite the formal change of the company's corporate name and branding, it continues to be primarily known as "Twitter," rather than as "X." For the convenience of the Court and ease of understanding, Petitioners will continue to refer to it as "Twitter."

12. The DRA states that it is governed by the Federal Arbitration Act and evidences a transaction involving commerce.

13. It provides that "Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement." The DRA further provides that

> [e]xcept as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.
>
> Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

(emphasis in original).

14. Twitter's practice was to send offer letters to successful job applicants.

15. Twitter's offer letters explain the steps the applicant must take to accept a job offer, which include signing the DRA.

16. Twitter uses Adobe Sign to collect electronic signatures on those employment documents.

17. Twitter has largely automated the onboarding process for new employees, such that once the applicant submits executed documents through Adobe Sign, the documents are stored, Twitter's People Services team is notified, and a new Workday profile is created for the newly hired Twitter employee.

18. This automated process requires the employee to execute the DRA.

19. Therefore, execution of the DRA is a condition of employment.

20. Since June 2018, the DRA has provided that the employee and Twitter agree to bring any arbitration claim before JAMS, pursuant to the then-current JAMS Rules.

21. The DRA also contains a link to the Employment Arbitration Rules page, which in turn contains a link to the "Complete List of Rules & Procedures," including the Policy on Employment Arbitration Minimum Standards of Procedural Fairness" ("the Minimum Standards"). Rule 2 of the JAMS Rules provides that the parties to an arbitration can agree to any procedures not specified in the JAMS Rules, or otherwise alter the JAMS Rules, only if any such alterations are "consistent with the applicable law and JAMS policies (including without limitations, the []Minimum Standards . . . .")

22. JAMS adopted its Minimum Standards effective July 15, 2009.

23. The Minimum Standards apply to arbitrations based on a pre-dispute agreement that is required as a condition of employment.

24. Minimum Standard No. 6 provides in pertinent part that "An employee's access to arbitration must not be precluded by the employee's inability to pay any costs or by the location of the arbitration. The only fee that an employee may be required to pay is JAMS' initial Case Management Fee. All other costs must be borne by the company, including any additional JAMS Case Management Fee and all professional fees for the arbitrator's services."

25. Moreover, since at least June 1, 2021, the JAMS Employment Arbitration Rules & Procedures have provided in Rule 31(c) that "[i]f an Arbitration is based on a clause or agreement that is required as a condition of employment, the only fee that an Employee may be required to pay is the initial JAMS Case Management Fee."

**ELON MUSK'S DISRUPTIVE PURCHASE OF TWITTER, AND TWITTER'S EFFORTS TO REASSURE ITS EMPLOYEES**

26. In late March 2022, Elon Musk ("Musk") vocally criticized Twitter's content moderation decisions.

27. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company.

28. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

29. On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale.

30. Musk and Defendants executed a Merger Agreement later that day.

31. The Merger Agreement contained the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

32. Almost immediately, Twitter's employees began expressing concern about the security of their jobs if Musk purchased the company.

33. Thereafter Twitter repeatedly reassured its employees its employees that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing

date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

34. The merger closed on October 27, 2022.

**MUSK TAKES THE HELM, SLASHES STAFF, AND LITIGATION ENSUES**

35. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

36. The first lawsuit related to Twitter's wrongful termination of its employees was filed that evening.

37. On November 4, 2022, the layoffs at Twitter began. The severance offered in connection with these layoffs was far less than had been promised by Twitter's prior communications.

38. In mid-November, Musk sent another email to Twitter's remaining employees. This email contained a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

39. The layoffs and constructive terminations continued thereafter.

40. After Musk assumed control of Twitter, it terminated nearly 6,500 employees.

41. As a result, thousands of Twitter employees, including Petitioners, have filed arbitrations against Twitter with JAMS, seeking vindication of their common law and statutory rights.

**RESPONDENTS' REFUSAL TO ARBITRATE**

42. In the months after Twitter's former employees filed their arbitration demands, JAMS invoiced Defendants for their share of the initiation fees and indicated that JAMS had concluded that the Minimum Standards would apply to the arbitration.

43. Defendants did not object to these statements, and instead, filed answers and affirmative defenses, paid their share of the case initiation fees, and participated in the selection of arbitrators.

44. After proceeding in arbitration for several months, on June 2, 2023, Defendants began objecting to the application of the Minimum Standards, arguing that the DRA superseded the Minimum Standards.

45. On June 21, 2023, JAMS rejected Defendants' objection.

46. On June 28, 2023, Defendants wrote JAMS and indicated that they would refuse to proceed under the Minimum Standards, asserting that only an arbitrator could answer questions regarding the interpretation of the DRA.

47. The practical effect of Defendants' position (and refusal to pay the arbitration fees) was to halt the progress of hundreds of arbitrations involving former Twitter employees who contended that they had been denied severance benefits which had been promised to them.

48. In response, Plaintiff Zhang asked JAMS whether an arbitrator could consider a motion for an interim award to resolve the dispute if Mr. Zhang pre-paid Twitter's share of the fees for the motion.

49. JAMS confirmed that, under those circumstances, an arbitrator could consider such a motion.

50. On July 31, 2023, Mr. Zhang submitted a motion for an interim award to the arbitrator handling his case, retired Judge Frank Maas.

51. On August 31, 2023, Defendants filed their response opposing Mr. Zhang's motion.

52. On September 12, 2023, Mr. Zhang filed his reply brief in support of his motion.

53. On October 25, 2023, Judge Maas heard oral arguments from the parties on Mr. Zhang's motion.

54. On November 30, 2023, Judge Maas issued his Partial Final Award.

55. In his Partial Final Award, Judge Maas found that

> Twitter employees . . . are required to sign the DRA electronically as a condition of employment even though they may opt out of its applicability if they choose to do so. The DRA, which contains mandatory arbitration language in Section 1, therefore constitutes '<u>an agreement</u> . . . required as a condition of employment' within the meaning of JAMS Rule 31(c)."

(emphasis in Partial Final Award).

56. After considering and rejecting Respondents' argument that the DRA mandated that the arbitral fees be split between Respondents and the employees, Judge Maas held that "Respondent Twitter, Inc., and Respondent X Holdings I, Inc. (as Twitter's affiliate, successor, subsidiary, or parent), will be required to pay all the JAMS fees and arbitrator fees (other than the initial case management fee) incurred in connection with this proceeding."

## <u>**FIRST CAUSE OF ACTION**</u>

(Compel Arbitration Pursuant to 9 U.S.C. § 4)

57. Petitioners repeat and reallege the allegations of Paragraphs 1-56 of the Petition as though more fully set forth herein.

58. Petitioners executed their DRAs as part of Twitter's mandatory new-hire paperwork and employment agreement, comprised of their offer letters, Employee Invention Assignment and Confidentiality Agreement, and Code of Business Conduct and Ethics.

59. The DRA was – and was a part of – an agreement required as a condition of employment.

60. The DRA contains Twitter's agreement to arbitrate in accordance with JAMS's Rules.

61. JAMS's Rules require Twitter to pay all arbitral fees other than a $400 initial filing fee.

62. Respondents had a full and fair opportunity to litigate their contention that, given the opt-out provision in the DRA, such payment is not required by JAMS's Rules.

63. Both JAMS and Judge Maas have rejected Respondents' contention that such payment is not required by JAMS's Rules.

64. Respondents had a full and fair opportunity to litigate their position that the DRA does not contain their agreement to abide by JAMS's Rules with respect to the allocation of fees.

65. Respondents had a full and fair opportunity to litigate their position that the DRA in fact requires that such fees be allocated equally among the parties.

66. Judge Maas rejected Respondents' position that the DRA requires that such fees be allocated equally among the parties.

67. The DRA does not contain any provision reciting that fees for any arbitration are to be shared equally among the parties.

68. Nevertheless, Respondents have refused to proceed to arbitrate under the JAMS Rules.

69. Nevertheless, Respondents have refused to pay the arbitral fees required of them under those rules.

70. By so doing, Respondents have prevented the arbitrations from proceeding. Petitioners are aggrieved by Respondents' refusal to arbitrate in accordance with the terms of the DRA.

71. As such, Petitioners are entitled to an Order compelling arbitration and specifically directing Respondents to abide by the terms of the DRA and pay the arbitral fees required by the JAMS Rules Twitter selected when it drafted the DRA.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioners respectfully request:

(a) An Order compelling Respondents to arbitrate in accordance with the terms of the DRA, including by paying all arbitral fees required under the rules of their chosen arbitration provider; and

(b) Such other and further relief as the Court deems right and proper.

Dated: March 21, 2024
New Brunswick, New Jersey

KAMERMAN UNCYK SONIKER & KLEIN, P.C.

By: */s/ Akiva M. Cohen*
Akiva M. Cohen
1700 Broadway
New York, New York 10019
(212) 400-4930

*Attorneys for Plaintiff*

# EXHIBIT 1

**CAUSE NO. 1601002342**

| | |
|---|---|
| **YUNFENG ZHANG,**<br>**CLAIMANT,**<br>**V.**<br>**TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,**<br>**RESPONDENTS.** | **JAMS**<br>**MOTION FOR AN INTERIM AWARD DECLARING THAT THE PARTIES' DISPUTE RESOLUTION AGREEMENT REQUIRES RESPONDENTS TO PAY ALL COSTS UNIQUE TO ARBITRATION** |

# CLAIMANT YUNFENG ZHANG'S MOTION FOR AN INTERIM AWARD DECLARING THAT THE PARTIES' DISPUTE RESOLUTION AGREEMENT REQUIRES RESPONDENTS TO PAY ALL COSTS UNIQUE TO ARBITRATION

KAMERMAN, UNCYK, SONIKER &
KLEIN P.C.
Akiva M. Cohen, Esq.
Attorneys for Plaintiffs
1700 Broadway, 16th Floor
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............ iii

INTRODUCTION ............ 1

RELEVANT FACTS ............ 3

ARGUMENT ............ 4

I. The DRA Obligates Respondents to Comply with the Minimum Standards ............ 4

A. Applicable California law requires Respondents to pay the entire cost of the arbitration ............ 5

B. Generally applicable contract law requires Respondents to pay the entire cost of the arbitration ............ 6

II. Even if None of That Were True, Respondents Waived Section 6 of the DRA and Any Objection to the Minimum Standards, and Agreed to Abide by the Minimum Standards ............ 10

III. Twitter's Defenses Are Meritless ............ 11

CONCLUSION ............ 18

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*544 Bloomrest, LLC v. Harding*, 202 A.D.3d 499, 501 N.Y.S.3d 53 (2022)....18

*A.X.M.S. Corp. v. Friedman*, 948 F. Supp. 2d 319, 335 (S.D.N.Y. 2013)....11

*All Metro Aids, Inc. v. Homeward Bound Servs., Inc.*, 15 Misc. 3d 1121(A), 839 N.Y.S.2d 431 (Sup. Ct., Nassau County, 2007)....14

*Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83 (2000)....5, 8

*Bank of Tokyo-Mitsubishi, Ltd., New York Branch v. Kvaerner a.s.*, 243 A.D.2d 1, 671 N.Y.S.2d 905 (1998)....14

*BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674 (2d Cir. 1997)....2

*Bynum v. Maplebear Inc.*, No. 15-CV-6263, 2016 WL 5373643 (E.D.N.Y. Sept. 19, 2016)....14

*Certain Underwriters at Lloyd's v. Expeditors Int'l of Washington, Inc.*, 584 F. Supp. 3d 860 (C.D. Cal. 2022)....16

*Coventry Enterprises LLC v. Sanomedics Int'l Holdings, Inc.*, No. 14 CIV. 8727 NRB, 2015 WL 4486335 (S.D.N.Y. July 23, 2015)....7

*Dunkin v. Boskey*, 82 Cal. App. 4th 171, 98 Cal. Rptr. 2d 44 (2000)....8

*Elliott v. Nestle Waters N. Am. Inc.*, No. 13 CIV. 6331 RA, 2015 WL 1611333 (S.D.N.Y. Apr. 10, 2015)....17

*Empire Asset Mgmt. Co. v. Best*, No. 21-CV-4542 (PAC), 2021 WL 2650457 (S.D.N.Y. June 28, 2021), *aff'd*, No. 21-1798-CV, 2022 WL 893402 (2d Cir. Mar. 28, 2022)....6

*Harris v. TAP Worldwide, LLC*, 248 Cal. App. 4th 373 (Cal. Ct. App., 2d Dist., 2016)....7

*In re Barney Mac, LLC*, No. 04-17768 AJG, 2006 WL 2864974 (Bankr. S.D.N.Y. Oct. 3, 2006)....9

*In re Live Primary, LLC*, 626 B.R. 171 (Bankr. S.D.N.Y. 2021)....11

*In re Lois/USA, Inc.*, 264 B.R. 69 (Bankr. S.D.N.Y. 2001)....14

*Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564 (S.D.N.Y. 2013)....16

*Jimenez v. Monadnock Const., Inc.*, 109 A.D.3d 514, 970 N.Y.S.2d 577 (2013)....17

*Kinsey v. New York Times Co.*, 991 F.3d 171 (2d Cir. 2021)....15

*Kolchins v. Evolution Markets, Inc.*, 31 N.Y.3d 100, 96 N.E.3d 784 (2018)....8

*Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 63 P.3d 979 (2003)....16

*Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52 (1995)....6

*Medtronic, Inc. v. Walland*, No. 21 CIV. 2908 (ER), 2021 WL 4131657 (S.D.N.Y. Sept. 10, 2021)....17

*Mills v. Facility Sols. Grp., Inc.*, 84 Cal. App. 5th 1035, 300 Cal. Rptr. 3d 833 (2022)....16

*Oakland-Alameda Cnty. Coliseum Auth. v. Golden State Warriors, LLC*, 53 Cal. App. 5th 807, 267 Cal. Rptr. 3d 799 (2020) .......... 9

*Oce Bus. Servs., Inc. v. Christensen*, No. 116720/04, 2005 WL 1712143 (Sup. Ct., N.Y. County, 2005) .... 5

*Old Colony Tr. Co. v. City of Omaha*, 230 U.S. 100 (1913) .......... 10

*Pac. Emps. Ins. Co. v. Indus. Accident Comm'n of State of California*, 306 U.S. 493 (1939) .......... 16

*Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 522, 644 N.E.2d 1001 (1994) .......... 15

*PaineWebber Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996) .......... 6

*Penilla v. Westmont Corp.*, 3 Cal. App. 5th 205, 207 Cal. Rptr. 3d 473 (2016) .......... 16

*Ramirez v. Charter Commc'ns, Inc.*, 75 Cal. App. 5th 365, 290 Cal. Rptr. 3d 429 (2022) .......... 8

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) .......... 11

*Sateriale v. RJ Reynolds Tobacco Co.*, No. 2:09-CV-08394-CAS, 2014 WL 7338881 (C.D. Cal. Dec. 19, 2014) .......... 7

*SG Cowen Sec. Corp. v. Messih*, No. 00CIV.3228(HB), 2000 WL 633434 (S.D.N.Y. May 17, 2000), *aff'd*, 224 F.3d 79 (2d Cir. 2000) .......... 17

*Sims v. Worldpac Inc.*, No. C 12-05275 JSW, 2013 WL 663277 (N.D. Cal. Feb. 22, 2013) .......... 5, 15

*Tsatsani v. Walmart, Inc.*, No. 19CV9063PAEBCM, 2020 WL 6688939 (S.D.N.Y. Oct. 26, 2020), *report and recommendation adopted*, No. 19CIV9063PAEBCM, 2020 WL 6701019 (S.D.N.Y. Nov. 13, 2020) .......... 15

*United States v. Hamdi*, 432 F.3d 115 (2d Cir. 2005) .......... 7

*Youngman v. Robert Bosch LLC,* 923 F. Supp. 2d 411 (E.D.N.Y. 2013) .......... 15

**Statutes**

28 U.S.C. § 2201 .......... 16

9 U.S.C. § 4 .......... 17

N.Y. C.P.L.R. § 7513 .......... 13, 21

**Rules**

JAMS Rule 2 .......... 13

**Treatises**

11 *Williston on Contracts* § 32:11 (4th ed.) .......... 11

## INTRODUCTION

Since Respondent X Holdings Corp. f/k/a X Holdings I, Inc. ("X Holdings") purchased Respondent X Corp. f/k/a Twitter, Inc. ("Twitter"), Twitter has adopted a policy of refusing to timely pay bills it knows are due and owing, on the theory that it would save money by forcing its creditors to sue to enforce Twitter's debts.[1] And Respondents had already expressly imported that disregard for their payment obligations to the arbitrations filed against them; though Twitter's arbitration agreement (the "DRA") required Respondents to arbitrate under JAMS' rules and JAMS provides that invoices are due on receipt, Respondents unilaterally decided that it would be "reasonable" to delay payment (and therefore the progress of the arbitrations) by 30 days after each

[1] *See*, *e.g.*, *Imply Data, Inc. v. Twitter, Inc. et al,* No. CGC 22 603473 (Cal. Super. Ct., Dec. 13, 2022) (breach of contract for non-payment of more than three million dollars in invoices for work performed); *Columbia REIT - 650 California, LLC, v. Twitter, Inc., et al.*, No. CGC 22 603719 (Cal. Super Ct., Dec. 29, 2022) (breach of contract for non-payment of rent); *Canary, LLC v. Twitter, Inc. et al.*, No. CGC 23 603842 (Cal. Super. Ct., Jan. 6, 2023) (breach of contract for non-payment of invoices owed for marketing work); *Mediant Communications Inc. v. Twitter, Inc*, No. 650092/2023 (Sup. Ct., N.Y. Cnty., January 10, 2023) (breach of contract for non-payment of invoices owed); *The Crown Estate Commissioners v. Twitter UK Ltd & anor*, No. PT-2023-000043 (UK High Court, Jan. 19, 2023); *CRA Intl. Inc. Twitter Inc.*, No. 2384CV00142 (Mass. Super. Ct., Suffolk Cnty., January 19, 2023) (breach of contract for non-payment of more than two million dollars in invoices for expert consulting); *SRI Nine Market Square LLC, v. Twitter, Inc., et al.*, No. CGC 23 604136 (Cal. Super. Ct., Jan. 20, 2023) (breach of contract for non-payment of rent); *Leapley LLC v. Twitter Inc.*, No. 23-A-00690-2 (Geo. Super. Ct., Jan. 24, 2023); *Innisfree M&A Inc. v. Twitter, Inc.*, No. 650686/2023 (Sup. Ct., N.Y. Cnty., Feb. 3, 2023) (breach of contract for non-payment of nearly two million dollars in unpaid consulting fees); *Jamestown Ponce City Market, L.P. v. Twitter, Inc.*, No. 23DD000299 (Geo. Super. Ct., Feb. 9. 2023); *Analysis Group, Inc. v. Twitter Inc.*, No. 1:23-cv-10312 (D. Mass, Feb. 9, 2023) (breach of contract for non-payment of more than two million dollars in expert consulting fees); *Blueprint Studios Trends Inc., v. Twitter, Inc., et al.*, No. CGC 23 604709 (Cal. Super. Ct., Feb. 17, 2023); *Writer, Inc. v. Twitter, Inc., et al.*, No. CGC 23 604735 (Cal. Super. Ct., Feb. 21, 2023); S*HIGO Center Plaza Owner LLC vs. Twitter Inc.,* No. 2384CV00461 (Mass. Super. Ct., Suffolk Cnty., Feb. 22, 2023); *Nube Group LLC v. Twitter, Inc.,* No. 3:23-cv-00921 (N.D. Cal., Mar. 1, 2023) (breach of contract for non-payment of invoices); *Private Jet Services Group, LLC v. Twitter, Inc.* No. 1:23-cv-00210 (D.N.H, Mar. 27 2023) (breach of contract for non-payment of invoices for private jet services); *Melior Productions Inc. v. Twitter, Inc. et al.*, No. CGC 23 605464 (Cal. Super. Ct., Mar. 28, 2023); *KRE 1330 Broadway Owner LLC v. Twitter, Inc.* No. 23CV030513 (Cal. Super. Ct., Apr. 4, 2023); *White Coat Captioning, LLC et al. v. Twitter, Inc.*, No. 3:23-cv-01594 (N.D. Cal., Apr. 4, 2023) (multiplaintiff breach of contract); *Global Data Strategy Ltd v. Twitter Inc.*, No. 3:23-cv-02266 (N.D. Cal., May 10, 2023) (breach of contract for unpaid business consulting fees); *JF Associates LLC v. X. Corp*, No. 652564/2023 (Sup. Ct., N.Y. Cnty, May 26, 2023) (breach of contract for unpaid public relations consulting fees); *Gjoni v. Twitter, Inc.*, No. 1:23-cv-04465 (S.D.N.Y., May 30, 2023) (violations of NYC Admin Code § 22-505, the New York City Displaced Building Service Workers Protection Act); *Facilitate Corporation Pte Ltd v. Twitter, Inc.,* No. 4:23-cv-03242 (N.D. Cal., Jun. 29, 2023) (breach of contract for unpaid construction and facilities invoices); *Point B, Inc. v. Twitter, Inc.*, No. 3:23-cv-02934 (N.D. Cal., Jun 14, 2023) (breach of contract for unpaid business consulting fees); *see also* Amended Complaint in *Arnold et al. v. X Corp et al*, No. 1:23-cv-00528 (D. Del., Jun. 16 2023), D.I. 10, at ¶¶ 6 ("Elon told me he would only pay rent over his dead body"), 206-07 ("well, we just won't pay those. We just won't pay landlords" and "We just won't pay rent"), 244 (Musk directed Twitter not to pay the janitorial staff for work already completed), 246 (Transition Team member informing Twitter employee that Musk had decided Twitter would no longer be paying rent globally).

invoice, and so Respondents did, contrary obligations notwithstanding. Declaration of Akiva M. Cohen ("Cohen Dec"), Ex. 1.

Not content to merely continue to delay payments, Respondents are now applying that disregard for known payment obligations by entirely refusing to continue to pay arbitration fees invoiced by JAMS for arbitrations outside of California and Nevada, based on the spurious argument that the DRA's fees provision allows Respondents to refuse to comply with Standard 6 of JAMS' Policy on Employment Arbitration Minimum Standards of Procedural Fairness (the "Minimum Standards"). Twitter's refusal has ground this arbitration to a halt, along with thousands of others), as JAMS – reasonably – will not proceed without being paid. Claimant (and his thousands of colleagues) cannot afford to advance the necessary fees for their cases. But Claimant could, and therefore did, advance sufficient funds to allow the Arbitrator to rule on this one issue.

Claimant therefore brings this motion for an interim award: (1) construing the parties' DRA and ruling that Respondents are contractually required to abide by the Minimum Standards; or (2) to the extent that the Arbitrator does not so-construe the DRA, ruling that Respondents waived any objection to the application of the Minimum Standards by paying the case initiation fees and proceeding under the Minimum Standards without objection on the timeline required by JAMS' commencement letter. Whatever path the Arbitrator chooses,[2] the outcome should be the same: an interim award declaring that Respondents are obligated to pay the fees for this arbitration, which Claimant can then confirm and enforce.

[2] Respectfully, because this issue impacts thousands of Claimant's colleagues and Respondents could be collaterally estopped by a ruling in Claimant's favor so long as that ruling is necessary to the outcome of the award, *see BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir. 1997) (unconfirmed arbitration award is sufficient to collaterally estop if other elements are met), Claimant asks that the Arbitrator consider the issues in the order presented by Claimant and neither rule in the alternative nor focus first on the waiver despite, as discussed below, the clarity of that waiver. In other words, Claimant asks that the Arbitrator: (1) first consider whether the DRA, properly construed, requires Respondents to abide by the Minimum Standards and, if it does, to stop there; and (2) only reach the waiver issue if the Arbitrator concludes that the DRA does not require Respondents to abide by the Minimum Standards.

## RELEVANT FACTS

The relevant facts are uncontested. By its own admission, Twitter has for years required its employees to execute a form Dispute Resolution Agreement as a condition of employment. *See Cornet v. Twitter, Inc.*, D.I. 18[3] at 8 (Twitter arguing that employees "could not have completed the process and been hired by Twitter without signing the Agreements"). JAMS adopted the Minimum Standards in July 2009. *See* Minimum Standards ("Effective July 15, 2009").[4] Roughly nine years later, in or about June 2018, Twitter amended its form DRA to identify JAMS as the provider before whom Twitter and its employees would arbitrate disputes brought under its DRA, and would do so under the Employment Arbitration Rules. *See* Cohen Dec Ex. 3 (pre-amendment form DRA), 4 (post amendment form). That form DRA includes a link to the Employment Arbitration Rules page, which in turn contains a link to the "Complete List of Rules & Procedures," including the Minimum Standards. *Id.*, Ex. 4, ¶ 3.

Claimant Yunfeng Zhang joined Twitter in 2021 and executed Twitter's standard DRA. Cohen Dec. Ex. 5. On November 4, 2022, Twitter notified Mr. Zhang that it would be placing him on a three-month non-working leave and then terminating him on February 2, 2023. Demand for Arbitration, ¶¶ 96-98. Twitter fired thousands of Mr. Zhang's colleagues in the same way. *Id.* Thousands of those fired employees have filed arbitrations against Twitter with JAMS, some as early as December 2022. Cohen Dec, Ex. 6. Many of those arbitrations, like Mr. Zhang's, include claims against each of the Respondents. *Id.*

Mr. Zhang filed his claims against Respondents on February 13, 2023. Demand for Arbitration. After receiving Claimant's payment of the case-initiation fee, JAMS promptly sent

---

[3] Cohen Dec. Ex. 2.

[4] Available at https://www.jamsadr.com/employment-minimum-standards/#:~:text=B.-,Minimum%20Standards%20of%20Procedural%20Fairness,Procedural%20Fairness%20for%20Employment%20Arbitration

Respondents an invoice for their share of the fee and notice of JAMS' intent to initiate the arbitration. That notice specified that the Minimum Standards would apply to the arbitration and that the "parties' agreement to proceed constitutes agreement to the foregoing." Cohen Dec. Ex. 7. Respondents had previously received similar notices for other arbitrations. Cohen Dec. Ex. 8. On February 28, 2023, Respondents filed their answer and affirmative defenses. Respondents thereafter paid their share of the case initiation fees (as per the Minimum Standards) and engaged in arbitrator selection. Judge Maas was appointed on May 25, 2023, and, pursuant to the Minimum Standards, Respondents were invoiced for the initial deposit of arbitrator fees. Cohen Dec Ex. 9. Respondents paid those fees.

On June 2, 2023, for the first time, Respondents objected to imposition of the Minimum Standards, arguing that the Minimum Standards were a "default" that had been "superseded" by the parties' DRA, even though until that point Respondents' conduct indicated that they were proceeding under the Minimum Standards. Cohen Dec Ex. 6. On June 21, JAMS rejected that objection. *Id.*, Ex. 10. On June 28, Respondents wrote JAMS and indicated that they would refuse to proceed under the Minimum Standards. *Id.* Ex. 11. JAMS has since confirmed that the Arbitrator can proceed to consider this motion so long as Claimant advances what Twitter alleges are Claimant's share of the fees for this motion. *Id.*, Ex. 12. Because the Parties' DRA provides that disputes over payment for the arbitration must be resolved by the Arbitrator, Cohen Dec. Ex. 5, ¶ 6, this motion followed.

## ARGUMENT

### I. The DRA Obligates Respondents to Comply with the Minimum Standards

The DRA Twitter imposed on its employees requires Respondents to comply with the Minimum Standards and pay all of the fees involved in this arbitration for two reasons. First, the DRA expressly provides that Respondents will bear the arbitration fees where required by applicable

law. Because the arbitration agreement includes in its scope a potential claim under California's Fair Employment and Housing Act ("FEHA"), applicable California law requires that it be construed as obligating Respondents to pay the arbitration fees. Second, applicable state law governing the enforceability and interpretation of contracts requires Respondents to comply with the Minimum Standards.

### A. Applicable California law requires Respondents to pay the entire cost of the arbitration

California law implies in every mandatory employment arbitration agreement an agreement by the employer "to pay all types of costs that are unique to arbitration" if the parties' agreement "contains within its scope the arbitration of FEHA claims." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 113 (2000). *See also Oce Bus. Servs., Inc. v. Christensen*, No. 116720/04, 2005 WL 1712143 at *5 (Sup. Ct., N.Y. County, 2005) ("California law construes a contract to arbitrate in such circumstances to have implicitly included provisions for conscionable discovery and costs in an arbitration proceeding). The parties' DRA does not carve out of its scope FEHA claims, Cohen Dec Ex. 5, and as a California-headquartered employer, ***all*** of Twitter's employee DRAs "contain[] within [their] scope the arbitration of FEHA claims" because any Twitter employee could potentially have a claim against Twitter for a discriminatory decision made from Twitter's California headquarters. *See Sims v. Worldpac Inc.*, No. C 12-05275 JSW, 2013 WL 663277, at *4 (N.D. Cal. Feb. 22, 2013) (declining to dismiss FEHA claim filed by non-California employee where discriminatory decision was allegedly made in California headquarters). Indeed, though it is unnecessary for these purposes, Mr. Zhang has asserted a FEHA claim in connection with his termination. Demand for Arbitration, ¶¶ 177-189.

At the conference, Respondents' reply on this point was to suggest that California law was irrelevant because – they contend – the DRA should be interpreted under New York law. As discussed in Section III(B), *infra*, Respondents are wrong in those assertions, both as to which law

should govern interpretation of the fees provision and as to what the outcome would be under New York law. But more fundamentally, the dispute about choice of law is irrelevant. The DRA does not provide that Respondents will pay fees 'if required by the law of the state governing interpretation of the DRA.' Rather, it provides that Respondents will pay such fees "in all cases where required by law." Cohen Dec. Ex. 5, ¶ 6. And Respondents cannot dispute either that they are bound by FEHA, or that FEHA requires them to pay the fees they now object to. Because Respondents are "required by law" to pay such fees, the DRA contains their agreement to do so.[5]

### B. Generally applicable contract law requires Respondents to pay the entire cost of the arbitration

In addition, and in the alternative, basic principles of contract construction and general laws on the enforceability of contracts require the same result.[6] It is well-settled that the Arbitrator may not construe the DRA in a manner that renders it void and unenforceable if any other reasonable construction is available. *See Koenig v. Warner Unified Sch. Dist.*, 41 Cal. App. 5th 43, 55 (Cal. Ct. App., 4th Dist., 2019) ("'[A] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties'"), *quoting* Cal. Civ. Code, § 1643; *Unique Photo, Inc. v. Vormittag Assocs., Inc.*, No. CV 08-2682 SJF AKT, 2010 WL 3924828, at *4 (E.D.N.Y. Aug. 27, 2010) ("the court construes the contract as a whole, giving effect to every portion of the instrument, if possible, and utilizing

---

[5] Importantly, Respondents, not Mr. Zhang, drafted the form DRA, and they had an absolutely free hand in doing so. Had Respondents wished to include a choice of law clause, they could have done so. Had they wished to agree to pay fees only where required by the law of the forum state, they could have drafted the DRA to say so. Instead, Respondents included a broader clause obligating them to pay fees "in ***all*** cases where required by law." And to the extent that provision was in any way ambiguous, it must be construed against respondents. *See Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63 (1995) (applying the "common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it" to arbitration agreement). *See also PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) and *Empire Asset Mgmt. Co. v. Best*, No. 21-CV-4542 (PAC), 2021 WL 2650457, at *4 (S.D.N.Y. June 28, 2021), *aff'd*, No. 21-1798-CV, 2022 WL 893402 (2d Cir. Mar. 28, 2022) (both holding that arbitration clauses are subject to interpretation against the interest of drafting party)

[6] The DRA does not contain a choice of law clause and, as a contract between a New York-based employee and a California-based employer, either New York or California law will apply to the DRA's construction. The Arbitrator need not address which state's law governs the DRA, however, because – as shown herein – both New York and California law apply the same relevant interpretive principles.

that construction rendering the agreement legal rather than one which makes it void"), *report and recommendation adopted*, No. 08 CV 2682 AJF AKT, 2010 WL 3909324 (E.D.N.Y. Sept. 29, 2010). Here, Respondents argue that Section 6 of the DRA obligates Claimant to pay for half of the arbitration costs at JAMS. Cohen Dec Ex. 6. But that interpretation cannot be adopted.

First, Respondents' interpretation of the DRA would render the entire arbitration agreement void. JAMS ***will not*** accept jurisdiction of any arbitration in which an employee subject to a mandatory arbitration agreement is required to share in the arbitration costs, *see* Minimum Standards**,** yet Section 5 of the the DRA provides for arbitration ***only*** with JAMS, and only under the Employment Arbitration Rules and Procedures Cohen Dec Ex. 5**.** Respondents' proposed construction would thus render performance impossible and the entire agreement unenforceable, and therefore must be rejected. *See United States v. Hamdi*, 432 F.3d 115, 124 (2d Cir. 2005) *quoting* 11 *Williston on Contracts* § 32:11 (4th ed.) ("[I]nterpretations which render the contract valid or its performance possible are preferred to those which render it invalid or its performance impossible")*; Sateriale v. RJ Reynolds Tobacco Co.*, No. 2:09-CV-08394-CAS, 2014 WL 7338881, at *8 (C.D. Cal. Dec. 19, 2014) (same).

Moreover, Respondents' ability to accept or reject the Minimum Standards on a case-by-case basis would render the contract unenforceable as illusory and without consideration. Under respondent's construction of the DRA, while employees would be bound to arbitrate any claim *Respondents* wished to arbitrate (upon Respondents' election in a particular case to abide by the Minimum Standards), Respondents could decline to arbitrate any case they wanted to take to court (by declining to abide by the Minimum Standards). *See Harris v. TAP Worldwide, LLC*, 248 Cal. App. 4th 373, 385 (Cal. Ct. App., 2d Dist., 2016) (contract is illusory where one party is not actually obligated under the contract, or where there is no consideration); *Coventry Enterprises LLC v. Sanomedics Int'l Holdings, Inc.*, No. 14 CIV. 8727 NRB, 2015 WL 4486335, at *4 (S.D.N.Y. July 23, 2015) (bilateral

contract would be illusory if one party were not actually bound, for lack of consideration, and court should not construe disputed terms in a manner that would render the agreement illusory).

Respondents' proposed construction would also render the DRA void for illegality and as contrary to California public policy. As noted above, California law does not allow Twitter to enter into a DRA that both potentially encompasses FEHA claims and yet requires Mr. Zhang to pay for arbitration. *Armendariz,* 24 Cal. 4th at 113. Respondents contend that they did so anyway, executing the DRA at Twitter's corporate headquarters *in* California and sending it from there to Mr. Zhang for countersignature. But contracts entered into in violation of law and public policy are void and unenforceable. *See, e.g.*, *Kolchins v. Evolution Markets, Inc.*, 31 N.Y.3d 100, 110, 96 N.E.3d 784, 790 (2018) (rejecting construction of contract that would operate in a manner that would be void against public policy); *Dunkin v. Boskey*, 82 Cal. App. 4th 171, 183, 98 Cal. Rptr. 2d 44, 51 (2000) ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms") (cleaned up). For that reason, too, Respondents' proposed construction must be rejected if there is any viable alternative. *See*, *e.g.*, *Ramirez v. Charter Commc'ns, Inc.*, 75 Cal. App. 5th 365, 379, 290 Cal. Rptr. 3d 429, 440 (2022) ("ambiguous terms in an arbitration agreement should be construed, where reasonable, in favor of legality")

And there is, in fact, a reasonable alternative construction that does not place Sections 5 and 6 in conflict: by amending the DRA to select JAMS as the required arbitration provider years after JAMS had already adopted the Minimum Standards, Respondents agreed to bear the unique costs of arbitrating with JAMS in any arbitration in which JAMS applied the Minimum Standards, unless and until JAMS changed its rules. This construction is consistent with an informed decision by Twitter – a company that recently sold for $44 Billion dollars and had a fully staffed legal department – to change their required form DRA to incorporate JAMS and the JAMS rules. It is also consistent with

Twitter's decision to provide a link within the DRA that referred employees to the JAMS employment arbitration page, which in turn directed visitors to the Minimum Standards. Cohen Dec Ex. 5. And the DRA provides that the arbitration will be conducted in accordance with the JAMS Rules, *id.*, which themselves reference the Minimum Standards and ***require*** parties to abide by them. *See* JAMS Rule 2(a) (providing that any variation from the baseline rules agreed on by the parties will be allowed only if consistent with the Minimum Standards).

Nor would such a construction render the terms allowing for a split "in accordance with applicable law" meaningless. That provision would simply cover the contingent possibility – unlikely as it might be – that at some future point JAMS might choose to cease requiring employers to bear the full costs in these arbitrations even if not separately required by state law.[7]

Finally, to whatever extent the DRA is ambiguous regarding Respondents' obligation to pay the arbitration fees when required by the rules of the chosen arbitration association, Respondents' course of performance would compel the same conclusion. It is well-established that the parties' course of performance under an ambiguous contract can supply the meaning of a disputed term. *See, e.g.*, *In re Barney Mac, LLC*, No. 04-17768 AJG, 2006 WL 2864974, at *14 (Bankr. S.D.N.Y. Oct. 3, 2006); *Oakland-Alameda Cnty. Coliseum Auth. v. Golden State Warriors, LLC*, 53 Cal. App. 5th 807, 821, 267 Cal. Rptr. 3d 799, 811 (2020). Here, Twitter faced thousands of arbitrations filed with JAMS since December 2022, in which JAMS insisted on the application of the Minimum Standards. For roughly half a year, and at a cost of hundreds of thousands of dollars if not more, Respondents simply abided by the Minimum Standards and raised no argument that the DRA provided them any other option. That "practical interpretation of a contract by the parties to it" definitively answers any

[7] The provision Respondents rely on notably does not say that in the absence of a state law requiring Respondents to bear the entire cost, the parties will split the arbitration fees equally. Rather, it provides that in the absence of such a provision, the parties will split the fees as provided for under applicable state law. Respondents cite no New York law ***requiring*** Claimant to pay 50% of the fees, and indeed the New York law's default would allow the Arbitrator to allocate costs in any manner he chooses – including in accordance with the Minimum Standards. N.Y. C.P.L.R. § 7513.

remaining questions about its appropriate construction. *Old Colony Tr. Co. v. City of Omaha*, 230 U.S. 100, 118 (1913). And even were that not so, because Respondents drafted the agreement at issue and presented it to Mr. Zhang on a take-it-or-leave-it basis, any ambiguity in the agreement must be construed against Respondents regardless. *See* note 4, *supra*.

In sum, the motion should be granted, and the Arbitrator should issue the requested interim award. Because Respondents' proposed construction of the DRA would render the agreement void and unenforceable, and Claimant's proposed construction would not, "applicable state law" – which Respondents agreed to follow – requires that the DRA be construed as mandating that Respondents abide by the Minimum Standards. And even were the DRA ambiguous (and it is not), the parties' course of performance requires the same conclusion. The Arbitrator should thus issue an interim award declaring as much and directing Respondents to immediately reimburse Claimant for the funds Claimant advanced.

## II. Even if None of That Were True, Respondents Waived Section 6 of the DRA and Any Objection to the Minimum Standards, and Agreed to Abide by the Minimum Standards

Finally, Respondents have in any event waived any contrary provision of the DRA by proceeding under the Minimum Standards. JAMS' case-initiation notice was crystal clear: this arbitration would proceed only under the Minimum Standards notwithstanding any contrary agreement by the parties, and that Respondents would convey their acceptance of those standards by proceeding with the arbitration. Cohen Dec, Ex. 7. Respondents then proceeded with the arbitration for months in accordance with the Minimum Standards, paying invoiced fees and participating in arbitrator selection, before abruptly changing their minds and objecting to the Minimum Standards. But it was too late for Respondents to do that.

Respondents were specifically advised that proceeding with the arbitration would constitute their agreement to abide by the Minimum Standards. Cohen Dec Ex. 7. And Respondents

proceeded with the arbitration by paying the case initiation fees and engaging in arbitrator selection, two non-trivial steps in the arbitration process. Therefore, Respondents agreed to proceed under the Minimum Standards and cannot now object to the application of those Standards. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree"). Moreover, proceeding under the Minimum Standards and paying fees thereunder without seeking contribution from Claimant, as Respondents did for months after the case was initiated, waived any right to contribution Respondents may have otherwise had under their interpretation of the DRA. *See, e.g.*, *A.X.M.S. Corp. v. Friedman*, 948 F. Supp. 2d 319, 335 (S.D.N.Y. 2013) ("a party may, by words or conduct, waive a provision in a contract or eliminate a condition in a contract which was inserted for its benefit"); *In re Live Primary, LLC*, 626 B.R. 171, 195 (Bankr. S.D.N.Y. 2021) (conduct can waive even unambiguous provisions of contract).

## III. Twitter's Defenses Are Meritless

At the conference, Twitter raised a series of arguments objecting to the Arbitrator's consideration of this motion or to the substantive points raised herein. As discussed below, those arguments have no merit.

### A. Respondents' "Advisory Opinion" Objections are Baseless

At the conference, Respondents objected to the Arbitrator even considering this motion on two theories: (a) unless Mr. Zhang agreed to waive the Minimum Standards if the DRA does not require Respondents to pay the fees, he is seeking an "advisory opinion" that would allow him to "have his cake and eat it too"; and (b) because JAMS would only "consider" the Arbitrator's opinion

on whether the Minimum Standards should apply in this action, any ruling on that issue would be advisory.

As to the first argument, it is legally unintelligible. Mr. Zhang and Respondents disagree about what the DRA requires of Respondents with respect to payment of fees. Had the DRA delegated this issue to the courts, Mr. Zhang would be able to file a declaratory judgment action seeking to have the DRA interpreted without first agreeing to waive the Minimum Standards in the event that the DRA was construed as Respondents prefer. *See* 28 U.S.C. § 2201. And the DRA allows Mr. Zhang to seek just such a declaratory judgment, expressly providing that "no remedies that would be available to an individual in a court of law will be forfeited by virtue of this Agreement." Cohen Dec. Ex. 5 at ¶ 7. Respondents can no more require Mr. Zhang to prophylactically waive the Minimum Standards as a precondition to obtaining the Arbitrator's determination of the meaning of the DRA than it could require him to do so before obtaining a declaratory judgment, and this objection fails.

And Respondents' second argument erroneously conflates two distinct issues: (1) whether Respondents agreed in the DRA to pay the fees for this arbitration; and (2) whether JAMS correctly interpreted its own Rules in concluding that the Minimum Standards apply in this case. As to the former issue – *i.e.* the declaratory judgment Mr. Zhang seeks by this Motion – the Arbitrator's word is final; JAMS will not review that determination, whatever that is. Only as to the *latter* issue – which Respondents indicated at the conference *they* intended to raise – would anyone be seeking an "advisory opinion" as to which JAMS would have the last word. Cohen Dec. Ex. 10.[8]

[8] In any event, JAMS correctly interpreted its own Rules. The Minimum Standards apply whenever an arbitration is required by a standard "clause ***or agreement***" that an employer requires an employee to sign as a condition of employment. Minimum Standards at B. Respondents have affirmatively represented to the Northern District of California that execution of the DRA is a condition of employment. Cohen Dec Ex. 2 at 8. That Twitter allowed Mr. Zhang to subsequently "opt out" of his DRA if he jumped through a series of procedural hurdles – he could only do so via a specific form that he would get access to only upon making an email request of Twitter HR, *see* Cohen Dec Ex. 5, ¶ 8 – does not change the fact that this arbitration is predicated on an agreement he was required to sign in the first

Finally, and contrary to Respondents' arguments at the conference, the distinction between the two issues is very much ***not*** "without a difference." First, as shown above, the DRA obligates Respondents to pay the fees because they are "required by law" to do so, independent of the Minimum Standards. But if the requirement turned on the Minimum Standards, the distinction between the two issues would be critical. In that case, whether or not the Minimum Standards apply would, of course, be a threshold issue; if they did not, then whether the DRA requires Respondents to abide by them if applicable would be irrelevant. But given that the Minimum Standards do apply, as JAMS has repeatedly confirmed, Cohen Dec. Exs. 7, 8, 10, 12., whether the DRA requires Respondents to pay the arbitral fees is of huge significance. If the DRA requires Respondents to pay the fees where required by the Minimum Standards, then Respondents' refusal to do so is a breach of the DRA, for which Mr. Zhang could either seek damages or as to which Mr. Zhang could obtain a federal court order, under Section 4 of the Federal Arbitration Act, compelling Respondents to arbitrate "in accordance with the terms [of the agreement]," 9 U.S.C. § 4, and Mr. Zhang's arbitration will proceed. If the DRA does *not* require Respondents to do so, then Respondents can terminate this arbitration (by declining to abide by the Minimum Standards and thereby causing JAMS to decline jurisdiction). The "difference," then, is whether this arbitration will proceed. The Arbitrator therefore can and should resolve the dispute between the parties about the meaning of the DRA.

### B. Choice of Law Does not Rescue Respondents

At the conference, Respondents argued that Mr. Zhang's DRA should be subject to New York law, and that if it was they would have no obligation to pay the fees under the Minimum Standards. Both assertions are wrong.

---

instance as a condition of employment, and JAMS is correct to reject employers' attempts to "one neat trick" themselves out of the Minimum Standards instead of simply giving the employee the option to not sign the arbitration agreement in the first instance.

a. The DRA has no choice of law clause

At the conference, Respondents argued that the DRA contains a choice of law clause because the contract selects New York as the venue for arbitration and requires appointment of an arbitrator barred in the forum state. Cohen Dec. Ex. 5, ¶ 3. While those provisions reflect the reality that a contract requiring Mr. Zhang to litigate elsewhere would be unenforceable**,** *Bynum v. Maplebear Inc.*, No. 15-CV-6263, 2016 WL 5373643, at *8 (E.D.N.Y. Sept. 19, 2016) ("To the extent that the arbitration clause provides for arbitration in San Francisco…it violates applicable federal policy in regards to venue and is invalid.") and both the convenience of having an arbitrator local to the hearing and the reality that many choice of law issues would result in application of the law of the forum state, neither provision designates New York law as governing the interpretation of the DRA.[9] "Choice of law clauses are not to be confused with choice of forum clauses." *All Metro Aids, Inc. v. Homeward Bound Servs., Inc.*, 15 Misc. 3d 1121(A), 839 N.Y.S.2d 431 (Sup. Ct., Nassau County, 2007) (rejecting argument that Pennsylvania choice of forum clause meant parties had agreed to Pennsylvania law). *See also In re Lois/USA, Inc.*, 264 B.R. 69, 101 (Bankr. S.D.N.Y. 2001) ("The choice-of-law clause does not address the court or courts in which the law is to be applied, and the forum selection clause does not address the law the chosen forum is to apply … A choice-of-law clause and a forum selection clause are not the same, and address different needs and concerns"); *Bank of Tokyo-Mitsubishi, Ltd., New York Branch v. Kvaerner a.s.*, 243 A.D.2d 1, 5, 671 N.Y.S.2d 905, 908 (1998) ("choice of law and choice of forum are altogether separate matters"). Nor does Mr. Zhang's employment offer letter (which required Mr. Zhang to execute the DRA) contain a choice of law clause. Cohen Dec Ex. 5. Thus, the Arbitrator must engage in a choice of law analysis to determine what substantive law governs Mr. Zhang's claims, and this fee issue.

[9] To the contrary, the DRA expressly allows the parties to choose a location other than New York for the arbitration.

b. California law governs Mr. Zhang's FEHA rights[10]

There should be no question that California law governs Mr. Zhang's rights under FEHA. After all, Mr. Zhang unquestionably has rights under FEHA, *Sims v. Worldpac Inc.*, No. C 12-05275 JSW, 2013 WL 663277, at *4, and New York law does not address FEHA. Thus, California's rule that requires employers mandating arbitration of potential FEHA claims to agree to pay the costs imposed by arbitration is the only relevant law that *can* apply. But even if this were viewed as a broader question – with California's rule for such agreements viewed as conflicting with New York's decision not to have a blanket requirement as a matter of state unconscionability law – New York courts would apply California law to that question, and so should the Arbitrator.

Statutory claims under FEHA are tort claims, and with respect to tort claims, New York's conflict of laws analysis focuses on (1) which state has the greater interest in the conduct at issue; and (2) whether one of the states at issue has a stronger public policy concern. *See*, *Kinsey v. New York Times Co.*, 991 F.3d 171, 177 (2d Cir. 2021). Particularly where a conduct-regulating (rather than loss-allocating) statute is at issue, the location of the allegedly tortious conduct is "a predominant, if not exclusive, concern." *Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 522, 644 N.E.2d 1001, 1002 (1994) (cleaned up). *See also Youngman v. Robert Bosch LLC,* 923 F. Supp. 2d 411, 416 (E.D.N.Y. 2013). Here, FEHA is a conduct-regulating statute that bars California employers from engaging in discrimination, *see, e.g.*, *Tsatsani v. Walmart, Inc.*, No. 19CV9063PAEBCM, 2020 WL 6688939, at *14 (S.D.N.Y. Oct. 26, 2020), *report and recommendation adopted*, No. 19CIV9063PAEBCM, 2020 WL 6701019 (S.D.N.Y. Nov. 13, 2020) (holding that state interest test applies in employment discrimination claims because the relevant laws are primarily conduct-regulating)**,** and the allegedly discriminatory conduct occurred in California. Demand for Arbitration, ¶¶95-100. Moreover,

[10] Because the law that applies to the payment of arbitration fees under an arbitration agreement that encompasses a FEHA claim is the only issue that turns on which state's law governs, the choice of law does not impact the other arguments in this Motion for why the Arbitrator should grant the requested interim award.

California has an overwhelmingly strong public policy interest in enforcing FEHA, including in prohibiting employers from mandating arbitration of potential FEHA claims in which employees must pay the arbitration costs. *See, e.g.*, *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1076, 63 P.3d 979, 987 (2003) (holding that *Armendariz* requirements allow employee to vindicate "unwaivable" FEHA rights); *Penilla v. Westmont Corp.*, 3 Cal. App. 5th 205, 221, 207 Cal. Rptr. 3d 473, 487 (2016) (extending *Armendiariz* costs rule to find unconscionability where costs sharing was imposed in housing arbitration); *Mills v. Facility Sols. Grp., Inc.*, 84 Cal. App. 5th 1035, 1055, 300 Cal. Rptr. 3d 833, 848 (2022) (finding unconscionable a provision in which fee sharing in an arbitral appeal process).

New York, in contrast, has no countervailing public policy *against* mandating that an employer pay arbitration fees where an arbitration agreement implicates statutory claims; it simply does not require it. *See*, *Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) (holding arbitration agreement not unconscionable and enforceable where agreement called for employer to pay fees). *See*, *Certain Underwriters at Lloyd's v. Expeditors Int'l of Washington, Inc.*, 584 F. Supp. 3d 860, 875 (C.D. Cal. 2022) (only necessary to decide which state has stronger interest if each state has interest in applying its own law); *Cf. Pac. Emps. Ins. Co. v. Indus. Accident Comm'n of State of California*, 306 U.S. 493 (1939) (courts of one state must give full faith and credit to applicable laws of another state unless the foreign state's law is "obnoxious to [the forum state's] policy"). And New York has no real interest in prohibiting enforcement of California's policy here, against a non-New York-based corporation and under a contract by which the parties did not affirmatively select New York law. Under these circumstances, a New York court applying New York choice of law principles would apply California law and require Respondents to pay the arbitration fees.

Nor would the analysis be different under the choice of law analysis applicable to contract claims. New York courts determining what law applies to contract claims apply the "center of

gravity" test, *see, e.g., Jimenez v. Monadnock Const., Inc.*, 109 A.D.3d 514, 516, 970 N.Y.S.2d 577, 580 (2013)**,** and in employment contexts that typically results in applying the law of the employee's home state to the contract with the employer. *Elliott v. Nestle Waters N. Am. Inc.*, No. 13 CIV. 6331 RA, 2015 WL 1611333, at *1 (S.D.N.Y. Apr. 10, 2015). But even where analyzing choice of law applicable to contracts, New York courts will enforce the law of another state "where the issue is of such overriding concern to the public policy of the other jurisdiction as to override the intent of the parties and the interest of [New York] in enforcing its own policies." *SG Cowen Sec. Corp. v. Messih*, No. 00CIV.3228(HB), 2000 WL 633434, at *3 (S.D.N.Y. May 17, 2000), *aff'd,* 224 F.3d 79 (2d Cir. 2000). *See also Medtronic, Inc. v. Walland*, No. 21 CIV. 2908 (ER), 2021 WL 4131657, at *5 (S.D.N.Y. Sept. 10, 2021) (New York courts will apply law of state with greater interest, despite choice of law clause, where that state has a fundamental policy interest in application of its law). And here, as noted above, enforcement of California's requirement that Respondents pay for this arbitration is of overriding public policy concern to California, and of no concern at all to New York. As such, application of the "center of gravity" approach would *still* require application of California law.

c. Even applying New York law, the Arbitrator should direct Respondents to pay the fees

Finally, Respondents appear to be incorrectly presuming that if New York law applies, then Mr. Zhang agreed to – and therefore must – bear 50% of the arbitration costs despite JAMS' imposition of the Minimum Standards. But that is ***not*** what the DRA provides. Rather, the DRA provides that if applicable law doesn't *require* Respondents to pay all of the arbitration fees, those fees "will be apportioned between the parties in accordance with said applicable law." Cohen Dec Ex. 5 at ¶ 6. But no New York law *requires* that arbitration fees be split between the arbitrating parties, let alone split equally, in the absence of an express agreement to do so. To the contrary, the default rule in New York arbitration law is that the arbitrator determines how such fees and expenses are to be allocated. N.Y. C.P.L.R. § 7513. *See, e.g.*, *544 Bloomrest, LLC v. Harding*, 202

A.D.3d 499, 501, 162 N.Y.S.3d 53, 55 (2022) (holding that award of fees under specific AAA rule was proper, citing § 7513).

Thus, while New York law may not mandate that Mr. Zhang pay no fees, neither does it affirmatively require him to pay any fees at all, rendering Respondents' argument that application of the Minimum Standards violates the DRA entirely meritless in any event. And under JAMS' Rules, the Arbitrator may not allocate any such fees and expenses to Mr. Zhang beyond the case initiation fee he already paid. Indeed, Respondents agreed to arbitrate under the JAMS Rules. The JAMS Rules require the Arbitrator to allocate all costs and expenses against Respondents. New York law requires Respondents to pay those costs and expenses precisely as allocated by the Arbitrator. And Respondents agreed to pay such costs if required by law. Even assuming New York law applies, the DRA requires Respondents to proceed with arbitration and pay the costs invoiced to them.

## CONCLUSION

In sum, Respondents must abide by the Minimum Standards. They must do so because they agreed in the DRA that they would pay all the costs of arbitration. And Respondents must abide by the Minimum Standards because they expressly agreed to do so, and waived any contrary provision of the DRA, by proceeding with the arbitration after being provided with notice that the Minimum Standards were applicable. But Respondents refuse to do so absent an Award. Thus, the Arbitrator should issue an Interim Award, under Rule 24(e) of the Employment Arbitration Rules, declaring that the DRA requires Respondents to abide by the Minimum Standards, directing them to do so, and directing them to reimburse Claimant for fees advanced in connection with this motion.

Respectfully Submitted,
Dated: July 31, 2023

*/s/ Akiva M. Cohen*
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER &
KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

# EXHIBIT 2

MORGAN, LEWIS & BOCKIUS LLP
Eric Meckley, Bar No. 168181
eric.meckley@morganlewis.com
Brian D. Berry, Bar No. 229893
brian.berry@morganlewis.com
Kassia Stephenson, Bar No. 336175
kassia.stephenson@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Tel: +1.415.442.1000
Fax: +1.415.442.1001

MORGAN, LEWIS & BOCKIUS LLP
Ashlee N. Cherry, Bar No. 312731
ashlee.cherry@morganlewis.com
1400 Page Mill Road
Palo Alto, CA 94304
Tel: +1.650.843.4000
Fax: +1.650.843.4001

MORGAN, LEWIS & BOCKIUS LLP
Sari M. Alamuddin, Bar No. 6215689
salamuddin@morganlewis.com
110 North Wacker Drive, Suite 2800
Chicago, IL 60601
Tel.: +1.312.324.1000
Fax: +1.312.324.1000

MORGAN, LEWIS & BOCKIUS LLP
Kaiser H. Chowdhry, Bar No. 18076
kaiser.chowdhry@morganlewis.com
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: +1.202.739.3000
Fax: +1.202.739.3001

Attorneys for Respondents
X CORP., as successor in interest to TWITTER, INC.,
X HOLDINGS CORP., as successor in interest to
X HOLDINGS I, INC., and ELON MUSK

**IN ARBITRATION BEFORE JAMS**

| | |
|---|---|
| Yunfeng Zhang,<br>Claimant,<br><br>v.<br><br>Twitter, Inc., X Holdings I, Inc., and Elon Musk,<br>Respondents. | JAMS Ref. No. 1601002342<br><br>**RESPONSE IN OPPOSITION TO CLAIMANT YUNFENG ZHANG'S MOTION FOR AN INTERIM AWARD DECLARING THAT THE PARTIES' DISPUTE RESOLUTION AGREEMENT REQUIRES RESPONDENTS TO PAY ALL COSTS UNIQUE TO ARBITRATION** |

Respondents X Corp. (as successor-in-interest to Twitter, Inc.), X Holdings Corp. (as successor-in-interest to X Holdings I, Inc.), and Elon Musk hereby oppose Claimant Yunfeng Zhang's Motion for an Interim Award Declaring that the Parties' Dispute Resolution Agreement ("DRA") Requires Respondents to Pay All Costs Unique to Arbitration (the "Motion").

## I. INTRODUCTION

Claimant worked for Twitter in New York City. Before he started, he agreed to arbitrate disputes pursuant to the DRA, which clearly states that arbitrator and arbitration fees will be apportioned between the parties if permissible under applicable law. Claimant had a 30-day window in which he was free to opt out of the DRA entirely. The contract emphasized in bold text: "**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.**" Claimant never made use of this opportunity. Yet now he asks the Arbitrator to rewrite the DRA's terms on fee apportionment to require Respondents to bear the full cost. As explained below, Claimant's effort to revise the contract that he voluntarily accepted is without merit.

But the Arbitrator should not even resolve this issue because JAMS has no intention of adhering to the terms of the DRA. It has repeatedly stated it will apply the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("Minimum Standards," reproduced as part of Exhibit 7 to the Cohen Declaration) unless the claimant waives their application, and that it reserves the right to make a final determination on the applicability of the Minimum Standards even if an arbitrator concludes they do not apply. JAMS' position allows Claimant a chance to test the waters at no legal risk to himself. If he succeeds and convinces the Arbitrator that the DRA requires Twitter to pay the full cost, he will argue that Twitter is bound by the Arbitrator's decision. If he fails, he will contend that he is not bound by the Arbitrator's decision and can continue to refuse to waive the Minimum Standards. By the same token, Twitter is in a no-win situation: regardless of what happens with his Motion, Claimant can continue to refuse to pay for this Arbitration. Rather than indulge Claimant's strategy, this Arbitrator should at most consider anew whether the Minimum Standards even purport to apply here. And because

they are expressly limited to agreements that are conditions of employment, and because the DRA is expressly not a condition of employment, the answer is easy: the Minimum Standards do not apply. The Arbitrator should advise JAMS to reevaluate its earlier determination to apply the Minimum Standards because that determination cannot be defended.

If the Arbitrator does proceed to resolve the substantive contract-interpretation issue presented by the Motion, the Arbitrator should reject Claimant's arguments on their merits. Claimant contends that even though he was a New York employee, his contractual rights are governed by California law—in particular, the California Supreme Court's instructions for how to interpret arbitration agreements in *Armendariz v. Foundation Health Psychcare Services, Inc.*, 6 P.3d 669 (Cal. 2000). But he cites no authority for using *Armendariz* to interpret an arbitration agreement entered into by a New York employee that requires arbitration in New York. Nor could he, as applicable choice-of-law principles plainly require construing such an agreement under the FAA and New York law. And it is settled under both the FAA and New York law that fee-apportionment provisions are not inherently unlawful. Claimant cannot attack the DRA's fee-apportionment provision under New York standards and does not really try. He instead puts forward a convoluted argument that the DRA somehow incorporates the Minimum Standards without saying so because of the JAMS General Counsel's opinion—issued years after the parties entered into their contract—on how to interpret the Minimum Standards as governing the DRA. But JAMS' mistaken opinion, which is contrary to the DRA's express terms, sheds no light on the meaning of the parties' earlier agreement or their intent in entering into it. In addition, among its many other flaws, Claimant's reliance on *Armendariz* presumes that the DRA is a condition of employment when, again, it clearly is not. So, like the Minimum Standards, *Armendariz* does not obligate Twitter to pay the full cost of this Arbitration even assuming California governed here, which it does not. The Arbitrator should deny the Motion in its entirety.

## II. STATEMENT OF RELEVANT FACTS

### A. Claimant Assented to the DRA and Chose Not to Opt Out.

On May 14, 2021, Claimant electronically signed the DRA. DRA (attached to Claimant's Arbitration Demand and as Exhibit 5 to the Cohen Declaration) at 3. The DRA contains the

following relevant terms:

- Introductory Paragraph. In a separate box at the top, the DRA contains bolded prefatory language stating that it "**is a contract and covers important issues relating to your rights**" and advising that employees are "**free to seek assistance from independent advisors of your choice.**" DRA at 1.
- Not a Condition of Employment. The Introductory Paragraph contains bolded language that states: "**You can choose to opt out of this Agreement – you have 30 days to opt out.**" *Id.* Section 8 also makes clear that "**[a]rbitration is not a mandatory condition of Employee's employment at the Company**." *Id.* § 8 (emphasis in original). An employee was free to opt out of the DRA by "**submit[ting] a form stating that the Employee wishes to opt out and not be subject to this Agreement**." *Id.* (emphasis in original). If the employee did not timely opt out of the DRA within 30 days, the agreement explained that "continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement…" *Id.*
- Governing Law. The DRA expressly states that it is "governed by the [FAA] and evidences a transaction involving commerce." *Id.* § 1.
- Commitment to Arbitrate Claims. The DRA states that it is "intended to apply to the resolution of disputes that otherwise would be resolved in a court of law" and "requires all such disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial." *Id.*
- JAMS Rules. The DRA states that the "Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules," without reference to the Minimum Standards, which are applicable only to arbitration agreements that are a mandatory condition of employment.
- Arbitration Fees. The DRA states that "in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such

fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator." *Id.* § 6.

**B. The Arbitration Proceedings**

**1. Claimant Files a Demand for Arbitration Following His Layoff.**

Claimant resides in Chappaqua, New York, and worked at Twitter's New York Office. Arbitration Demand ¶ 15. He accepted his position on or about May 14, 2021, began work on or about June 21, 2021, and worked for Twitter until he was laid off on February 2, 2023. *Id.* ¶ 22.

On or about February 13, 2023, Claimant filed a demand for arbitration with JAMS. Arbitration Demand at 4. Citing the DRA's provision governing the location of arbitration, he requested that the location of the arbitration take place within 45 miles of his Chappaqua, New York residence. *Id.*; *see* DRA § 3 ("The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise."). Claimant ticked the box on JAMS' form asserting that he was **not** bringing a "consumer arbitration." Arbitration Demand at 5. The form defines "consumer arbitration" to encompass "an arbitration conducted under a pre-dispute arbitration provision contained in a contract" that "[a]n employee or an applicant for employment" was "required to accept" and that was drafted by the other party to the contract. *Id.*

**2. JAMS Determines That Its Minimum Standards Apply Regardless of the Arbitrator's Determination, in Conflict with the DRA's Terms.**

On June 2, 2023, Twitter requested that arbitration costs in approximately 900 demands[1] pending with JAMS be apportioned equally between the parties for arbitrations in jurisdictions where fee-sharing is lawful. Cohen Decl., ¶ 7 & Ex. 6. Twitter cited Section 6 of the DRA:

> [I]n all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

*Id.*

[1] Two other law firms, in addition to Claimant's counsel, have filed the approximately 900 similar demands that are subject to the fee-sharing dispute.

On June 21, 2023, JAMS Senior Vice President and General Counsel Sheri Eisner wrote a letter in response (the "June 21 Letter"). *See* Dkt., uploaded 6/27/2023. She stated that the Minimum Standards apply "separate and apart from the protections that may apply in any given jurisdiction" and "notwithstanding any contrary provision in the parties' arbitration agreement." *Id.* The June 21 Letter explained that while "[t]he Minimum Standards do not prevent an employee from contributing to JAMS fees," JAMS would continue to issue invoices in accordance with the Minimum Standards absent employee agreement. Finally, she stated that, although the parties could direct any further dispute about the applicability of the Minimum Standards to the assigned arbitrator in each case, JAMS would retain the right to "make a final determination" on the issue. *Id.* This contradicts the plain language of the DRA, which as noted states explicitly that the Arbitrator will resolve any disputes over fee apportionment. DRA § 6.

On June 28, 2023, Twitter replied that the June 21 Letter "prevents Twitter from exercising its contractual rights and improperly negates a material provision in the dispute resolution agreements should Twitter proceed in accordance with [the] decision." *See* Dkt., uploaded 6/29/2023. Rather than abandon its rights under the DRA, Twitter declined to proceed under the Minimum Standards—but did not decline to arbitrate—for demands in jurisdictions where fee-sharing is lawful. *Id.* Twitter's letter identified this Arbitration as one of the arbitrations in a jurisdiction where fee-sharing is lawful. *Id.*

Then, on June 30, 2023, JAMS' General Counsel wrote again to the parties, observing that employees could elect to contribute to JAMS fees. *See* Dkt., uploaded 6/30/2023. The letter stated that if a claimant wished to waive the Minimum Standards and "share JAMS fees according to the underlying arbitration clause, they should advise JAMS and Respondent accordingly." *Id.*

**3. Claimant Asks the Arbitrator to Interpret the DRA Even Though JAMS Has Repeatedly Stated it Retains Ultimate Authority Over the Question.**

Claimant declined to waive the Minimum Standards in response to the General Counsel's June 30, 2023 letter. Instead, on July 2, 2023, he emailed JAMS Arbitration Practice Manager

Sarah Nevins to propose advancing $5,000, to be pooled with Twitter's prior deposit of $5,000, to fund a ruling by the Arbitrator on whether the DRA requires Respondents to pay all arbitration costs in this matter. Cohen Decl., ¶ 13 & Ex. 12. Twitter objected to this proposal because JAMS has already made clear that it asserts authority to make the final determination on this question, regardless of the terms of the DRA.

In a July 12, 2023 letter to the parties (the "July 12 Letter"), JAMS Senior Vice President Elizabeth Carter responded: "If any Claimant agrees to contribute to JAMS fees to proceed in arbitration—including for the purpose of having an arbitrator rule on the parties' respective obligations under applicable law and the terms of the arbitration agreement—JAMS will proceed to administer the matter accordingly." *See* Dkt., uploaded 7/12/2023. At the same time, however, the July 12 Letter reiterated JAMS' position that it would "continue to apply the Minimum Standards in these matters irrespective of an arbitrator's ruling on the parties' obligations under applicable law and the terms of the arbitration agreement." *Id.* At most, JAMS stated that it would "tak[e] the arbitrator's position into consideration," and "make a final determination" for itself if the "arbitrator believes JAMS should revisit the decision to apply the Minimum Standards in a given case—for example, if an arbitrator believes the arbitration agreement was negotiated or not a condition of employment." *Id.*

The parties held a videoconference with the Arbitrator on July 19, 2023, and in accordance with the Arbitrator's orders, now submit briefing on Claimant's request for an interim award on fees payment. Per the Arbitrator's July 19, 2023 order, this submission "shall not be deemed a waiver of any of the Respondents' rights with respect to this case."

## III. ARGUMENT

### A. Because JAMS Refuses to Adhere to the Terms of the DRA and Abide by the Arbitrator's Determination, the Arbitrator Should Not Entertain Claimant's Motion.

#### 1. JAMS Has Decided to Apply the Minimum Standards as an Administrative Decision and to Treat the Substance of the Parties' Contractual Obligations as Academic.

The premise of Claimant's Motion is that the dispute over fee apportionment is a run-of-

the-mill contractual dispute rather than a matter of arbitration administration. While the premise would make sense if the parties were writing on a blank slate, the problem here is that JAMS has already opined to the contrary. Its June 21 Letter made clear that "[t]he Minimum Standards reflect JAMS administrative policy"—a policy that stands "separate and apart from" the law in any given jurisdiction and that governs "notwithstanding any contrary provision in the parties' arbitration agreement." Under Rule 6 of the JAMS Employment Rules & Procedures, JAMS may convene "administrative conferences to discuss any procedural matter relating to the administration of the Arbitration," and "may order the suspension or termination of the proceedings" if "any Party has failed to pay fees or expenses in full." In addition to stating that it will treat the Minimum Standards as an administrative policy that applies regardless of contrary law or contract terms, JAMS has repeatedly stated that it retains the prerogative to make a "final determination" on the issue—even if the Arbitrator "advise[s]" JAMS that it should revisit its decision to apply the Minimum Standards. *Id.*, Exs. 10, 12. So long as JAMS believes that the Minimum Standards should apply, the only way to move forward in arbitration is for a claimant to waive the application of Minimum Standard No. 6 concerning payment of arbitration-related costs. *See id.* Otherwise, a claimant could go to court, as the JAMS Minimum Standards contemplate. *See* Minimum Standards at 4 ("If a party contests the enforceability of a pre-dispute arbitration agreement that was required as a condition of employment, and if compliance with the Minimum Standards is in question, JAMS will, if given notice of the dispute, defer administering the arbitration for a reasonable period of time to allow the contesting party to seek a judicial ruling on the issue."). A claimant could, for example, argue under 9 U.S.C. § 4 for an order compelling arbitration under the terms of the agreement—if the claimant could establish that the DRA requires adherence to the Minimum Standards—or request appointment of a different arbitration provider under 9 U.S.C. § 5. *See, e.g.*, *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1013 (9th Cir. 2004); *Khan v. Dell Inc.*, 669 F.3d 350, 354 (3d Cir. 2012).

Because JAMS currently will not deviate from its administrative policy of applying the Minimum Standards based on the DRA's content, any purported dispute over the meaning of the DRA is academic—not ripe for resolution. It does not matter what the DRA requires, according

to JAMS, as JAMS plans to apply the Minimum Standards regardless.

Claimant's Motion thus seeks to create a situation he cannot lose. If Respondents persuade the Arbitrator that the DRA really does obligate Claimant to pay half the arbitration costs, Respondents remain no better off than before because JAMS will give no effect to the Arbitrator's interpretation of the DRA. Conversely, if Claimant convinces the Arbitrator of the opposite view, Claimant is dramatically better off than before because he could confidently agree to waive Minimum Standard No. 6 knowing that the interim award would be law of the case and would require the same result as the Minimum Standards.[2]

Unless and until JAMS reconsiders its announced intention not to treat a ruling by the Arbitrator as determinative, the Arbitrator should refuse to issue what, by JAMS' own description, would be a mere "advis[ory]" opinion. The requirements of the DRA present no live controversy for the parties, because currently they have no potential to alter the parties' rights moving forward. Claimant has never asked JAMS to reconsider its stated intention of retaining the right to disregard the Arbitrator's ruling, even though that stated intention is plainly irreconcilable with the terms of the DRA itself. *See* DRA § 6 ("If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and **any disputes in that regard will be resolved by the Arbitrator**." (emphasis added)). Nor has Claimant pledged to waive the Minimum Standards should the Arbitrator find that they are inconsistent with the DRA's terms. If Claimant sincerely wanted to follow the terms of the DRA, he would state an intent to do these things. He would not be playing a game of heads-I-win-tails-you-lose.

**2. At Most, the Arbitrator Should Request That JAMS Reconsider its Administrative Decision to Apply the Minimum Standards Because They are Facially Inapplicable to the DRA.**

According to JAMS, the Arbitrator's only role at this juncture is to "advise" JAMS if the Arbitrator "believes JAMS should revisit the decision to apply the Minimum Standards in a given

[2] Claimant even suggests that his counsel would try to leverage such a ruling through collateral estoppel in arbitrations with other claimants. Mot. 2 n.2. While the collateral-estoppel effect of a potential interim award here is not an issue for the Arbitrator to decide, Respondents strongly disagree with any suggestion that collateral estoppel might apply.

case—for example, if an arbitrator believes the arbitration agreement was negotiated or not a condition of employment." Cohen Decl., Ex. 12. If the Arbitrator does not reject Claimant's request for an advisory opinion out of hand, the most the Arbitrator should do at this point is advise JAMS to revisit its decision.

The Minimum Standards, on their face, apply only to required conditions of employment, and as JAMS' July 12 Letter seemingly anticipates, the DRA is "not a condition of employment." The opening paragraph of the Minimum Standards state that they "apply to arbitrations based on pre-dispute agreements that are required as a condition of employment." Minimum Standards at 2; *see id.* ("If an arbitration is based on a clause or agreement that is required as a condition of employment, JAMS will accept the assignment only if the proceeding complies with the Minimum Standards of Procedural Fairness for Employment Arbitration."); *see also, e.g.*, *Selman v. FCB Worldwide Inc.*, No. B168315, 2004 WL 2729656, at *3 (Cal. Ct. App. Dec. 1, 2004) (unpublished) ("JAMS [Minimum] Standard 6 . . . appl[ies] only to arbitration agreements that are required as a condition of employment.").[3] As the DRA express states in bolded text, "**Arbitration is not a mandatory condition of Employee's employment at the Company**." DRA § 8. Rather, employees had 30 days after their receipt of the DRA "**to opt out and not be subject to this Agreement**." Such employees would "not be subject to any adverse employment action as a consequence of that decision and [could] pursue available legal remedies without regard to [the DRA]." *Id.* Numerous Twitter employees made use of this opportunity to opt out of the DRA—and some of those employees are now pursuing litigation in federal court—but Claimant did not opt out of the DRA.

Indeed, this type of opt-out provision is a quintessential example of the sort of an arbitration agreement that, according to courts across jurisdictions, is **not** a condition of employment. *See, e.g.*, *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016) ("[A]n arbitration agreement is not adhesive if there is an opportunity to opt out of it."); *Young v.*

[3] The JAMS Rules likewise prohibit fee-splitting only when the "Arbitration is based on a clause or agreement that is required as a condition of employment." JAMS Rule 31(c); *see Selman*, 2004 WL 2729656, at *3.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Refined Techs., Inc.*, No. 22-cv-1032, 2022 WL 3012536, at *5 (C.D. Cal. June 17, 2022) (referring to "an opt-out provision" as "[o]ne of the typical indicia that a contract is not a condition of employment"); *Essex v. Children's Place, Inc.*, No. 15-cv-5621, 2017 WL 6000347, at *5 (D.N.J. Dec. 4, 2017) ("Plaintiffs were not required to participate in TCP's arbitration program as a condition of employment with TCP. . . . [T]he Arbitration Agreement expressly state[s] that signing the Arbitration Agreement is not a mandatory condition of employment. . . . To the contrary, the Arbitration Agreement has a clear 'opt out' provision."); *Rodriguez v. Four Seasons Hotels, Ltd.*, No. 09-cv-2864, 2009 WL 2001328, at *4 (S.D.N.Y. July 10, 2009) ("[Plaintiff] was not required to submit to the . . . mediation/arbitration provisions as a condition of employment, but was provided with the choice of opting-out.").

Claimant suggests in a footnote that the Minimum Standards apply on the theory that "**execution** of the DRA [was] a condition of employment." Mot. 12 n.8 (emphasis added). He also suggests that having to request and return an opt-out form by email was too much of a "series of procedural hurdles" to qualify as a meaningful opt-out opportunity. *Id.* But both these arguments conflict with governing precedent, and Claimant cites nothing to support them.

For example, in *Simeon v. Domino's Pizza LLC*, the court easily rejected an indistinguishable argument by a plaintiff who "was required to sign the Agreement 'in order to commence or continue' his employment" because it "ignore[d] the rest of the agreement which explicitly allowed him to opt out within 30 days **and still retain his employment**." No. 17-cv-5550, 2019 WL 7882143, at *5 (E.D.N.Y. Feb. 6, 2019) (emphasis in original). As a result, "the plain terms of the Arbitration Agreement . . . ma[de] clear that dispute resolution by arbitration [was] not a mandatory condition of [the plaintiff's] employment." The same is true here. Moreover, Claimant mischaracterizes the language of the Minimum Standards in advancing this argument. Contrary to his description, the Minimum Standards do not purport to "apply whenever an arbitration is required by a standard 'clause **or agreement**' that an employer requires an employee to sign as a condition of employment." Mot. 12 n.8 (emphasis in original). They purport to apply "[i]f an arbitration is based on a clause or agreement that is required as a condition of employment." Minimum Standards at 2. The DRA was not "required as a condition

of employment." *Id.* Just the opposite, its opt-out procedure expressly enabled Claimant to choose to "**not be subject to this Agreement**." DRA § 8 (emphasis in original).[4]

Claimant's passing reference to supposed "procedural hurdles" fares no better. In *Mohamed*, the Ninth Circuit rejected a similar argument—though on far more compelling facts—that a "right to opt out was not 'meaningful' because drivers were required to opt out either in person at Uber's San Francisco offices or by overnight delivery service." 848 F.3d at 1210-11. The court reached this decision even though it did "not doubt that it was more burdensome to opt out of the arbitration provision by overnight delivery service than it would have been by e-mail." *Id.* at 1211. The email procedure here was far less burdensome than the one in *Mohamed*.

In short, the Minimum Standards apply only to agreements required as a condition of employment, the DRA was not required as a condition of employment, and thus there is no basis to treat the Minimum Standards as applicable. Before the Arbitrator entertains Claimant's contractual arguments about the meaning of Section 6 of the DRA, the Arbitrator should advise JAMS to reconsider its earlier determination. Were JAMS to agree with such advice, at least then Claimant would not be able to seek a no-risk advisory opinion from the Arbitrator on what the DRA requires. Claimant, instead, would be bound by what the DRA requires.

### B. If the Arbitrator Addresses the Substance of Claimant's Contract-Interpretation Arguments, the Arbitrator Should Reject Them.

#### 1. Federal and New York Law Govern the Parties' Fee Obligations.

Claimant's Motion gives remarkably little attention to the threshold question of what law governs the issue presented. As framed by the Motion itself, the issue at hand is the meaning of the DRA. *See* Mot. 2 ("Claimant . . . brings this motion for an interim award . . . construing the parties' DRA and ruling that Respondents are contractually required to abide by the Minimum Standards."). The DRA answers that threshold choice-of-law question in the first two sentences of Section 1: "This Agreement is governed by the Federal Arbitration Act . . . . If the FAA is

[4] Claimant also mischaracterizes Twitter's submission in *Cornet v. Twitter, Inc.*, No. 22-cv-6857 (N.D. Cal.). Mot. 12 n.8 (citing Cohen Decl., Ex. 2). In fact, Twitter emphasized in that submission that "[a]ll Versions of the Agreement expressly state that '[a]rbitration is not a mandatory condition of Employee's employment at the Company' and advises employees of their right to opt out of the Agreement." Cohen Decl., Ex. 2 at 13.

found not to apply, then this Agreement is enforceable under the laws of the state in which you . . . are employed at the time you enter into this Agreement." DRA § 1. Because there is no dispute that Claimant lived and worked in New York at all relevant times, *see* Arbitration Demand ¶ 15, the only applicable laws are the FAA and New York law. The FAA presumptively applies, but if it "is found not to apply" to the fee-apportionment provision in Section 6, then New York law applies by Section 1's plain terms. In no event is the DRA governed by the law of the state in which Twitter is headquartered, California, contrary to what the Motion suggests.

Claimant appears to have overlooked this express language in arguing that the DRA has no choice-of-law clause. *See* Mot. 14. The basis for Claimant's argument seems to be that Section 3, which sets the location for the arbitration, is not a choice-of-law provision. Claimant gives no reason, however, for disregarding Section 1.

If Section 1 were not a choice-of-law provision, which it plainly is, the choice-of-law issue would turn on "the choice-of-law doctrine of the forum state, here, New York." *Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 721 (E.D.N.Y. 2017). "Under New York's choice-of-law rules, the court evaluates the center of gravity or grouping of contacts," with the purpose of establishing which state has "the most significant relationship to the transaction and the parties." *Id.* (citations and quotations omitted). Here, the relevant factors point strongly to New York because New York was the place of contracting (where Claimant signed the DRA and declined to opt out), the place of performance (where arbitration between the parties is set to occur), the location of the subject matter (the employment and related arbitrations), and the domicile and place of business of the parties (Claimant's New York residence and Twitter's New York location). The only fact pointing the other way is that Twitter was headquartered in California. But that one countervailing factor does not tilt the balance in favor of California law. *See, e.g.*, *Guan*, 236 F. Supp. 3d at 722 ("Plaintiffs are drivers in New York who signed up to use the Uber App to receive transportation requests in New York. The issues in dispute involve contract formation and employment practices in New York, which implicate significant State policy interests.").

Claimant contends that his FEHA rights are governed by California law and that "New

York law does not address FEHA." Mot. 15. This conflates two separate choice-of-law questions: (1) which law governs the interpretation of the DRA (the issue presented in his Motion); and (2) which law governs the substance of his employment discrimination claims (an issue potentially to be decided at some later stage). The substance of Claimant's employment discrimination claim is not before the Arbitrator right now. Only the interpretation of the DRA is.

In any event, California law does **not** govern Claimant's claim for employment discrimination (Count Seven of the Arbitration Demand) because he lived and worked in New York and fails to show that any relevant conduct occurred in California. His argument on this point rests entirely on *Sims v. Worldpac Inc.*, No. 12-cv-5275, 2013 WL 663277, at *2 (N.D. Cal. Feb. 22, 2013), which merely denied a motion to dismiss a FEHA claim brought by a non-Californian, and in doing so emphasized that the plaintiff had plausibly "identif[ied] the individuals who engaged in the alleged discriminatory and retaliatory conduct" and plausibly alleged that they engaged in the allegedly tortious conduct while located in California. *Id.* at *3. The court recognized, however, that "the fact that the employer's headquarters were in California" is not enough to trigger FEHA, and that "general" "allegations that the decision to terminate [a plaintiff] was approved, implemented and ratified in California" are "insufficient to establish a nexus between the alleged discrimination and California." *Id.* at *2-3 (citing *Campbell v. Arco Marine, Inc.*, 42 Cal. App. 4th 1850, 1858 (1996), and quoting *Gonsalves v. Infosys Techs., LTD.*, No. 09-cv-04112, 2010 WL 1854146, at *6 (N.D. Cal. May 6, 2010)). Claimant's allegations, in contrast, do not identify any specific decisionmakers who engaged in allegedly unlawful acts in California but instead rest on the same sort of highly general allegations found insufficient in these and other cases. Arbitration Demand ¶ 188; *see, e.g.*, *Gulaid v. CH2M Hill, Inc.*, No. 15-cv-4824, 2016 WL 926974, at *4 (N.D. Cal. Mar. 10, 2016) (rejecting plaintiff's reliance on *Sims* because plaintiff failed to "specifically identify connections between the alleged discriminatory conduct and the activities of particular employees of defendants in California"); *Loza v. Intel Ams., Inc.*, No. 20-cv-6705, 2020 WL 7625480, at *4 (N.D. Cal. Dec. 22, 2020) (same). In all events, Section 1 of the DRA provides that New York applies, and New York choice-of-law principles would apply New York discrimination law to

Claimant's claims regardless because "the alleged discriminatory acts . . . occurred during his employment in New York." *Cagle v. Unisys Corp.*, No. 99-cv-9575, 2003 WL 21939705, at *7 (S.D.N.Y. Aug. 13, 2003).[5]

**2. Neither the FAA Nor New York Law Requires Twitter to Pay Claimant's Share of the Arbitration and Arbitrator Fees, and so the DRA Requires the Parties to Split the Fees.**

Under the applicable federal and New York law, and on the record before the Arbitrator, Twitter has no obligation to pay the full costs of this Arbitration. Under federal law, the Supreme Court has at most adverted to the possibility that an arbitration agreement might operate as an invalid "prospective waiver of a party's right to pursue statutory remedies" if "filing and administrative fees attached to arbitration . . . are so high as to make access to the forum impracticable." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013) (citation omitted); *see also Green Tree Fin. Corp.—Ala. v. Randolph*, 531 U.S. 79, 90 (2000). Yet the Court warned that "the fact that it is not worth the expense involved in proving a statutory remedy does not constitute the elimination of the **right to pursue** that remedy." *Italian Colors*, 570 U.S. at 236 (emphasis in original). Courts have widely held "that some showing of individualized prohibitive expense is necessary to invalidate an arbitration agreement." *Stewart v. Paul, Hastings, Janofsky & Walker, LLP*, 201 F. Supp. 2d 291, 293 (S.D.N.Y. 2002); *see also, e.g.*, *Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 556 (4th Cir. 2001) ("[T]he appropriate inquiry is one that evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, i.e., a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims."). And where a plaintiff fails to make any individualized showing of an inability to pay, courts have refused to strike down fee-splitting agreements. *Stewart*, 201 F. Supp. 2d at 293-94; *Bradford*, 238 F.3d at 558-59; *Gordon v. Wilson Elser Moskowitz Edelman &*

[5] Entirely separately, it appears from the allegations in the Arbitration Demand that the Arbitrator would not even possess jurisdiction over a FEHA claim by Claimant because he has not alleged that he has exhausted his administrative remedies for such a claim. *See, e.g.*, *Kim v. Konad USA Distrib., Inc.*, 226 Cal. App. 4th 1336, 1345 (2014).

*Dicker LLP*, No. 22-cv-5212, 2023 WL 2138693, at *6 (S.D.N.Y. Feb. 21, 2023).

New York law follows the same basic approach. *See, e.g.*, *Brady v. Williams Cap. Grp., L.P.*, 928 N.E.2d 383, 387 (N.Y. 2010) (citing *Gilmer* and *Bradford*, among other cases, in endorsing "the case-by-case, fact-specific approach employed by the federal courts"). Just as under the FAA, a failure to put forward meaningful evidence dooms an employee's attempt to avoid fee-splitting under New York law. *See, e.g.*, *Am. Fam. Life Assurance Co. of New York v. Baker*, 778 F. App'x 24, 27 (2d Cir. 2019); *Mariglio v. Berthel Fisher & Co. Fin. Servs.*, 133 A.D.3d 1371 (N.Y. App. Div. 2015).

There is no evidence here to meet these standards. Indeed, Claimant has already advanced $5,000 to fund consideration of this Motion and provides no evidence from which the Arbitrator could conclude that further funding half of the arbitration costs would be cost-prohibitive for him (or his counsel, who may have agreed to pay such costs as part of a contingency fee arrangement) relative to the cost of litigating. His Motion merely asserts, without evidentiary support, that "Claimant (and his thousands of colleagues) cannot afford to advance the necessary fees for their cases" despite that "Claimant could, and therefore did, advance sufficient funds to allow the Arbitrator to rule on this one issue." Mot. 2. Claimant's take-my-lawyer's-word-for-it strategy is far from adequate under applicable federal and New York law. *See, e.g.*, *Am. Fam. Life*, 778 F. App'x at 27 ("Because Appellants have not put forth any evidence of their financial inability to pursue arbitration under the terms of this Agreement, their unconscionability claim predicated on the cost-splitting provision must accordingly fail."); *Gordon*, 2023 WL 2138693, at *6 ("Without any showing by Gordon as to the likelihood of him incurring prohibitively expensive costs at arbitration, the Court will not invalidate the Of Counsel Agreement on the basis of prohibitive expense."); *Mariglio*, 133 A.D.3d at 1371 ("Here, plaintiff submitted no evidence concerning the cost of litigating her claims in court, and she thus failed to meet her burden[.]").

Claimant does not argue—nor could he—that the Minimum Standards are incorporated into the terms of the DRA. The DRA never refers to the Minimum Standards, much less states that they govern, even though it expressly states that arbitration will take place under the "then-current JAMS Rules." DRA § 5. The JAMS Rules make clear that the Minimum Standards are

distinct from the Rules, characterizing the Minimum Standards as one of the "JAMS policies" rather than part of the Rules themselves. JAMS Employment Rule 2(a). And again, the Minimum Standards apply only to agreements required as a condition of employment, which the DRA expressly is not. Moreover, the DRA's specific language embracing fee-apportionment wherever permitted by "applicable law" overrides any general references to fees in JAMS Rules or policies. *See Bahoor v. Varonis Sys., Inc.*, 152 F. Supp. 3d 1091, 1100 (N.D. Ill. 2015) ("[A]ny default fee provisions in the . . . JAMS rules are overridden by the express Agreement that the parties signed."); *Reed v. Navient Sols., LLC*, No. 17-cv-1218, 2020 WL 13701850, at *4 (N.D. Ohio Mar. 24, 2020) ("[T]he JAMS Minimum Standards clearly are not law[.]").

Claimant's only attempt to engage with non-California law is to argue that "[g]enerally applicable contract law" requires the Arbitrator to construe the DRA so that it is enforceable and not void. Mot. 6-8. This argument is circular because it assumes what it needs to prove—namely, that a fee-splitting agreement would invalidate the DRA or make it unenforceable under federal or New York law. For the reasons explained already, that is incorrect: neither federal law nor New York law treats such provisions as inherently unlawful. Sensing this, Claimant shifts gears and claims that "the entire arbitration agreement [is] void" because "JAMS **will not** accept jurisdiction of any arbitration in which an employee subject to a mandatory arbitration agreement is required to share in the arbitration costs." Mot. 7. This hindsight-based argument makes little sense as an attempt to discern the contracting parties' intent. When the parties entered the DRA, they had no reason to anticipate that JAMS would take the position it has taken—particularly when the DRA is not "mandatory" or a condition of employment such that it would trigger JAMS Minimum Standards in the first place. Besides, JAMS' unsupported determination does not actually make performance of the DRA impossible because courts have the power to appoint substitute arbitrators when a preselected arbitration provider refuses to accept the arbitration. *See, e.g.*, *Khan v. Dell Inc.*, 669 F.3d 350, 354 (3d Cir. 2012).

Claimant next contends that the DRA is somehow "illusory" or without consideration, but this argument is also groundless. Mot. 7-8. The fact that Twitter now has an ability to accept the Minimum Standards does not make any of the DRA's obligations illusory—just as Claimant's

ability to waive the Minimum Standards does not do so. If Twitter had a covered dispute with Claimant, it would be bound by the DRA to arbitrate it.

In a last-ditch effort at an argument under non-California law, Claimant invokes the parties' supposed "course of performance." But Twitter has never accepted the idea that the Minimum Standards apply. On the contrary, Twitter made its position clear in June 2023, just three and a half weeks after JAMS' notice that it found the Minimum Standards applicable to this case, and just four months after Claimant's Demand. *See* Cohen Decl., ¶ 8. Claimant's Demand, moreover, asserts that this dispute is not a "consumer arbitration" within JAMS' sense of that term (i.e., "an arbitration conducted under a pre-dispute arbitration provision contained in a contract" drafted by Twitter that "[a]n employee or an applicant for employment" was "required to accept"). Arbitration Demand at 5. Regardless, because the DRA makes clear that disputes over fee apportionment are reserved for the Arbitrator, any disagreement over the meaning of Section 6 of the DRA could not have become ripe for resolution under the contract's terms until the Arbitrator was asked to weigh in. The present facts are nothing like those in Claimant's lone New York example, in which the contracting parties had a consistent "course of performance for thirteen years." *In re Barney Mac, LLC*, No. 04-bk-17768, 2006 WL 2864974, at *15 (Bankr. S.D.N.Y. Oct. 3, 2006).

In sum, Claimant has put forward no evidence or plausible argument under the "applicable law" of the FAA and New York that Twitter is "required to pay all of the Arbitrator's and/or arbitration fees." DRA § 6. Nor has he put forward any basis for the Arbitrator to allocate fees other than according to the default JAMS Rule that "each Party shall pay its *pro rata* share of JAMS fees and expenses." JAMS Employment Rule 31(a). The Arbitrator should adhere to that default rule and construe the DRA as requiring Claimant to bear half of the JAMS fees and expenses for this Arbitration.

**3. Even if California Law Applied, it Would Not Support Claimant.**

Although Claimant failed to put forward any convincing basis for applying California law to the parties' contract, it is worth emphasizing that the California law he cites would not support the relief he seeks even if it somehow did apply.

Claimant's core argument is that his ability to assert a FEHA claim means that Respondents implicitly agreed "to pay all costs that are unique to arbitration." Mot. 5 (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 689 (Cal. 2000)). Claimant overlooks, however, a critical precondition for this California rule of contract interpretation: it applies only "when an employer imposes mandatory arbitration as a condition of employment." *Armendariz*, 6 P.3d at 687. As detailed above, *see* Section III.A.2, the DRA makes clear that arbitration was not a condition of Claimant's employment. So even on its own terms, Claimant's *Armendariz* argument falls apart. *See Armendariz*, 6 P.3d at 687 (quoting *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1484 (D.C. Cir. 1997)) ("Arbitration will occur in this case only because it has been mandated by the employer as a condition of employment."); *Selman*, 2004 WL 2729656, at *2 ("*Armendariz* only applies to mandatory employment arbitration clauses: those imposed by an employer on a prospective or current employee as a condition of employment.").

In any event, courts have recognized that *Armendariz*'s arbitration-disfavoring rule is preempted by the FAA as recently construed by the U.S. Supreme Court. *See, e.g.*, *Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 412 (S.D.N.Y. 2016) ("*Armendariz* is inconsistent with the Supreme Court's 2013 decision in *Italian Colors*, to the extent that the California Supreme Court found arbitration provisions unenforceable merely because the arbitral forum and procedures made it uneconomical to pursue claims in arbitration."); *James v. Conceptus, Inc.*, 851 F. Supp. 2d 1020, 1033 (S.D. Tex. 2012) ("To the extent *Armendariz* precludes arbitration in any employment dispute if the employee is required to bear any type of expense not present in litigation, it appears preempted[.]").

For these reasons, too, Claimant's attempt to rewrite the DRA using *Armendariz* cannot withstand scrutiny.

**C. Twitter Has Not Waived its Objections to the Minimum Standards' Purported Applicability to this Case.**

With no valid basis to argue that the DRA requires Twitter to bear the full cost of the Arbitration, Claimant pivots to argue that Respondents have "waived" their right not to bear the full cost "by proceeding under the Minimum Standards." Mot. 10. According to this theory,

"JAMS' case-initiation notice was crystal clear . . . that Respondents would convey their acceptance of those standards by proceeding with the arbitration." *Id.* Respondents also supposedly "proceeded with the arbitration for months in accordance with the Minimum Standards, paying invoiced fees and participating in arbitration selection," before objecting. This argument is specious, as Claimant's own evidence shows.

JAMS issued the notice in this case on May 9, 2023. *See* Dkt., uploaded 5/9/2023. By its terms, the notice stated that "[t]he parties' **agreement to proceed** constitutes agreement to [the application of the Minimum Standards]." *Id.* The invoice Claimant cites was issued two weeks later, on May 24, 2023. Cohen Decl., ¶ 10 & Ex. 9. Twitter then submitted a global objection to JAMS' position on June 2, 2023—just nine days after the invoice. *Id.*, ¶ 7 & Ex. 6. At no point between the May 9 notice and the June 2 letter did Respondents do anything to suggest an "agreement to proceed" with this arbitration under JAMS' view that the Minimum Standards governed. Claimant cites no communication in which Twitter conveyed such an agreement. And it is simply false to claim that Twitter "proceeded with the arbitration for months" before objecting to the imposition of the Minimum Standards in this case. Barely three and a half weeks passed between JAMS' notice and Twitter's written objection. Claimant cites no decision treating payment of a JAMS invoice as a waiver of an arbitration agreement provision deemed inconsistent with the Minimum Standards. *See contra Sabre GLBL, Inc. v. Shan*, No. 15-CV-8900, 2018 WL 1905802, at *5 n.8 (D.N.J. Apr. 23, 2018) ("Nor did Shan waive her right to enforce the anti-fee-shifting provision by failing to object when Sabre—pursuant to the Minimum Standards—paid the entire $87,000 arbitration fee."), *reversed in part on other grounds*, 779 F. App'x 843 (3d Cir. 2019).

Contrary to Claimant's suggestion, Mot. 10-11, the Arbitrator's appointment on May 25, 2023 does not constitute waiver, either. *See* Mot. 4. After all, JAMS' May 9 notice advised that "[a]ny further issue about whether the Minimum Standards apply should be directed to the arbitrator once he or she is appointed." *See* Dkt., uploaded 5/9/2023. According to the notice itself, then, appointment of the Arbitrator was a prerequisite for raising further objection to the Minimum Standards' purported applicability. In these circumstances, participating in arbitrator

selection could not have been a way of communicating an intention of **abandoning** "[a]ny further issue about whether the Minimum Standards apply."

Finally, any failure to object between the February 13 demand and JAMS' May 25 notice cannot be construed as waiver. Claimant affirmatively represented on his own JAMS Demand for Arbitration Form that this was **not** a "consumer arbitration," as JAMS defines it. Arbitration Demand at 5. Had Claimant been taking the position that he was an employee "required to accept the arbitration provision in the contract"—thereby potentially triggering the Minimum Standards—the correct box to check would have been the box for a consumer arbitration. *Id.* On these facts, finding waiver by Twitter would be particularly unjustified. Indeed, it could be argued that Claimant affirmatively waived the Minimum Standards by electing not to pursue a "consumer arbitration." Arbitration Demand at 5.

### D. X Holdings I, Inc. and Elon Musk Have No Conceivable Obligation to Pay the Costs of This Arbitration.

Claimant concedes that Respondents X Holdings I, Inc., and Musk are not parties to the DRA but asserts that they must arbitrate claims against them that are "inextricably intertwined with the claims against Twitter." Arbitration Demand ¶ 14. Even so, the Motion offers no rationale for imposing a contractual obligation to pay for this Arbitration on Respondents who did not agree to be bound by the DRA. The usual rule, for arbitration agreements as for any other contract, is that one is not bound by a contract that one did not agree to. *See, e.g.*, *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). At a minimum, the Arbitrator should deny Claimant's requested relief as to those Respondents.[6]

## IV. CONCLUSION

For all these reasons, the Arbitrator should deny Claimant's Motion in its entirety.

---

[6] As non-signatories, X Holdings I Inc. and Musk are not proper parties to this arbitration. In accordance with the Arbitrator's July 19, 2023 order, they reserve, and expressly do not waive, their right to raise that defense or others by joining this submission.

Dated: August 31, 2023

MORGAN, LEWIS & BOCKIUS LLP

By *\/s/ Sari M. Alamuddin*
Eric Meckley
Brian D. Berry
Sari M. Alamuddin
Kaiser Chowdhry
Ashlee N. Cherry
Kassia Stephenson

Attorneys for Respondents

# EXHIBIT 3

**CAUSE NO. 1601002342**

| | |
|---|---|
| **YUNFENG ZHANG,**<br><br>**CLAIMANT,**<br><br>**V.**<br><br>**TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,**<br><br>**RESPONDENTS.** | **JAMS** |

**CLAIMANT YUNFENG ZHANG'S REPLY IN FURTHER SUPPORT OF CLAIMANT'S MOTION FOR AN INTERIM AWARD**

KAMERMAN, UNCYK, SONIKER & KLEIN P.C.
Akiva M. Cohen, Esq.
Attorneys for Plaintiffs
1700 Broadway, 16th Floor
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ iii
ARGUMENT........ 1
I. JAMS Correctly Interpreted Its Own Rules and the DRA Does Not Provide the Arbitrator with Authority to Overrule That Interpretation ........ 1
II. The DRA Contains No Choice of Law Clause and California Law Applies........ 2
III. The DRA Requires Respondents to Bear the Forum Costs ........ 5
IV. Respondents Continue to Mischaracterize the DRA as Requiring Equal Fee Splitting Unless Prohibited by Law ........ 8
V. Finally, Respondents Waived Any Objection to Proceeding Under the Minimum Standards... 9
CONCLUSION........ 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83 (2000) .... 4

*Bahoor v. Varonis Sys., Inc.*, 152 F. Supp. 3d 1091 (N.D. Ill. 2015) .... 8

*Cordero v. C.R. England, Inc.*, 2021 WL 2793929 (C.D. Cal. Apr. 30, 2021) .... 2

*Essex v. Children's Place, Inc.*, No. CV 15-5621, 2017 WL 6000347 (D.N.J. Dec. 4, 2017) .... 2

*Gentry v. Superior Ct.*, 42 Cal. 4th 443 (2007) .... 3

*Gould v. Lightstone Value Plus Real Est. Inv. Tr., Inc.*, 301 F. App'x 97 (2d Cir. 2008) .... 6

*Guan v. Uber Techs., In*c., 236 F. Supp. 3d 711 (E.D.N.Y. 2017) .... 3

*Heisman v. Wyndham Vacation Resorts, Inc.*, No. CV2011480KMJBC, 2021 WL 1138125 (D.N.J. Mar. 22, 2021) .... 5

*James v. Conceptus, Inc.*, 851 F. Supp. 2d 1020 (S.D. Tex. 2012). .... 4

*Loc. 355 United Serv. Workers Union, Int'l Union of Journeymen & Allied Trades v. Dual-Purpose Corp.*, No. 17-CV-262 (CBA) (ST), 2018 WL 3151686 (E.D.N.Y. Mar. 1, 2018) .... 5

*Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201 (9th Cir. 2016) .... 2

*Moss v. First Premier Bank*, 835 F.3d 260 (2d Cir. 2016) .... 5

*Natixis Funding Corp. v. GenOn Mid-Atl.*, LLC, 181 A.D.3d 481 (2020) .... 7

*OTO, L.L.C. v. Kho*, 8 Cal. 5th 111 (2019) .... 3

*Ranzy v. Extra Cash of Texas, Inc.*, No. CIV.A. H-09-3334, 2010 WL 936471 (S.D. Tex. Mar. 11, 2010), *aff'd sub nom. Ranzy v. Tijerina*, 393 F. App'x 174 (5th Cir. 2010) .... 5

*Reed v. Navient Sols., LLC*, No. 1:17-CV-1218, 2020 WL 13701850 (N.D. Ohio Mar. 24, 2020) .... 8

*Rodriguez v. Four Seasons Hotels, Ltd.*, No. 09 CIV. 2864 (DLC), 2009 WL 2001328 (S.D.N.Y. July 10, 2009) .... 2

*Simeon v. Domino's Pizza LLC*, No. 17CV5550RJDST, 2019 WL 7882143 (E.D.N.Y. Feb. 6, 2019) .... 2

*Sims v. Worldpac Inc.*, No. C 12-05275 JSW, 2013 WL 663277 (N.D. Cal. Feb. 22, 2013) .... 4

*Young v. Refined Techs., Inc.*, No. SACV2201032CJCJDEX, 2022 WL 3012536 (C.D. Cal. June 17, 2022) .... 2

**Other Authorities**

JAMS Arbitration Schedule of Fees and Costs .... 9

JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness .... 2

**Rules**

JAMS Employment Arbitration Rules & Procedures Rule 2 .... 6

JAMS Employment Arbitration Rules & Procedures Rule 31(c) .... 2, 6

In his moving brief ("MB") in support of his motion for an interim award (the "Motion"), Claimant demonstrated that, properly construed, the DRA[1] requires Respondents to pay the arbitral fees in this dispute. As shown below, Respondents'[2] opposition ("Opp") makes a series of meritless contrary arguments, and the Motion should be granted.

## ARGUMENT

### I. JAMS Correctly Interpreted Its Own Rules and the DRA Does Not Provide the Arbitrator with Authority to Overrule That Interpretation

Respondents open their argument by again insisting that the Arbitrator should not construe the DRA at all because the Arbitrator cannot compel Claimant to waive the Minimum Standards. Opp at 8. They do so despite simultaneously arguing the exact opposite position to the Delaware District Court: that *only* an Arbitrator can construe the DRA and determine if Respondents' conduct breached it. Cohen Reply Dec. Ex. 1 at 18-19. Respondents cite no law for the proposition that Claimant cannot seek a declaratory judgment about the meaning of the DRA unless the outcome of that declaratory judgment could potentially leave "Respondents [] better off than before."[3] Opp at 8. There is no such rule, and because Claimant could have obtained such a declaration from a Court absent the arbitration agreement, the DRA entitles him to obtain one from the Arbitrator. *See* MB at 12.

Respondents' argument that the Arbitrator ought to be empowered to interpret JAMS' Rules in a manner that is binding on JAMS is similarly frivolous. Arbitration is a creature of contract, and the parties' DRA does not allocate to the Arbitrator a dispute about the meaning of JAMS' Rules. Cohen Dec. Ex. 5 at 1 (covered disputes are only those arising from or relating to the interpretation of the DRA or disputes regarding the employment relationship). In any event, *JAMS* is not a party

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

[2] Respondents argue that X Holdings and Musk are not bound by Twitter's arbitration agreement. As to Musk, that dispute will be the subject of a different motion. But as to X Holdings, it is a profoundly disingenuous argument, because X Holdings is *simultaneously* taking *the exact opposite* position in its motion to compel arbitration in *Woodfield v. X. Holdings Corp. et al.*, C.A. No. 1:23-cv-780-CFC (D. Del.), a motion it filed *just three days* prior to filing this brief. *See* Cohen Reply Dec. Ex. 1.

[3] Respondents' argument here reveals their recognition that – contrary to their claims, Opp at 7 – no Court could appoint a substitute arbitrator on the circumstances here. *See infra* at III. Were that possible, a declaration that the DRA requires Mr. Zhang to pay 50% of the fees would leave Respondents better off by allowing them to seek appointment of a substitute arbitrator after Respondents rendered JAMS "unavailable" by refusing to abide by its Rules.

to the DRA and therefore could not be bound by any such purported delegation; JAMS has authority to interpret its own rules.

And JAMS' interpretation of those Rules was correct. The Rule is clear: "If an Arbitration is *based on a clause or agreement* that is required as a condition of employment" the employee cannot be required to share the forum fees beyond a portion of the initial filing fee. JAMS Rule 31(c); Minimum Standards, Standard 6. This arbitration is based on the DRA. The DRA is an agreement "required as a condition of employment"; Mr. Zhang literally could not accept employment at Twitter without executing the DRA. Cohen Dec Ex. 2 at 8; Cohen Reply Dec Ex. 2 at 3. This remains true whether or not the DRA is a contract of adhesion, and whether or not Mr. Zhang had the ability to later opt out of the DRA after first executing the document as required by his offer letter.[4] Under JAMS' Rules, that is sufficient to require application of the Minimum Standards.

## II. The DRA Contains No Choice of Law Clause and California Law Applies

At the preliminary conference, Respondents suggested the DRA had a choice of law clause because it set New York as the place of hearing. Now, Respondents shift their attention to a different provision: that a party seeking to *enforce* the DRA may do so under the FAA or, if the FAA is found not to apply, under the law of the employee's home state. Not only does that provision focus exclusively on the procedures for *enforcement* of the agreement, rather than interpretation of disputed provisions (indeed, the FAA provides no rules of construction in the first instance), but there has never been a finding that the FAA does not apply to the DRA (nor could there be). Thus,

[4] In that regard, the cases cited by Respondents are instructive. In *Young v. Refined Techs., Inc.*, No. SACV2201032CJCJDEX, 2022 WL 3012536, at *5 (C.D. Cal. June 17, 2022), the Court cited *Cordero v. C.R. England, Inc.*, 2021 WL 2793929 (C.D. Cal. Apr. 30, 2021) for the proposition that "an opt-out provision" would be an "indicia" that an agreement was not required as a condition of employment. But the "opt-out provision" in *Cordero* allowed the employee to refuse to sign the arbitration agreement in the first instance. *Cordero*, 2021 WL 2793929, at *2. Similarly, the "opt-out provision" in *Essex v. Children's Place, Inc.*, No. CV 15-5621, 2017 WL 6000347 (D.N.J. Dec. 4, 2017) provided the employee with the opportunity to decline to sign the arbitration agreement. *Id.* at *3. The Plaintiff in *Rodriguez v. Four Seasons Hotels, Ltd.*, No. 09 CIV. 2864 (DLC), 2009 WL 2001328 (S.D.N.Y. July 10, 2009) was similarly not required to sign the arbitration agreement prior to opting out. *Id.*, *4. Finally, the Courts in *Simeon v. Domino's Pizza LLC*, No. 17CV5550RJDST, 2019 WL 7882143 (E.D.N.Y. Feb. 6, 2019) and *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201 (9th Cir. 2016) were addressing arguments that arbitration agreements that allowed an employee to subsequently opt out were unenforceable as *unconscionable*. *See Simeon*, 2019 WL 7882143, *5; *Mohamed,* 848 F.3d at 1211. But JAMS' rule applies more broadly than to unconscionable agreements – by its terms, it applies to any arbitration based on an agreement the employee was compelled to sign as a condition of employment, even if the arbitration agreement itself is enforceable. JAMS' refusal to indulge the "opt-out" trick as a workaround was entirely correct.

this provision cannot be read as selecting New York law for disputes over interpretation of the DRA,[5] and the Arbitrator must apply New York's choice-of-law rules.[6]

And Respondents entirely ignore Claimant's point on that analysis: given California's fundamental public policy interest in controlling the terms of arbitration agreements that could conceivably impact FEHA, and the absence of any countervailing public policy interest of New York, that analysis requires application of California law. Respondents do not deny that California's public policy interest here is strong, and make no argument that New York has any public policy interest at all. The closest Respondents come to addressing the public policy balance is in a parenthetical describing *Guan v. Uber Techs., Inc*., 236 F. Supp. 3d 711 (E.D.N.Y. 2017) as holding that *in that case*, New York's policy interests mandated application of New York law. Opp at 12. But that makes Claimant's point for him. There, the question was the enforceability of click-wrap contracts relating to New York employment, an issue for which New York's policy interests were readily apparent. *Id.* at 722. Here, Respondents identify no similar policy concerns at issue for New York; California is the only state with a strong public policy interest in *this* issue. Thus, under New York choice of law rules, California law applies.

And under California law, Respondents must pay the arbitration costs. Respondents argue that *Armendariz* is inapplicable because the DRA included an opt-out provision. But the California Supreme Court *specifically* rejected the argument that a *subsequent* opt-out provision can remove an arbitration agreement from *Armendariz*'s ambit where *Armendariz* is protecting against waiver of non-waivable statutory rights (as opposed to mere unconscionability). *See Gentry v. Superior Ct.*, 42 Cal. 4th 443, 467 (2007) (opt out provision has no impact on validity of class-action waiver under *Armendariz* because opt-out cannot rescue pre-dispute waiver of non-waivable statutory rights, and impacts only issues of unconscionability).[7] *Cf. Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.

---

[5] As noted in the Moving Brief, to the extent that any disputed provision in the DRA is ambiguous, the Arbitrator must construe it in Claimant's favor. MB at 10 (and at 6 n.5). Respondents do not contest that proposition.

[6] Respondents only argue under the "center-of-gravity" test applicable to contractual choice of law. But as Claimant noted in his opening brief, that is not the test applicable to choice-of-law issues relating to tort claims, and Claimant's FEHA claim is a tort claim, not a contractual claim.

[7] "*Gentry's* holding [that] class arbitration waivers [are unenforceable] ha[s] been abrogated by United States Supreme Court precedent." *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 129 (2019)

4th 83, 102 (2000) (fees provision is matter of non-waivable statutory rights). Thus, Respondents' argument that the opt-out provision alters the requirements of California law is meritless.[8]

Similarly, Respondents' argument that Claimant did not adequately plead his FEHA claim is misplaced, incorrect, and irrelevant. It is misplaced because this motion is not the proper place for the argument; the claim remains live unless and until a motion to dismiss the claim is granted. The argument is also incorrect. Claimant's FEHA claim was sufficiently pled under Rule 9, and met the standards articulated in *Sims v. Worldpac Inc.*, No. C 12-05275 JSW, 2013 WL 663277 (N.D. Cal. Feb. 22, 2013), which distinguished *Campbell* and *Gonsalves* on the basis that "in those cases, the courts found that there were insufficient facts to conclude that the decisions had been made in California." *Id.*, *3. And, in any event, Respondents' objection is irrelevant; California's requirement that the employer agree in the arbitration agreement to bear the unique costs of arbitration – and its insertion of such a provision into each DRA as a matter of law – does not turn on whether the employee *eventually and in fact asserts a viable FEHA claim*, but on whether such a claim, if viable, *would be covered under the arbitration agreement*. *Armendariz,* 24 Cal. 4th at 113. Because Respondents do not dispute that their DRA covers any FEHA claims Mr. Zhang could conceivably have if Respondents violated FEHA, they do not contest that California law requires the DRA to be construed as mandating that Respondents bear the forum fees.

Finally, Respondents' preemption argument is frivolous; no court has held that a state law requirement that employers pay the costs of arbitration is preempted by the FAA, and Respondents make no argument that doing so *precludes* arbitration. *Armendariz* may be preempted to the extent that it held that certain arbitration agreements were *per se* unconscionable and invalid. *See James v. Conceptus, Inc.*, 851 F. Supp. 2d 1020, 1033 (S.D. Tex. 2012). But as no party to this proceeding has argued *Armendariz* renders the DRA invalid, that argument carries no weight.

---

[8] The *Gentry* rule that a right to later opt out of a mandatory arbitration agreement does not make the agreement less than mandatory for purposes of *Armendariz* makes logical sense, as well. Much like the JAMS rules and the Minimum Standards, *Armendariz* implies into the agreement, as a matter of law and *at the moment the contract was entered as a mandatory condition of employment*, the company's agreement to pay fees. The subsequent opt out right, then, would be for the employee to opt out of an arbitration agreement that already includes the fees agreement implied by law.

### III. The DRA Requires Respondents to Bear the Forum Costs

Regardless, generally applicable rules of contract construction require Respondents to pay the forum fees. Not only would Respondents' proposed construction render the DRA illegal under California law, as discussed above, but as Claimant noted in the Moving Brief, it would also render performance impossible and the entire agreement unenforceable, and therefore must be rejected. Respondents' sole response on this point is to suggest that the parties could petition the Court for appointment of a new arbitrator pursuant to §5 of the FAA. But that is triply wrong. It is wrong because §5 of the FAA is entirely inapplicable here; that provision applies when an arbitrator is not named, *not* when the named arbitrator declines to continue to administer an arbitration because one party will not abide by its rules. *See Moss v. First Premier Bank*, 835 F.3d 260, 266 (2d Cir. 2016) ("the "lapse" referred to in Section 5 means a lapse in time in the naming of the arbitrator or in the filling of a vacancy on a panel of arbitrators or some other mechanical breakdown in the arbitrator selection process") (quotation omitted); *Loc. 355 United Serv. Workers Union, Int'l Union of Journeymen & Allied Trades v. Dual-Purpose Corp.*, No. 17-CV-262 (CBA) (ST), 2018 WL 3151686, at *8 (E.D.N.Y. Mar. 1, 2018) (substitute cannot be appointed where agreement selects exclusive arbitration provider, has no provision for appointing a substitute, and no indication the parties agreed to arbitrate before anyone else). Even under the Third Circuit approach cited by Respondents (which has no application to Claimant), Respondents' unwillingness to follow JAMS' rules does not make JAMS "unavailable." *See Heisman v. Wyndham Vacation Resorts, Inc.*, No. CV2011480KMJBC, 2021 WL 1138125, at *4 (D.N.J. Mar. 22, 2021) (Section 5 substitution not available despite AAA refusing to administer arbitration because "[h]ere, the AAA is able and willing to hold arbitrations with Wyndham if Wyndham complies with its rules"). *See also Bedgood v. Wyndham Vacation Resorts, Inc.*, 595 F. Supp. 3d 1195, 1203–04 (M.D. Fla. 2022) (same). It is also wrong because the parties designated JAMS as the exclusive arbitration venue and pervasively cited the JAMS Rules, and §5 substitution cannot be invoked where the choice of arbitrator was central to the arbitration agreement. *Ranzy v. Extra Cash of Texas, Inc.*, No. CIV.A. H-09-3334, 2010 WL 936471, at *5 (S.D. Tex. Mar. 11, 2010), *aff'd sub nom. Ranzy v. Tijerina*, 393 F. App'x 174 (5th Cir. 2010). And finally it is

wrong *because substitution would not matter*. Any new arbitrator would still need to conduct the arbitration pursuant to JAMS' Rules, Cohen Dec Ex. 5 at 5, and JAMS' Rules both prohibit the parties from deviating from the Minimum Standards, JAMS Rules, Rule 2, and prohibit fee-splitting where the Minimum Standards would apply. *Id.*, Rule 31(c). So even with substitution, no arbitrator could administer the arbitration under Respondents' construction of the DRA.

Similarly, construing the DRA as Respondents wish would render the arbitration agreement illusory, with Respondents having the opportunity to opt out of arbitration at any time by refusing to abide by the Minimum Standards. Respondents simply hand-wave here, offering no substantive argument that they could be compelled to arbitrate with JAMS and instead pointing to Claimant's theoretical ability to waive the Minimum Standards as a corresponding power.[9] Opp at 16-17. But that would only make things worse: on Twitter's proposed construction, the parties' DRA was merely an agreement to consider potentially arbitrating on a case-by-case basis, depending on their desire to either waive or comply with the Minimum Standards. That is the very definition of an illusory contract. *See Gould v. Lightstone Value Plus Real Est. Inv. Tr., Inc.*, 301 F. App'x 97, 100 (2d Cir. 2008) (if provision was just an agreement to agree, that "would make the provision unenforceable as an illusory promise").

Moreover, the DRA provides that the arbitration will be conducted by the JAMS Rules, and the JAMS Rules plainly incorporate the fees provisions of the Minimum Standards, both in Rule 2 (generally noting that the parties may not deviate from the Minimum Standards) and in Rule 31(c). Other than Respondents' assertion that the Arbitrator ought to be empowered to overrule JAMS' determination that the Minimum Standards apply, Respondents have no response to this point.

Respondents also ignore their repeated course of performance under the DRA. In thousands of arbitrations filed since December 2022, Respondents received JAMS invoices for case initiation fees only due under the Minimum Standards and Rule 31(c). For six months, through June 2023, Respondents paid those invoices without suggesting they were not required to under the DRA, at a

[9] As a practical matter, it would be pyrrhic for Claimant to pay potentially five-to-six figures in fees on his severance and other claims. But Claimant has not argued that should impact the appropriate construction of the DRA, much though Respondents would like to pretend otherwise. Opp at 15.

cost in the seven figures. While Respondents now suggest those months are insufficient to establish a course of performance confirming they understood the DRA as obligating them to pay fees, millions of dollars in fee payments is more than sufficient to establish that Respondents must have understood that those fees were, in fact, due. Indeed, during that period Respondents had no difficulty refusing to pay case initiation fees they did not believe were due, and asking JAMS to reissue invoices on that basis. *See*, *e.g.*, Cohen Reply Dec. Exs. 3-4. The conclusion is unmistakable: Respondents paid the fees because they knew the DRA required it.

Finally, as noted above, Respondents do not deny that to the extent the fees provision is ambiguous, it must be construed as obligating Respondents to pay those fees. Indeed, Respondents point to no principle of contract interpretation which would suggest that Twitter did *not* agree to abide by the Minimum Standards when it amended its form DRA to provide for arbitration by JAMS, a provider that expressly refuses to accept arbitrations that do not comply with those Minimum Standards. Instead, Respondents refer to that as a "hindsight-based argument" and assert that "[w]hen the parties entered the DRA, they had no reason to anticipate that JAMS would" apply the Minimum Standards. Opp at 16. But Respondents notably decline to submit any testimony to that effect from Twitter, and certainly cannot speak to what their employees did or did not anticipate when they signed the agreement Twitter drafted. Twitter is, at best, arguing that it made a unilateral mistake when it drafted the agreement. And, particularly given that Twitter was the drafting party, Twitter bears the consequences of their own errors. *See Natixis Funding Corp. v. GenOn Mid-Atl.*, LLC, 181 A.D.3d 481, 483 (2020).

Ultimately, what Twitter "anticipated" is irrelevant; the question is simple: when Twitter chose JAMS as its provider and agreed that the arbitration would be held according to the JAMS Rules, did it agree to abide by those rules however JAMS interpreted them if and when an arbitration occurred? The answer is, self-evidently, yes; the DRA contains no carve-outs limiting JAMS' authority to construe its own rules or limiting the parties' requirement to be bound by those determinations. The Arbitrator should thus construe the DRA as including Respondents' agreement to abide by the rules of Twitter's chosen arbitration provider, and pay the forum fees.

### IV. Respondents Continue to Mischaracterize the DRA as Requiring Equal Fee Splitting Unless Prohibited by Law

Even if the DRA is not construed as requiring Respondents to pay 100% of the forum fees, *nothing* in the DRA requires Claimant to pay anything at all. Respondents engage in a long discussion of whether New York or law federal law require Respondents to pay the arbitration fees, on the assumption that if not, the DRA must require Claimant to pay 50% of the forum costs. Opp at 14-17. *But that is not what the DRA provides.*

The DRA Respondents drafted provides that for attorneys' fees, each party will bear their own *attorneys' fees*. Cohen Dec. Ex. 5 at 6. As to forum costs, however the DRA provides two options: (1) if required by law, Twitter "will pay the Arbitrator's and arbitration fees"; and (2) if that is not required by law, such fees "will be apportioned between the parties in accordance with said applicable law" and disputes about such apportionment will be "resolved by the Arbitrator." *Id.* That provision notably does not require such costs to be apportioned equally between the parties, and Respondents cite no provision of Federal or New York law requiring equal apportionment by default.[10] To the contrary, as Claimant noted in the Moving Brief, the default provision of New York law is that the apportionment of fees is at the Arbitrator's discretion. MB at 17. And the Arbitrator's discretion here is cabined by JAMS' Rules and the Minimum Standards, which require the Arbitrator to allocate all such fees to Respondents. *Id.* Such an allocation would be "in accordance with [New York] law." Respondents simply ignore this issue in the Opp, never mentioning or addressing it.

Indeed, for the same reason, Respondents' suggestion that application of the Minimum Standards can be overridden by the DRA is not viable. The clause at issue here stands in stark contrast to the clause at issue in *Bahoor v. Varonis Sys., Inc.*, 152 F. Supp. 3d 1091 (N.D. Ill. 2015), in which the parties had agreed to "each pay an equal share of the costs and expenses of such arbitration, except as prohibited by law." *Id.* at 1100. And in *Reed v. Navient Sols., LLC*, No. 1:17-CV-

[10] Respondents instead cite to the default *JAMS* Rule that fees are shared equally unless otherwise agreed or Rule 31(c) and the Minimum Standards apply. Opp at 17. But Respondents again make Claimant's point for him: Respondents cannot seriously argue that JAMS' application of its Rules to require Respondents to pay the arbitration fees is contrary to the DRA because Rule 31(a) – which JAMS found inapplicable – provides a different default.

1218, 2020 WL 13701850 (N.D. Ohio Mar. 24, 2020), the parties' agreement *did not* incorporate the JAMS Rules, and that was the *express* basis on which the court held that the agreement could theoretically trump the Minimum Standards.[11] *Id.*, *4, n.2.

### V. Finally, Respondents Waived Any Objection to Proceeding Under the Minimum Standards

Last, even were none of that true, Respondents' objections are waived. Respondents pretend that their relevant behavior runs from JAMS' notice to them that *this specific arbitration* would proceed under the Minimum Standards, on May 9, 2023. But that is not the relevant period.

JAMS issued its first invoice to Respondents in this proceeding, for "case initiation fees," on March 6, 2023. Cohen Reply Dec. Ex. 5. Under the Rules and JAMS' fee schedules, Respondents could only be responsible for case initiation fees under the Minimum Standards; otherwise, such fees are entirely the Claimant's responsibility. *See Arbitration Schedule of Fees and Costs*.[12] And Respondents were already well aware that JAMS was issuing that invoice to them because it was applying the Minimum Standards to the ex-employees' arbitration demands; they had received such notice in multiple other cases – including, for another of undersigned counsel's clients using the same general form of demand, a month earlier on February 10, 2023. Cohen Dec. Ex. 8. Thus, Respondents were already on notice, from early February and March 2023, both that the Minimum Standards would apply and also that they would "apply notwithstanding any contrary provisions in the parties' predispute arbitration agreement." *Id.* Respondents had likewise *already* been informed that their "agreement to proceed constitutes agreement" that the Minimum Standards would apply in these arbitrations. *Id.* Despite that, Respondents paid the case initiation fees in this matter without complaint or cavil about the Minimum Standards. And Respondents proceeded to engage in arbitrator selection without raising any dispute that the Minimum Standards applied and that they were responsible for paying forum fees as provided in the Minimum Standards. In so doing, Respondents waived any objection they might otherwise have had.

---

[11] The court in *Reed* construed the contract as requiring Navient to pay the appeal fees, but noted that the plaintiffs had not sought relief for Navient's breach of contract in not doing so. *Id.*, *3-4.

[12] https://www.jamsadr.com/arbitration-fees

Respondents' only argument on this point, aside from the misdirection about relevant dates, is that the notice that the Minimum Standards applied directed them to make further arguments to the arbitrator once appointed, and therefore they did not waive any objection by following that instruction. Opp at 19-20.[13] But when Respondents finally objected to the Minimum Standards, *that is not what they did*; rather, they filed objection letters and made arguments *to JAMS itself*. Cohen Dec. Exs. 6, 11. Thus, the argument that Respondents were simply choosing to wait to present their objections to individual arbitrators is empirically false, and Respondents could have taken the action they eventually did - appealing to JAMS as an organization and then declaring that they would not proceed under the Minimum Standards - in February, March, April, or May. Indeed, Respondents *currently* object to the Arbitrator even considering this issue, and have not filed objections with any other arbitrator. To the contrary, Respondents have refused to pay arbitral appointment fees that would allow other arbitrators to even consider such an objection. More, if Respondents *had* wished to raise the issue with the arbitrators, they could have informed JAMS (and Claimant and his colleagues) as much promptly on receipt of the notice. Instead, they continued to arbitrate under the Minimum Standards for months without raising any dispute at all, despite being specifically informed that such behavior would constitute consent to the Minimum Standards. On that record, Respondents waived any challenge they might otherwise have had.

**CONCLUSION**

Respondents' problem is of their own making; they drafted an arbitration agreement with provisions they now regret. That change of heart is no basis to deny the Motion, and the Arbitrator should grant the requested Interim Award.

Dated: September 12, 2023

---

[13] Respondents also suggest that a clerical error in misunderstanding JAMS' "consumer arbitration" checkbox should impact the Arbitrator's analysis. *See* Declaration of Kathryn Tewson. Not only is that argument unseemly, Respondents notably fail to submit a declaration suggesting that they in fact believed that this arbitration – unlike the others following the same template – would not be subject to the Minimum Standards. Indeed, Respondents do not even make that claim in unsworn attorney argument, merely gesturing at it in apparent hopes that the Arbitrator will mistakenly infer it. *See* Opp at 20 (studiously avoiding any claim that the checkbox impacted Respondents' subjective beliefs about Claimant's allegations or how JAMS would respond). At a *minimum*, the argument should be disregarded.

*/s/ Akiva M. Cohen*
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER & KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

# EXHIBIT 4

# JAMS ARBITRATION NO. 1601002342

| | |
|---|---|
| YUNFENG ZHANG,<br><br>Claimant,<br><br>-against-<br><br>TWITTER, INC., et al.,<br><br>Respondents. | **PARTIAL FINAL AWARD** |

Claimant Yunfeng Zhang ("Zhang") was employed by Respondent Twitter, Inc. ("Twitter") as a Senior Machine Learning Engineer from late June 2021 until February 2, 2023.[1] Prior to joining Twitter, Zhang signed a Dispute Resolution Agreement ("DRA").

Section 1 of the DRA requires Zhang to resolve "any dispute arising out of or related to [his] employment with Twitter" or the "termination of [his] employment." Section 3 of the DRA provides that the parties shall select the Arbitrator by mutual agreement, but that, if they could not agree, "the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures" ("JAMS Rules").

The DRA further provides in Section 6 that

> in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law, the Company is not required to pay all of the Arbitrator's or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes will be resolved by the Arbitrator.

Finally, Section 8 of the DRA, captioned "An Employee's Right To Opt Out of Arbitration" informed Zhang that:

> **Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.**

---

[1] In addition to Twitter, Zhang has named as Respondents X Holdings I, Inc., and Elon Musk. Respondent Twitter is described in the Demand for Arbitration as an entity that became a wholly-owned subsidiary of Respondent X Holdings I as the result of a merger in or around April 2022. Musk is described as a "natural person" who engineered the acquisition of Twitter and appointed himself "Chief Twit." For convenience, I will refer to the Respondents collectively as "Twitter."

(Bold face type in original). For an opt-out to be effective under Section 8, it must be submitted "to the Human Resources Department [of Twitter] within 30 days of the Employee's receipt of [the DRA]."

Zhang commenced this arbitration on February 13, 2023. Thereafter, JAMS advised the parties that the JAMS Policy on Employment Minimum Standards of Procedural Fairness ("Minimum Standards") would apply to this proceeding "notwithstanding any contrary provisions in the parties' pre-dispute arbitration agreement." Standard No. 6 of those Minimum Standards states, in part, that "[t]he only fee that an employee may be required to pay [in connection with an employment-related dispute] is JAMS' initial Case Management Fee. All other costs must be borne by the company, including any additional JAMS Case Management Fee and all professional fees for the arbitrator's services." A comment to the Standard cautions that this "does not preclude an employee from contributing to administrative and arbitrator fees and expenses."

Zhang has now moved for an interim award declaring that the DRA requires the Respondents to pay all JAMS' costs other than the initial filing fee because (a) this case is governed by the Minimum Standards, and (b) the Respondents waived any argument to the contrary by paying the case initiation fees and proceeding for a period of time under the Minimum Standards. Zhang further requests that I not consider his waiver argument unless I conclude that the DRA does not require Twitter to comply with the Minimum Standards.

For its part, Twitter contends that the Minimum Standards are inapplicable because Zhang was given an opportunity to opt out of the DRA entirely, provided he did so within 30 days. Twitter argues further that I should not reach this issue because JAMS has made clear that it will not administer this proceeding unless Twitter accedes to the applicability of Standard No. 6. Accordingly, in Twitter's view, I am impermissibly being asked to render an advisory opinion.

I heard oral argument with respect to Zhang's motion to October 25, 2023. Although Zhang maintains that he cannot be required to pay any additional fees with respect to this proceeding, he has remitted an amount equaling the funds posted by Twitter before Twitter concluded that Zhang had to split the ongoing costs of this proceeding. Zhang did so in an effort to ensure that there would be sufficient funds for the Arbitrator to consider the issues raised by his motion and to rule.

Rule 2(a) of the JAMS Rules provides, in substance, that the parties may amend the JAMS Rules so long as their agreement is consistent with the Minimum Standards. The Minimum Standards, in turn, provide that JAMS will accept an arbitration that is "based on a clause or agreement that is required as a condition of employment . . . only if the proceeding complies with the Minimum Standards," i.e., the employer pays all JAMS fees other than the initial case management fee. After Twitter urged JAMS to find that the Minimum Standards were inapplicable due to the opt-out provision in the DRA, JAMS adhered to its initial determination that the fees for this proceeding could not be apportioned. JAMS also stated in a notice to all parties that if Twitter refused to proceed under the Minimum Standards, JAMS would "decline to administer the arbitration." JAMS further observed that any further issue regarding the applicability of the Minimum Standards should be referred to the Arbitrator, who,

after hearing from the parties, could ask JAMS to review its decision, although JAMS would make the final determination.

The parties disagree as to the body of law that I should apply to resolve their dispute. Zhang maintains that I should look to the law of California, which is where the decision to terminate him allegedly was made. Twitter contends that federal and New York law are applicable because Section 1 of the DRA provides that it shall be "governed by the Federal Arbitration Act" and that, "[i]f the FAA is found not to apply, it shall be enforced pursuant to the laws of the state where the employee worked. Here, it is undisputed that Zhang worked for Twitter in New York.

Zhang's contention that I should apply California law is based on case law in that state indicating that an employer must pay all the costs of an arbitration if the parties' agreement "contains within its scope the arbitration of FEHA [California Fair Employment and Housing Act] claims." Armendariz v. Found. Health Psychcare Servs., Inc., 24 Cal. 4th 83, 113 (2000). However, as Twitter accurately notes, the DRA contains two choice of law provisions expressly calling for the application of either federal or New York law. The mere fact that Twitter (a Delaware corporation) has its principal place of business in California is not enough to suggest that the determination of who must pay all the JAMS and arbitrator fees should be determined pursuant to California law – even if, as Zhang contends, the decision to fire him was made in California in violation of FEHA.

In Section 6 of the DRA, the parties agreed that if the governing law does not compel Twitter to pay all the Arbitrators and JAMS' fees, "such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes will be resolved by the Arbitrator." Neither party has drawn my attention to any provision of the Federal Arbitration Act or New York law which spells out who must pay the costs associated with an employment arbitration. Accordingly, the law that Twitter contends applies is silent as to the proper outcome here.

What is clear – and undisputed – is that both parties agreed in the DRA to have their dispute heard before JAMS "pursuant to the then-current JAMS Rules." Rule 31 of the JAMS Rules provides insofar as relevant as follows:

> (a) Except as provided in paragraph (c) below, unless the Parties have agreed to a different allocation, each Party shall pay its pro rata share of JAMS fees and expenses as set forth in the JAMS fee schedule in effect at the time of the commencement of the Arbitration. To the extent possible, the allocation of such fees and expenses shall not be disclosed to the Arbitrator. JAMS' agreement to render services is jointly with the Party and the attorney or other representative of the Party in the Arbitration. The non-payment of fees may result in an administrative suspension of the case in accordance with Rule 6(c).
>
> . . .
>
> (c) If an Arbitration is based on a clause or agreement that is required as a condition of employment, the only fee that an Employee may be required

> to pay is the initial JAMS Case Management Fee. JAMS does not preclude an Employee from contributing to administrative and Arbitrator fees and expenses. If an Arbitration is not based on a clause or agreement that is required as a condition of employment, the Parties are jointly and severally liable for the payment of JAMS Arbitration fees and Arbitrator compensation and expenses. . . .

(Emphasis added).

Twitter contends that Rule 31(c)is inapplicable here because Section 8 of the DRA entitled Zhang to opt out of mandatory arbitration as long as he did so in a timely manner. What Twitter fails to acknowledge is that Twitter employees evidently are required to sign the DRA electronically as a condition of employment even though they then may opt out of its applicability if they choose to do so. The DRA, which contains mandatory arbitration language in Section 1, therefore constitutes "an agreement . . . required as a condition of employment" within the meaning of JAMS Rule 31(c). (Emphasis added). It follows that "the only fee that [Zhang] may be required to pay" in order to arbitrate his claims is "the initial JAMS Case Management Fee," even if he failed to opt out of the DRA within the thirty-day period set forth therein.

I therefore see no reason to ask JAMS to revisit its decision to require that Twitter pay all the fees other than the initial case management fee in connection with this proceeding. Nor do I believe that Zhang's request that I rule with respect to this issue is premature or constitutes an impermissible advisory opinion.[2] Accordingly, because I conclude that JAMS' administrative decision was consistent with both Standard 6 of the Minimum Standards and Rule 31(c) of the JAMS Rules, Zhang is entitled to a partial final award.[3]

## PARTIAL FINAL AWARD

For the foregoing reasons, Zhang's application is granted and Respondent Twitter, Inc., and Respondent X Holdings I, Inc. (as Twitter's affiliate, successor, subsidiary, or parent), will be required to pay all the JAMS fees and arbitrator fees (other than the initial case management fee) incurred in connection with this proceeding.[4]

SO ORDERED.

---

[2] In any event, Twitter cites no authority, nor am I aware of any, suggesting that an arbitrator – unlike a court – is unable to render an advisory opinion.

[3] Zhang's motion papers request the entry of an "interim award" compelling Twitter's compliance with the Minimum Standards. As became evident during oral argument, Zhang seeks an award that he can attempt to enforce immediately through a motion to compel should Twitter fail to comply. It is unclear that Zhang can secure such relief before the entry of a final award disposing of all the issues before the Arbitrator. See generally American Int'l Specialty Lines Ins. Co. v. Allied Capital Corp., 35 N.Y.3d 64, 72 (2020) (declining to adopt the federal courts' view "that partial determinations may be treated as final awards where the parties expressly agree both that certain issues submitted to the arbitrators should be decided in separate partial awards and that such awards will be considered to be final"). Nevertheless, because nothing remains to be decided by me with respect to the issue of responsibility for the payment of JAMS and arbitrator fees, I have captioned this award a "Partial Final Award."

[4] As Zhang apparently concedes, there has not been a sufficient showing at this juncture that respondent Musk can be required to pay any fees pursuant to the terms of the DRA. (See Zhang Reply Br. at 1 n.2).

Dated: New York, New York
November 30, 2023

Frank Maas
Arbitrator

# EXHIBIT 5

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

**1-800-352-JAMS**
**www.jamsadr.com**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

A. **Demand for Arbitration** *(2 copies)*

B. **Proof of service of the Demand on the appropriate party** *(2 copies)*

C. **Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

D. **Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.* JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.
- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

RESPONDENT NAME Twitter, Inc.

ADDRESS 1355 Market St #900

CITY San Francisco STATE CA ZIP 94103

PHONE (415) 222-9670 FAX EMAIL

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/COMPANY

ADDRESS

CITY STATE ZIP

PHONE FAX EMAIL

## FROM CLAIMANT

Add more claimants on **page 7**.

CLAIMANT NAME Burgious Frazier

ADDRESS [redacted]

CITY [redacted] STATE NY ZIP [redacted]

PHONE FAX EMAIL

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY Akiva M. Cohen

FIRM/COMPANY Kamerman, Uncyk, Soniker & Klein, P.C.

ADDRESS 1700 Broadway, 16th Floor

CITY New York STATE NY ZIP 10019

PHONE (212) 400-4930 FAX (866) 221-6122 EMAIL acohen@kusklaw.com

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐ If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION. A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) ______

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. ***Please cite location of arbitration provision and attach two copies of entire agreement.***

ARBITRATION PROVISION LOCATION

Frazier Burgious DRA JAMS.pdf (Attached)

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. ***Send the original response and counter-claim to the claimant at the address stated above with two copies to JAMS.***

## REQUEST FOR HEARING

REQUESTED LOCATION [redacted] [redacted]

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See:* ***Comprehensive Rule 16.1***

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

SIGNATURE /s/ Akiva M. Cohen DATE 2-13-2023

NAME (PRINT/TYPED) Akiva M. Cohen.

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

**Completion of this section is required for all consumer or employment claims.**

## CONSUMER AND EMPLOYMENT ARBITRATION

**Please indicate if this is a CONSUMER ARBITRATION. For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:**

☐ **YES**, this **is** a CONSUMER ARBITRATION.

☑ **NO**, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE: JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter. In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

**If this is an EMPLOYMENT matter, Claimant must complete the following information:**

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ **Less than $100,000** ☐ **$100,000 to $250,000** ☐ **More than $250,000** ☑ **Decline to State**

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.

JAMS

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

RESPONDENT NAME: X Holdings I, Inc.

ADDRESS: 1209 ORANGE ST

CITY: Wilmington STATE: DE ZIP: 19801

PHONE: FAX: EMAIL:

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY:

FIRM/ COMPANY:

ADDRESS:

CITY: STATE: ZIP:

PHONE: FAX: EMAIL:

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

RESPONDENT NAME: Elon Musk

ADDRESS: 1355 Market St #900

CITY: San Francisco STATE: CA ZIP: 94103

PHONE: FAX: EMAIL:

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY:

FIRM/ COMPANY:

ADDRESS:

CITY: STATE: ZIP:

PHONE: FAX: EMAIL:

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

CLAIMANT NAME

ADDRESS

CITY STATE ZIP

PHONE FAX EMAIL

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/ COMPANY

ADDRESS

CITY STATE ZIP

PHONE FAX EMAIL

## CLAIMANT #3

CLAIMANT NAME

ADDRESS

CITY STATE ZIP

PHONE FAX EMAIL

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/ COMPANY

ADDRESS

CITY STATE ZIP

PHONE FAX EMAIL

**CAUSE NO. ____________**

| | |
|---|---|
| **BURGIOUS FRAZIER,**<br><br>**CLAIMANT,**<br><br>**V.**<br><br>**TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,**<br><br>**RESPONDENTS.** | **JAMS** |

**CLAIMANT'S DEMAND FOR ARBITRATION**

Claimant Burgious Frazier ("Burgious") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

## I. INTRODUCTION

1. This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2. Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3. Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4. The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5. On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6. As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7. Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8. That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited:

"Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was ***not*** what would happen to them if Twitter carried out a layoff after the merger closed.

9. Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10. Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11. As detailed below, that worked; Burgious relied on Twitter's representation that he would have a safety net if he was terminated after the merger as part of his decision to remain at Twitter.

12. On January 4, 2023, after the close of the merger and one month before the notice period he was entitled to under the New York WARN Act, Burgious was laid off by Twitter. Yet Twitter has refused to provide him with the severance it promised.

## II. ARBITRATION PROVISION

13. This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Burgious signed. A copy of Burgious's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14. There is no arbitration agreement between Burgious and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Burgious' employment with Twitter.

## III. PARTIES

15. Claimant Burgious Frazier is a former Twitter employee residing in New York. While employed at Twitter, Burgious worked remotely from his home, [redacted] New York, and reported to a manager located at the New York City office.

16. Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

17. Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18. Respondent X Holdings I is a Delaware corporation.

19. Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20. On information and belief, neither Twitter, X Holdings I, nor Musk is presently represented by counsel in connection with this action.

## IV. FACTUAL BACKGROUND

### A. Burgious Was A Dedicated Twitter Employee

21. Burgious is a graphic designer, and was employed by Twitter as a Senior Designer.

22. Burgious accepted his position with Twitter on or about August 27, 2021, began work on or about September 21, 2021, and remained continuously employed by Twitter until he was laid off on January 4, 2023.

23. Twitter made several promises to Burgious during the course of his employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24. Other promises were made more recently, including promises that, Burgious would maintain at least the same base salary and wage rate, that his employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide **him** with a severance package that was at least as favorable as those it had long offered.

25. These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B. Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered

26. Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

27. Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

**C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.**

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

> (a) Continuing Employee Benefits. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those*

> *applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Burgious in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:
    - Two months base salary or On Target Earnings for employees on the Sales Incentive Plan
    - Pro-rated Performance Bonus Plan compensation at target
    - Cash value of equity that would have vested within three months from the separation date
    - A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Burgious did, in fact, rely upon these representations.

82. The promised severance in fact factored into Burgious' decision to remain at Twitter through the closing of the merger.

83. To put it simply, Burgious was aware that he had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, he would receive a significant sum as a severance payment, which would help provide him time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Burgious would have begun the interview process to find a more stable employment situation in mid-May.

85. Instead, Burgious chose to remain at Twitter.

### D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement

86. On October 26, 2022, Musk took over as the owner of Twitter.

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98. The next day, roughly half of Twitter's workforce, including Burgious, were laid off.

99. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100. Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101. But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102. These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103. In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

104. He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105. Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

106. Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107. As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108. But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109. As part of this wave of layoffs, a substantial number of employees, were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

110. And yet again, that still wasn't enough.

111. After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

112. The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

113. After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

114. Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

115. The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

116. All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

117. The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

118. Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

119. On information and belief, Musk routinely violates agreements as a that would require him to expend money matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

120. In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

121. For that reason, Burgious – along with hundreds (hopefully thousands) of his former colleagues filing similar claims – brings this arbitration to vindicate his rights and recover the amounts Twitter owes him, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V. CAUSES OF ACTION

### A. Count One (against Twitter and X Holdings I): Breach of Merger Agreement

122. Burgious restates and realleges each paragraph above as if fully stated herein.

123. Burgious is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

124. Twitter has breached the Merger Agreement by refusing to pay Burgious the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

125. X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Burgious the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Burgious *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Burgious will provide in briefing if and as necessary. Burgious raises the issue here as part of his duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

126. As such, Burgious is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**B. Count Two: (against Twitter) Breach of Oral Contract**

127. Burgious restates and realleges each paragraph above as if fully stated herein.

128. The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

129. Burgious accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

130. Burgious provided Twitter with consideration for its promise by continuing to work at Twitter through that period until he was laid off on January 4, 2023.

131. As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Burgious with the severance outlined in the Severance Policy Email, which he fully performed.

132. Twitter has breached this agreement by refusing to pay Burgious the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Burgious.

133. As such, Burgious is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**C. Count Three (in the alternative, against Twitter): Promissory Estoppel**

134. Burgious restates and realleges each paragraph above as if fully stated herein.

135. To the extent that Twitter's communications and Burgious' subsequent conduct somehow did not create an enforceable contract between Burgious and Twitter, Twitter's

representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

136. The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

137. Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

138. It was reasonable for Burgious to rely upon that promise.

139. Burgious did in fact rely upon that promise.

140. Burgious was damaged by that reasonable reliance, in that it negatively impacted his ability to find alternative employment in advance of the merger.

141. Twitter's promise to provide Burgious with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Burgious with such severance.

142. As such, Burgious is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D. Count Four (against Twitter): Breach of Offer Letter**

143. Burgious restates and realleges each paragraph above as if fully stated herein.

144. On or about August 27, 2021, Burgious executed an offer letter from Twitter, which detailed the terms of Burgious' employment (the "Offer Letter").

145. The Offer Letter constitutes a binding contract between Burgious and Twitter.

146. The Offer Letter provides that Burgious will be eligible to receive benefits under the terms of Twitter's benefits plans.

147. Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Burgious was entitled to receive the benefit of when Twitter terminated Burgious.

148. Twitter did not provide Burgious with severance in accordance with its benefit plan.

149. As such, Twitter breached the Offer Letter, and Burgious is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E. Count Five (against all Respondents): Fraud**

150. Burgious restates and realleges each paragraph above as if fully stated herein.

151. In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

152. Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

153. In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

154. On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

155. Burgious did rely upon these representations.

156. On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

157. Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that

requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

158. On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

159. When it laid off Burgious, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

160. As a result of Respondents' fraud, Burgious suffered damages.

161. As such, Burgious is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

162. In addition, Burgious is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

163. On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

164. In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Burgious agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F. Count Six: WARN Act Violations**

165. Burgious restates and realleges each paragraph above as if fully stated herein.

166. The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

167. On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

168. In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Burgious.

169. Instead, Twitter designated the period from November 4, 2022 through January 4, 2023 as a period during which Burgious would remain employed but in a 'nonworking' status.

170. However, Twitter has failed to continue to provide the laid-off employees (including Burgious) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

171. For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

172. Twitter also provided other "annually refreshing" benefits to its employees.

173. Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Burgious, despite those employees continuing to be employed by Twitter on January 1, 2023.

174. Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

175. As a result of Twitter's violation of the WARN Act, Burgious is entitled to damages to be proven at hearing, including Burgious's benefits for the "Non-Working Notice period window" to which Burgious was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**G. Count Seven: New York WARN Act Violations.**

176. Burgious is a remote worker, and thus, for State and Federal WARN Act purposes, his single site of employment is the Twitter office to which he was assigned.

177. Under that standard Burgious' single site of employment is Twitter's New York City office.

178. The New York State WARN Act, New York Labor Law Article 25-A et seq ("New York WARN Act") required Twitter to provide Burgious with 90 days' notice before it could terminate him, not merely 60 days' notice.

179. Despite that, Twitter terminated Burgious on only 60 days' notice.

180. As a result of Twitter's violation of the New York WARN Act, Burgious is entitled to damages to be proven at hearing, including Burgious' salary and benefits for the 90 days' notice to which Burgious was entitled, the value of any RSUs which would have vested in that 90-day period, the value of any RSU vests which would have been included in Burgious' severance had Burgious remained employed for that 90-day period, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute

**H. Count Eight: Employment Discrimination**

181. Burgious restates and realleges each paragraph above as if fully stated herein.

182. Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

183. For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

184. In addition, New York Human Rights Law bars discrimination in employment.

185. Despite those laws, the anecdotal evidence currently available to Burgious indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

186. Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

187. Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

188. Compounding these warning signs, Twitter has refused to respond to Burgious' counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Burgious to confirm or rebut the picture painted by the available anecdotal information.

189. Burgious is Person of Color.

190. Burgious is an older employee.

191. On information and belief, Burgious was included in the mass layoff because he is a Person of Color and an older employee.

192. The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

193. As a result of the foregoing, Twitter has violated Federal, New York, and California antidiscrimination law, and Burgious is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

**I. Count Nine (Against Twitter, X Holdings I, and Musk): Wage Theft**

194. Burgious restates and realleges each paragraph above as if fully stated herein.

195. Under both New York and California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

196. Under New York and California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

197. Under California law, engaging in such wage theft triggers waiting time penalties in the amount of 1/365th of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

198. Under New York law, engaging in such wage theft triggers a liquidated damages penalty of up to one hundred percent of the total amount of the wages determined to be due.

199. Under California and New York law, Burgious may bring claims for wage theft against not only Twitter, but X Holdings I and Musk as an individual.

200. As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Burgious' unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**J. Count Ten (Against Musk): Piercing the Corporate Veil**

201. Burgious restates and realleges each paragraph above as if fully stated herein.

202. There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

203. Musk, through X Holdings I, owns more than 50% of Twitter.

204. Musk dominates Twitter's decision-making and operations.

205. For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

206. Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

207. Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

208. At Musk's direction, Twitter restored Anglin's account.

209. Twitter has engaged in other content moderation decisions at Musk's whims.

210. For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

211. After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

212. Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

213. On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

214. On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

215. On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

216. Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

217. On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

218. On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

219. Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

220. As such, Burgious is entitled to an award holding Musk personally liable for any amounts awarded on her other claims.

## VI. REQUEST FOR RELIEF

221. Wherefore, Burgious Frazier respectfully requests that the Arbitrator:

a. Award Burgious compensatory damages in an amount to be proven at hearing;

b. Award Burgious penalty damages under the WARN Act and New York WARN Act, and California, New York and federal antidiscrimination laws;

c. Award Burgious liquidated damages under New York Labor Law;

d. Award Burgious waiting time penalties under the California Labor Code;

e. Award Burgious punitive damages in the amount of $500,000,000.00;

f. Award Burgious costs and attorneys' fees as allowed by statute;

g. Award Burgious pre- and post-judgment interest; and

h. Award Burgious such other and further relief as the Arbitrator deems appropriate.

Respectfully Submitted,

*/s/ Akiva M. Cohen*
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER & KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com